**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TERRENCE ZEHRER, Derivatively on Behalf of HARBOR INTERNATIONAL FUND, <br><br> Plaintiff, <br><br> v. <br><br> HARBOR CAPITAL ADVISORS, INC., <br><br> Defendant, <br> -and- <br> HARBOR INTERNATIONAL FUND, <br><br> Nominal Defendant. | Case No. 1:14-CV-00789 <br><br> Honorable Joan Humphrey Lefkow |

**MEMORANDUM IN SUPPORT OF MOTION OF
<u>HARBOR CAPITAL ADVISORS, INC. TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement..................................................................................................1

II.     The Applicable Law....................................................................................................2

III.    Argument ....................................................................................................................6

      A.      Plaintiff Has Failed to Allege Facts Giving Rise to an Inference that HCA's Advisory Fee Was "Excessive" Under *Jones* and *Gartenberg*...............................6

      B.      The Allegations of the Complaint Do Not Satisfy Any of the *Gartenberg* Factors.....................................................................................................................10

            1.      Plaintiff Fails to Allege Facts Calling into Question the  Independence or Thoroughness of the Independent Trustees. ..........................................10

            2.      The Complaint Fails to Allege Facts Giving Rise to an Inference that HCA Charged an Excessive Fee Under Any of the Remaining *Gartenberg* Factors. ....................................................................................14

                  (a)     Nature and Quality of the Services Provided................................14

                  (b)     Profitability of the Fund to the Adviser ........................................18

                  (c)     Economies of Scale........................................................................20

                  (d)     Comparative Fee Structures...........................................................23

                  (e)     Fallout Benefits..............................................................................24

IV.     Conclusion ................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*In re Am. Mut. Funds Fee Litig.*,
  No. 04-CV-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), *aff'd sub
  nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir.
  2011) ................................................................................................................18, 19

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
  464 F.3d 338 (2d Cir. 2006)................................................................ *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................6, 8, 10, 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................6, 8, 10, 18

*Benak v. Alliance Capital Mgmt., L.P.*,
  No. 01-CV-5734, 2004 WL 1459249 (D.N.J Feb. 9, 2004) ....................................5

*Bissessur v. Indiana Univ. Bd. of Trustees*,
  581 F.3d 599 (7th Cir. 2009) ................................................................6

*Burks v. Lasker*,
  441 U.S. 471 (1979)................................................................3

*Cox v. ING Inv., LLC*,
  No. 1:13-CV-01521 (D. Del. filed Aug. 30, 2013)................................................7

*Curd v. SEI Inv. Mgmt. Corp.*,
  No. 2:13-CV-07219 (E.D. Pa. filed Dec. 11, 2013)................................................7

*In re Evangelist*,
  760 F.2d 27 (1st Cir. 1985)................................................................4

*In re Evergreen Mut. Funds Fee Litig.*,
  240 F.R.D. 115 (S.D.N.Y. 2007) ................................................................21

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982)................................................................ *passim*

*Hamilton v. Allen*,
  396 F. Supp. 2d 545 (E.D. Pa. 2005) ................................................................15

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ................................................................7, 15

*Henson v. CSC Credit Servs.*,
   29 F.3d 280 (7th Cir. 1994) ...............................................................................7

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008)................................................................20

*Jones v. Harris Assocs. L.P.*,
   527 F.3d 627 (7th Cir. 2008), *vacated by* 559 U.S. 335 (2008) ...........................4, 9

*Jones v. Harris Assocs., L.P.*,
   559 U.S. 335 (2010)................................................................................... *passim*

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991), *cert.
   denied*, 112 S. Ct. 75 (1991) ..........................................................................19

*Kamen v. Kemper Fin. Servs., Inc.*,
   908 F.2d 1338 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991)...........4

*Krantz v. Prudential Inv. Fund Mgmt., LLC*,
   305 F.3d 140 (3d Cir. 2002)...........................................................................12

*Krinsk v. Fund Asset Mgmt., Inc.*,
   715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ..................19

*Krinsk v. Fund Asset Mgmt, Inc.*,
   875 F.2d 404 (2d Cir. 1989).............................................................................21

*McClure v. Russell Inv. Mgmt. Corp.*,
   No. 1:13-CV-12631 (D. Mass. filed Oct. 17, 2013) ...............................................7

*Meyer v. Oppenheimer Mgmt. Corp.*,
   707 F. Supp. 1394 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ...............19

*Migdal v. Rowe Price-Fleming Int'l Inc.*,
   248 F.3d 321 (4th Cir. 2001) .....................................................................12, 23

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) .............................................................................7

*In re Salomon*,
   528 F. Supp. 2d 332 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other
   grounds sub nom. The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon
   Bros. All Cap Value Fund*, 425 Fed. App'x 25 (2d Cir. 2011).........................20, 21

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
   663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987), *cert.
   denied*, 108 S. Ct. 1594 (1988) .......................................................................19

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    835 F.2d 45 (2d Cir. 1987)........................................................................4

*In re Scudder Mut. Funds Fee Litig.*,
    No. 04-CV-1921, 2007 WL 2325862 (S.D.N.Y. Aug 14, 2007)................................20, 21, 23

*Steinberg v. Janus Capital Mgmt.*,
    457 F. App'x 261 (4th Cir. 2011)............................................................15

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002)......................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................7

## Federal Statutes

15 U.S.C. § 80a-2(a)(19).............................................................................12

15 U.S.C. § 80a-10(a) .............................................................................1, 3

15 U.S.C. § 80a-15(c) .............................................................................1, 17

15 U.S.C. § 80a-17(i).................................................................................18

15 U.S.C. § 80a-35(b) ........................................................................ *passim*

15 U.S.C. § 80a-46(b).................................................................................15

## Rules

Fed. R. Civ. P. 12(b)(6)...............................................................................1

Fed. R. Civ. P. 23.1...................................................................................15

## Other Authorities

S. Rep. No. 91-184 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897..............................18

Defendant Harbor Capital Advisors, Inc. ("HCA") respectfully submits this memorandum in support of its Motion to Dismiss the Verified Complaint of plaintiff Terrence Zehrer pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted under § 36(b) of the Investment Company Act of 1940 (the "ICA"), as amended, 15 U.S.C. § 80a-35(b) ("§ 36(b)").

## I.        PRELIMINARY STATEMENT

Harbor Funds is a Delaware statutory trust and a registered open-end management investment company, commonly referred to as a mutual fund. Shares issued by Harbor Funds are divided into multiple series, one of which is Harbor International Fund (the "Fund"), named as a nominal defendant in this action. (Verified Complaint ("Compl."), ¶ 8 and n. 1)[1] Plaintiff Terrence Zehrer alleges that he is a shareholder in the Fund.

During most of the time period relevant to the Complaint, the Fund was governed by a Board of six Trustees, five of whom (the "Independent Trustees") were not, and are not today, "interested persons," as that term is defined in the ICA. 15 U.S.C. § 80a-2(a)(19). Defendant HCA serves as the investment adviser to the Fund pursuant to investment advisory agreements which must be, and were, approved annually by a majority of the Independent Trustees, as well as by the Board as a whole. 15 U.S.C. § 80a-15(c). The investment advisory agreements require HCA to perform a range of services on behalf of the Fund, some of which HCA performs directly and some of which are performed by a subadviser selected, monitored and overseen by HCA in accordance with the investment objectives and related policies of the Fund. Under HCA's management, the Fund has grown from $15 billion to $48 billion in less than eight years. (Compl., ¶¶ 8, 24)

---

[1]        The Fund has separately moved to dismiss plaintiff's Complaint.

Pursuant to the investment advisory agreements, HCA is compensated for the range of services it performs and for payments it makes on the Fund's behalf based upon a fraction of one percent of the average daily net asset value of the Fund. The rate at which HCA is compensated is based upon a declining scale, employing "breakpoints" at specified asset levels, ranging from 0.75% on the first $12 billion in assets under management to 0.58% on assets over $36 billion.

Plaintiff Zehrer filed the one count Complaint in this action claiming that the investment management fee paid to HCA for the services it performs and expenses it incurs on the Fund's behalf, as authorized by the Independent Trustees and full Board of the Fund, purportedly is excessive, in violation of § 36(b) of the ICA. Zehrer's Complaint appears to be part of a general assault by his attorneys on the mutual fund industry -- or at least the segment of that industry that utilizes the services of subadvisers -- and is the fourth installment in a series of complaints they have filed in a five month period against unrelated investment advisers to unrelated funds, each of which is accused (in allegations frequently copied rote from one complaint to another) of charging "excessive" fees.

The generic and conclusory allegations in Mr. Zehrer's Complaint are insufficient, as a matter of law and of federal pleading requirements, to state a claim for relief under § 36(b) of the ICA. The Complaint therefore should be dismissed.

## II. THE APPLICABLE LAW

A mutual fund "is a pool of assets, consisting of portfolio securities, and belonging to the individual investors holding shares in the fund." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010). A mutual fund does not have employees of its own, but rather relies upon "[a] separate entity called an investment adviser," which "manages the fund's investments, and provides other services" to the fund. *Id.*

Mutual funds are subject to, and regulated by, the ICA, which requires that each fund have a board of directors or trustees (depending upon how the fund is legally organized), no more than 60% of whom may be "interested persons." *Id.* at 339; 15 U.S.C. § 80a - 10(a).[2] The ICA gives the independent trustees (or directors) of a fund "a host of special responsibilities," among which is that they "review and approve the contracts of the investment adviser annually, and a majority of these directors must approve an adviser's compensation." *Jones*, 559 U.S. at 340 (internal citations and quotations omitted). The ICA entrusts the independent trustees of a fund with "the primary responsibility for looking after the interests of the funds' shareholders," serving as "an independent check upon the management of investment companies." *Burks v. Lasker*, 441 U.S. 471, 484 (1979) (internal citation and quotation omitted).

Section 36(b) of the ICA, in turn, imposes upon investment advisers a fiduciary duty "with respect to the receipt of compensation for services, or of payments of a material nature, paid by . . . [a] . . . registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b). The same section of the ICA permits a shareholder to bring an action for breach of this duty but, in a significant departure from common law principles, places the burden of proving a breach of fiduciary duty squarely on the shareholder-plaintiff. 15 U.S.C. § 80a-35(b)(1); *Jones*, 559 U.S. at 347 ("[t]he Investment Company Act modifies this duty in a significant way: it shifts the burden of proof from the fiduciary to the party claiming the breach"). If the shareholder meets his or her burden to establish a breach of duty, a court may award actual damages not exceeding

---

[2]     The Harbor Funds Board of Trustees far exceeds this statutory requirement. As plaintiff Zehrer's Complaint acknowledges, as of 2012, only one of the six trustees of Harbor Funds was an "interested person." (Compl., ¶ 30 and n. 2) Two additional Independent Trustees joined the Board in January 2014, bringing the total number of Trustees to eight (Compl., ¶ 8, n. 1), of whom seven are independent. Brief biographical sketches of the seven distinguished Independent Trustees appear *infra* at pages 11-12.

the amount of compensation received by the adviser in the one year period preceding the filing of the complaint. 15 U.S.C. § 80a-35(b)(3). Plaintiff Zehrer's Jury Trial Demand notwithstanding, there is no right to a jury trial in § 36(b) actions, as the Seventh Circuit has expressly held. *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991); *see also In re Evangelist*, 760 F.2d 27, 29-31 (1st Cir. 1985); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 835 F.2d 45, 46 (2d Cir. 1987).[3]

The standard against which a § 36(b) "excessive" fee claim is measured is a stringent one, as the United States Supreme Court recently affirmed in its landmark decision in *Jones*. There the Supreme Court approved as "correct in its basic formulation of what § 36(b) requires" the earlier decision of the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982).[4] *Jones*, 559 U.S. at 345-46. Under that standard, an advisory fee is excessive for purposes of a claim under § 36(b) only if a plaintiff establishes that the fee is "*so disproportionately* large that it bears *no reasonable relationship* to the services rendered and *could not have been* the product of arm's-length bargaining." *Id.* at 346 (emphasis added). Thus, the question such a claim poses is *not* whether an investment advisory fee is "reasonable" by some subjective measure; to the contrary, § 36(b) does not "permit a compensation agreement to be reviewed in court for 'reasonableness.'" *Id.* at 341.

The standard embodied in § 36(b) "represented a delicate compromise" between a proposal advanced by the SEC -- which would have enabled the SEC to challenge fees that were not "reasonable" -- and investment industry representatives, who objected to the SEC proposal

---

[3]     Given the Seventh Circuit's express ruling in *Kamen*, plaintiff's Jury Trial Demand contravenes directly controlling authority, and should be stricken.

[4]     *Jones* reached the Supreme Court on petition for a writ of certiorari from a ruling of the Seventh Circuit, which had rejected the *Gartenberg* standard. 559 U.S. at 342-43 (citing *Jones v. Harris Assocs., L.P.*, 527 F.3d 627 (7th Cir. 2008), *vacated and remanded*, 559 U.S. 335 (2010)).

on the ground that it essentially would vest the SEC with "ratemaking authority." *Jones,* 559 U.S. at 340-41. Congress recognized that subjecting advisory fees to a "reasonableness" review would have the undesired effect of "charging the courts with rate-setting responsibilities," a task for which the courts "are not well suited." *Id.* at 352-53. Consequently, the Supreme Court stressed in *Jones* that "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of board decisions" approving an advisory fee. *Id.* at 352.

The *Gartenberg* decision, approved by the Supreme Court in *Jones*, established a non-exclusive list of six factors typically considered in determining whether an advisory fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. Those six factors are: (1) the independence, expertise, and conscientiousness of the independent members of the fund board in evaluating and approving the advisory fee; (2) the nature and quality of the services provided to a fund and its shareholders; (3) the profitability to the adviser of its relationship with the fund; (4) whether economies of scale, if any, are shared with fund investors; (5) comparative fee structures; and (6) "fall-out" benefits resulting to the adviser. *Gartenberg,* 694 F.2d at 929-32. No single factor is dispositive of this inquiry. *See Benak v. Alliance Capital Mgmt., L.P.*, No. 01-CV-5734, 2004 WL 1459249, at *9 (D.N.J Feb. 9, 2004) (dismissing § 36(b) complaint where plaintiff "ha[d] not pointed to a single case where allegations of excessive fees were sustained on the basis of only one of the six factors").

In assessing whether a complaint states a claim that advisory fees at issue in a given case were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining, a court must disregard conclusions couched as factual allegations, as well as allegations that "amount to nothing more

5

than a 'formulaic recitation of the elements'" of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) ("threadbare recitation of the elements of a claim without factual support" do not suffice). After excluding conclusory allegations from consideration, a court must determine from the remaining well pleaded allegations "whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," *id.* at 678, and a complaint pleading facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility . . . ." *Id.* (citing *Twombly*, 550 U.S. at 557). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (internal citation and quotation omitted).

## III.    ARGUMENT

### A.    Plaintiff Has Failed to Allege Facts Giving Rise to an Inference that HCA's Advisory Fee Was "Excessive" Under *Jones* and *Gartenberg*

Plaintiff's Complaint makes a number of generalized allegations concerning the mutual fund industry as a whole (Compl., ¶¶ 10-12, 22-23), but alleges few facts pertaining to the single fund and investment advisory fee at issue in this case. Generalized assumptions regarding the industry, however, cannot suffice to state a claim under § 36(b). *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 342-44 (2d Cir. 2006) (affirming dismissal of § 36(b) claim where complaint "rel[ied] heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders," but failed to "set forth those facts necessary to a finding that the fees were excessive").

As to HCA, Mr. Zehrer's Complaint rests on a few essential propositions: (1) that after payment of subadvisory fees, HCA retains a "substantial portion" of the advisory fee paid by the Fund (Compl., ¶ 2); (2) that HCA ostensibly performs "almost no work" or "minimal" work for the portion of the fee left to it after payment of subadvisory fees (Compl., ¶¶ 2, 19); (3) that HCA ostensibly has not adequately shared asserted economies of scale that plaintiff presumes HCA has experienced (Compl., ¶ 24); and (4) that because these vacant allegations purportedly demonstrate that the advisory fee paid to HCA was excessive, the Fund's Independent Trustees and full Board could not, in plaintiff's view, have acted conscientiously in approving the fee. However, if these allegations demonstrate any failure to act "conscientiously," the failure is not that of the Fund's Independent Trustees and full Board, but rather in plaintiff's pre-filing investigation.

Many of the allegations in Mr. Zehrer's Complaint are simply recycled from three earlier § 36(b) actions filed since August 30, 2013 by one of the same law firms representing the plaintiff in this case.[5] Among the "factual" allegations lifted intact from these prior complaints, which were brought against unrelated investment advisers serving unrelated mutual funds, are plaintiff's allegations concerning the asserted existence of "significant economies of scale" that

---

[5] The three other actions filed by one of plaintiff's law firms are *Cox v. ING Inv., LLC,* No. 1:13-CV-01521 (D. Del. filed Aug. 30, 2013); *McClure v. Russell Inv. Mgmt. Corp.,* No. 1:13-CV-12631 (D. Mass. filed Oct. 17, 2013); and *Curd v. SEI Inv. Mgmt. Corp.,* No. 2:13-CV-07219 (E.D. Pa. filed Dec. 11, 2013). The complaint in each of these actions is in the public record, and may be considered by the Court on HCA's motion to dismiss. *Pugh v. Tribune Co.,* 521 F.3d 686, 691, n. 2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment"); *Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir. 1994) (on a motion to dismiss, a court may take notice of documents in the public record, including public court documents). A compilation of excerpts from the complaints in the cases is attached as Exhibit 1 to the Declaration of Paul J. Walsen submitted in support of HCA's motion. The other Exhibits to the Walsen Declaration are either publicly available documents, documents referenced in the Complaint, or both. Both the Supreme Court and the Seventh Circuit have approved consideration of documents referenced in a complaint in ruling on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (internal citation omitted); *Hecker v. Deere & Co.,* 556 F.3d 575, 582 (7th Cir. 2009).

ostensibly have been "appropriated for the benefit" of HCA rather than "being shared with" the Fund (Compl., ¶ 24); the allegedly insubstantial "incremental costs" to HCA (after payment of subadvisory fees) (Compl., ¶ 26); the supposed inability of the Fund's Independent Trustees to "properly monitor" the Fund (Compl., ¶ 32); the claim that HCA's retention of a subadviser, Northern Cross LLC ("Northern Cross") "has no effect on the management fees" charged by HCA to the Fund, which ostensibly "are not based on the services actually rendered" (Compl., ¶ 19); and the purportedly "minimal" responsibilities assumed by HCA. (Compl., ¶ 21) A number of other allegations in Mr. Zehrer's Complaint come directly out of the three complaints recently filed by his counsel against other investment advisers. Even the allegations that HCA's fees "are unreasonable and hugely excessive" (Compl., ¶ 26) and "are disproportionate to the value of the services rendered, and therefore excessive" in light of supposed "excess profits resulting from economies of scale" (Compl., ¶ 25), as well as the allegation that "[t]he Board's lack of conscientiousness resulted in fees that are disproportionate to the value of the services rendered" (Compl., ¶ 35), all come directly out of these prior complaints. *See* Walsen Exhibit 1.

These are "factual" allegations stamped mechanically from a template in litigation brought on an industrial scale, not allegations believed, after reasonable inquiry into the facts of a particular case, to have evidentiary support. And neither they, nor any other allegations in the Complaint, can serve to raise plaintiff's claims above the speculative level insufficient under the Supreme Court's decisions in *Iqbal* and *Twombly*.

Stripped of the generic and conclusory allegations, the "facts" alleged by plaintiff fail to state a claim for relief under § 36(b). Those "facts" are insufficient as a matter of law and, in addition, are in many instances contradicted by plaintiff's own allegations, by the same documents that he cites as *support* for his allegations, or by information in the public domain that

plaintiff has chosen to ignore. The Complaint also is silent on several of the factors used by the courts to determine the adequacy of § 36(b) allegations. Some of the more glaring factual deficiencies in the Complaint, discussed in greater detail below, include the following:

- The Complaint ignores the qualifications of the Independent Trustees and the processes they employed in reaching their decision to approve the advisory fees paid to HCA -- information available to plaintiff from documents referenced in the Complaint and available in the Fund's public SEC filings. It does so notwithstanding the Supreme Court's admonition in *Jones* (citing *Gartenberg*) that "the expertise of the independent trustees of a fund, whether they are fully informed about all the relevant facts bearing on the [investment adviser's] service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered" in assessing a § 36(b) claim. 559 U.S. at 349. Rather than pleading any facts identifying any supposed inadequacies in the process employed by the Independent Trustees or the exhaustive information they considered in reaching their decision, plaintiff offers only circular logic and speculative assumptions that repeatedly have been rejected by the courts.

- Plaintiff's allegation that HCA does "almost no work" for the portion of the management fee remaining after payment of more than half of the advisory fee to HCA's portfolio management subadviser is squarely contradicted by the same documents cited by plaintiff, as well as by plaintiff's own allegations. The inference that plaintiff seeks to draw -- that HCA does nothing for the advisory fee it earns -- is simply implausible under the facts alleged and contradicted by the very Investment Advisory Agreement quoted in the Complaint.

- Plaintiff's allegations regarding the amount of investment management fees paid to HCA by the Fund relate to the year 2012 (Compl., ¶¶ 19-20), a year that falls entirely outside the applicable one-year recovery period under § 36(b), that extends from February 4, 2013 to February 4, 2014. A fund shareholder may not recover damages "for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3).

- Plaintiff alleges that HCA has failed to share economies of scale with the Fund's shareholders because it has charged the Fund the same rate for its services *since March 2006* (0.75% for the first $12 billion of assets under management ("AUM") and 0.65% for AUM above $12 billion.) (Compl., ¶ 24) In fact, HCA has implemented significant additional "breakpoints" or fee reductions through publicly disclosed, contractual fee waivers that reduced its fee to 0.63% on AUM in excess of $24 billion and 0.58% on AUM in excess of $36 billion. *The existence of these waivers, which have*

> *been in effect throughout the relevant time period, appears in the very same publicly filed documents referenced by plaintiff in the Complaint.*

- The Complaint contains no allegations whatsoever comparing the expense to shareholders of an investment in the Fund to the expense of an investment in similar funds, even though such comparative data is public and readily available to the plaintiff and other Fund shareholders.

Any purported "factual" allegations in plaintiff's Complaint do not give rise to a plausible inference under *Twombly* and *Iqbal* that the fees at issue were excessive under the demanding *Jones* standard. The facts that plaintiff has omitted or misstated amply demonstrate that he could never state a claim for a violation of § 36(b).

**B.**  **The Allegations of the Complaint Do Not Satisfy Any of the *Gartenberg* Factors**

**1.**  **Plaintiff Fails to Allege Facts Calling into Question the Independence or Thoroughness of the Independent Trustees.**

In recognizing the continued vitality of the *Gartenberg* factors in analyzing § 36(b) claims, the Supreme Court in *Jones* first addressed the significance of the business judgment exercised by independent directors or trustees in approving an advisory fee. *Jones*, 559 U.S. at 348. Under *Jones*, "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Id.* at 351. The board's judgment is entitled to deference, the degree of which depends upon the level of care with which the independent trustees performed their duties. *Id.* at 349. Where a board's process is robust, *Jones* requires that a court should give "commensurate deference to the outcome of the bargaining process." *Id.* at 351.

Mr. Zehrer's Complaint reveals nothing about the backgrounds and expertise of the Independent Trustees. And for ample reason: as appears from the Harbor Funds Statement of Additional Information referenced in paragraph 18 of the Complaint, the Independent Trustees of

the Fund are distinguished and highly capable business leaders and scholars, with specialized

expertise in economics, accounting, and investment management:

- Independent Trustee Raymond J. Ball is the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago Booth School of Business. He focuses on corporate disclosure, earnings and stock prices, international accounting and finance, market efficiency and investment strategies. Mr. Ball has served on the Fund's Board since 2006. (*See* Statement of Additional Information effective February 1, 2014, at 37 (filed with the SEC January 29, 2014), pertinent portions of which are attached as Walsen Exhibit 2).

- Independent Trustee Donna J. Dean is the Chief Investment Officer of the Rockefeller Foundation, a philanthropic organization established by the Rockefeller family in 1913. Prior to joining the Rockefeller Foundation, she served as Director of Investments at Yale University. Ms. Dean has been a member of the Fund's Board since 2010. (*Id.*)

- Independent Trustee John P. Gould is the Steven G. Rothmeier Professor and Distinguished Service Professor of Economics at the University of Chicago Booth School of Business. Mr. Gould has served on the Fund's Board since 1994. He also has served on the boards of other mutual fund families. (*Id.* at 37)

- Independent Trustee Randall A. Hack is a Senior Managing Director and Founder of Capstone Capital LLC, a firm which invests in private companies. He formerly served as President of the Princeton University Investment Company, which is the entity responsible for managing the endowment of Princeton University. Mr. Hack has served on the Fund's Board since 2010. (*Id.* at 37-38)

- Independent Trustee Robert Kasdin is a Senior Executive Vice President of Columbia University; prior to joining Columbia, he was the Executive Vice President and Chief Financial Officer of the University of Michigan. He began his career as a corporate attorney with the firm of Davis Polk & Wardwell. Mr. Kasdin joined the Fund's Board in 2014. (*Id.* at 38)

- Lead Independent Trustee Rodger F. Smith is a Managing Director of Greenwich Associates, a research-based consulting firm, where he focuses on issues impacting the investment management industry. Mr. Smith has served on the Fund's Board since 1987. (*Id.*)

- Independent Trustee Ann M. Spruill recently retired from the private investment management firm GMO & Co. LLC, where she was a partner, portfolio manager and the Head of the International Active Equities Division. Ms. Spruill joined the Fund's Board in 2014. She also serves as

a Trustee for the Financial Accounting Foundation, and as a member of the Investment Committee and Chair of Global Equities for the Museum of Fine Arts in Boston and as a Trustee of the University of Rhode Island. (*Id.*)

Plaintiff's only purported "factual" allegations challenging either the independence or conscientiousness of the Board in approving the fees paid to HCA are: (1) that the Trustees oversee multiple funds in the Harbor complex, from which plaintiff infers that the Trustees "cannot properly monitor" the Fund (Compl., ¶ 32); and (2) that the Trustees receive compensation for their Board service. (Compl. ¶ 30)[6] Allegations of both types consistently have been found deficient, and have been rejected by the courts. *See Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338, 345 (2d Cir. 2006) (allegations that directors received compensation in excess of $150,000 plus retirement benefits and served on the boards of many mutual funds "are insufficient as a matter of law" to establish lack of independence); *Migdal v. Rowe Price-Fleming Int'l, Inc.,* 248 F.3d 321, 329-30 (4th Cir. 2001) (allegations that directors served on boards of many related funds and received compensation for their service were insufficient to establish lack of independence); *Strougo v. BEA Assocs.,* 188 F. Supp. 2d 373, 382 (S.D.N.Y. 2002) (service on multiple boards does not constitute a lack of independence). If allegations of the type made by plaintiff *were* sufficient to rebut the presumption of independence established by the ICA, the boards of every major fund family in the country would fail to meet the standard for independence.

Presumably recognizing the complete inadequacy of his allegations to raise an inference that the Fund's Independent Trustees lacked independence or failed to act conscientiously,

---

[6]     Trustees and directors who are not "interested persons" under the ICA, 15 U.S.C. § 80a-2(a)(19), are *presumed* to be independent. "Only by alleging facts that, if proved, would render the directors interested will plaintiff be able to overcome the presumption." *Krantz v. Prudential Inv. Fund Mgmt., LLC,* 305 F.3d 140, 144 (3d Cir. 2002).

plaintiff employs the pleading equivalent of a parlor trick. He alleges that "truly independent boards acting conscientiously would not have tolerated the investment management fees charged by defendant [HCA] if they had obtained adequate information regarding, among other things: (i) the services provided by Northern Cross, and the fees Northern Cross charged for such services, as compared to the investment management fees that defendant [HCA] charged for its minimal services; (ii) the economies of scale enjoyed by defendant [HCA]; and (iii) the profitability of Harbor International Fund to defendant [HCA]" (profitability which is not alleged in the Complaint). (Compl., ¶ 34) But nowhere does the Complaint allege that the Independent Trustees actually lacked "adequate information" concerning any of the subjects listed by plaintiff, or point to any deficiency in the information supplied to the Board on the enumerated subjects. The Complaint is equally devoid of any allegations of fact challenging the processes employed and the factors considered by the Independent Trustees in reaching their decision to approve HCA's fees.[7]

In light of these deficiencies, the Complaint reduces to the contention that because *plaintiff* asserts that the investment management fee paid to HCA was excessive, the Independent Trustees *must* have lacked independence, *must* have lacked adequate information, and *must* have

---

[7] The absence of allegations as to the materials considered and processes employed by the Board is not the result of a lack of available information. Plaintiff appears to have wholly disregarded Harbor Funds' Semi-Annual Report, a document filed with the SEC and available at http://www.sec.gov/Archives/edgar/data/793769/000119312513281179/d528430dncsrs.htm, which identifies the materials furnished to and reviewed by the Board in its consideration and approval of the continuation of each investment advisory agreement, including "materials and presentations relating to Fund performance and the services rendered by the Adviser and each Subadviser" and "the fees charged by the Adviser for investment advisory services, including in each case specifically the portion of the fee to be retained by the Adviser, after payment of the Subadviser's fee, for the subadviser oversight, administration and 'manager of managers' services the Adviser provides." (Semi-Annual Report of Harbor International Fund for period ending April 30, 2013, at 53-54 (filed July 2, 2013), pertinent portions of which are attached as Walsen Exhibit 3.) The same document summarizes, at pages 53-58, the process followed by the Independent Trustees, as advised by their independent counsel, and the factors they considered in reviewing and approving the investment advisory agreements and the subadvisory agreements for each of the Harbor funds.

failed to act conscientiously in approving the fee. This is specious, circular reasoning, and it runs afoul of the *Jones* directive that courts use the board process as the prism through which to view the other *Gartenberg* factors. *See Jones*, 559 U.S. at 349. Plaintiff cannot work backwards from the unfounded *conclusion* that the fees allegedly were excessive, to the equally unfounded *premise* that the Board process must have been flawed. Having failed to allege facts giving rise to an inference that the Board process was deficient, the allegations relating to the remaining *Gartenberg* factors should be evaluated in the context of the high degree of deference to which the Board's determination is due.

>    2.    **The Complaint Fails to Allege Facts Giving Rise to an Inference that HCA Charged an Excessive Fee Under Any of the Remaining *Gartenberg* Factors.**

>        (a)    *Nature and Quality of the Services Provided*

Plaintiff's Complaint in no way challenges the quality of the services HCA provides to the Fund, nor does plaintiff claim any dissatisfaction with the investment performance of the Fund. Instead, plaintiff's central allegation is that HCA "retains a substantial portion in fees that it charges [the Fund]" (Compl., ¶ 2) after paying its subadviser, Northern Cross, a contractual subadvisory fee for portfolio management services. As alleged in the Complaint, in 2012 the expense to HCA of the services performed by Northern Cross represented about 55% of the total management fee received by HCA, leaving HCA with approximately 45% of the management fee, for which plaintiff alleges that HCA ostensibly performed "almost no work." (Compl., ¶ 19)[8] These allegations -- which are the lynchpin of the Complaint -- cannot possibly be

---

[8]    Plaintiff's allegations that Northern Cross charges HCA "just a fraction" of the total management fees paid by the fund to HCA (Compl., ¶ 21) and that the fees retained by HCA represent "over **81%** of the fees paid to Northern Cross" (Compl., ¶ 20) (emphasis in original) are misleading. It is a peculiar use of the phrase "just a fraction" to describe a fraction of more than 1/2, or in this case 11/20. And rather than use the confusing 81% figure, as plaintiff has done here, to describe the ratio of fees retained by HCA to those paid to Northern Cross (presumably an attempt by plaintiff to imply that HCA retained the

sufficient to give rise to an inference that the fees paid to HCA were so disproportionate to the services performed as to render the fees "excessive" under § 36(b).

Plaintiff's allegations that HCA did "almost no work" for the compensation received (Compl., ¶ 19) and that the services rendered by Northern Cross pursuant to its Subadvisory Agreement are "practically identical" to the services performed by HCA under the Advisory Agreement (Compl., ¶ 16) are belied by the very advisory and subadvisory agreements cited by plaintiff.[9]  In ruling on a motion to dismiss, the Court may consider documents attached to or referenced in the pleading if they are central to the claim.  *Hecker*, 556 F.3d at 582-83 (approving district court's consideration of summary plan descriptions and a trust agreement referenced in a complaint, as well as publicly available prospectuses).  That surely is the case here as to HCA's Investment Advisory Agreement with Harbor Funds, on behalf of the International Fund, and its Subadvisory Agreement with Northern Cross,[10] copies of which, as publicly filed, are attached as Exhibits 4 and 5 to the Walsen Declaration, respectively.

HCA is specifically charged under its Investment Advisory Agreement ("IAA") with responsibility for, among other things:

vast majority of the management fee paid), it is simpler and clearer to say that Northern Cross is paid approximately 55% of the total management fee, compared with about 45% retained by HCA for its services to the Fund -- including those relating to the retention and supervision of Northern Cross.

[9]     It may be that plaintiff's improbable allegation that HCA performs "almost no work" for its investment management fee is driven by his request for rescission of HCA's Investment Advisory Agreement pursuant to § 47(b) of the ICA, in which he seeks an order "requiring restitution of all investment management fees paid to . . . [HCA] . . . by Harbor International Fund . . . ."  (Compl., ¶ 44)  If so, the tactic fails.  Rescission is not available as a remedy for purported violations of § 36(b).  *See Steinberg v. Janus Capital Mgmt.*, 457 F. App'x 261, 267-68 (4th Cir. 2011).  Moreover, by its terms § 47(b) provides that a contract violative of the ICA is "unenforceable by either *party*" (emphasis supplied), and shareholders therefore have no standing to pursue a request for rescission.  *Hamilton v. Allen*, 396 F. Supp. 2d 545, 559-60 (E.D. Pa. 2005).  And, although the Complaint states that it is "a derivative action" it contains none of the allegations that would be required in a derivative action under Fed. R. Civ. P. 23.1 and state law.  Consequently, plaintiff's request for rescission should be stricken.

[10]     Plaintiff specifically references the Investment Advisory Agreement dated July 2013 (Compl., ¶ 9) and the Subadvisory Agreement dated July 2013 (Compl., ¶ 16), and purports to compare the services to be performed under those respective agreements.

- Identifying an appropriate subadviser to determine which specific securities should be purchased or sold, negotiating the subadvisory agreement with the subadviser, developing and implementing procedures designed to insure that the subadviser complies with the Fund's investment objectives and policies, and reporting to the Trustees periodically regarding the performance of the subadviser. (IAA, ¶¶ 3(e), 4; *see also* Compl., ¶ 21, where plaintiff admits that HCA has "the responsibility of assigning, overseeing and evaluating the assets managed by Northern Cross . . . .")

- Preparing the Fund's SEC registration statements, notices, shareholder reports, proxy statements and other documents required by law, such as the Annual Prospectus and the Statement of Additional Information ("SAI") incorporated into the Prospectus. (IAA, ¶ 3(d)) As plaintiff himself alleges, "[e]ach fund has its own lengthy prospectus, regulatory filings and compliance issues to review," and the preparation of each of the documents he references is the responsibility of HCA. (Compl., ¶ 32) Plaintiff also refers in the Complaint to the Fund's Statement of Additional Information (Compl., ¶ 18), a detailed public filing that is incorporated into the Prospectus for each fund. [11] The legal and compliance costs of these filings alone obviously are substantial.

- Providing the necessary legal and regulatory support for the Fund, including responding to regulatory inquiries and examinations as needed, and assuming the responsibility and risks associated with regulatory compliance. (IAA, ¶ 3(f))

- Providing the Fund, at HCA's expense, with personnel, including all of the Fund's officers. (IAA, ¶ 3(a))

- Preparing the detailed board meeting materials required by the ICA. (IAA, ¶ 3(c))

- Coordinating and overseeing the services of the Fund's transfer agent, custodian, legal counsel and auditors. (IAA, ¶ 3(b))

- Overseeing the determination of the Fund's daily net asset value. (IAA, ¶ 3(g))

- Preparing and monitoring budgets for the Fund. (IAA, ¶ 3(h))

---

[11]     The full Prospectus for the Harbor International Fund, including the SAI, is available on the SEC website at www.sec.gov/edgar/searchedgar/companysearch.html. Where either the Prospectus or SAI are cited in this Memorandum, the filing date is included and the pertinent pages are attached as exhibits to the Walsen Declaration.

●  Providing any other administrative services requested by the Fund or the Board of Trustees.  (IAA, ¶ 3(i)).

Plaintiff's casual dismissal of HCA's responsibilities as "almost no work" amounts to little more than an attack on the "manager of managers" structure in the mutual fund industry (*see, e.g.*, Compl., ¶¶ 16-21), one used by many investment advisers because it allows an adviser far greater flexibility to replace underperforming portfolio managers (who otherwise would be permanent employees of the adviser) in order to improve overall investment performance for the benefit of fund shareholders.  Because the "manager of managers" structure allows HCA, with the Board's approval, to replace an underperforming subadviser, the structure better addresses the concern alleged by plaintiff that "a mutual fund cannot, as a practical matter, sever its relationship with the adviser." (Compl., ¶ 10)

Plaintiff's additional allegation that HCA "shares its supervisory role with the Board," supposedly "further limit[ing] HCA's responsibilities" (Compl., ¶ 18) is entirely specious.  It is inherent in the structure of mutual funds that a board of trustees will have an oversight role, while the adviser will have day-to-day management responsibilities.  *See Jones*, 559 U.S. at 339-40; 15 U.S.C. § 80a-15.  Like boards of directors of operating companies, mutual fund boards do not have day-to-day oversight of funds; they have "a host of special responsibilities" imposed by the ICA.  And the "watchdog" role of the independent trustees necessarily *increases*, rather than diminishes, the responsibilities of the adviser, which is required to provide the independent trustees with a vast amount of information, including all the information required in connection with the annual advisory contract review process conducted pursuant to § 15(c) of the ICA.  15 U.S.C. § 80a-15(c).

Finally, plaintiff's allegation that the limitation of liability provision in HCA's Investment Advisory Agreement somehow diminishes the nature and quality of HCA's services

is equally facile. (*See* Compl., ¶ 17) Provisions limiting liability for ordinary negligence or errors in judgment are permitted by the ICA. 15 U.S.C. § 80a-17(i). Moreover, in view of the complete absence of allegations of fact challenging the nature and quality of the services rendered by HCA, the mere existence of a limitation of liability provision is meaningless. Plaintiff fails to allege that the limitation of liability provision had any actual impact on HCA's performance of its services, or diminished the services performed by HCA in any way. Furthermore, the provision serves only as a limitation of HCA's liability to the Fund for certain kinds of conduct relating to the services it performs. It does not relieve HCA of its responsibilities under the ICA, the federal securities laws, or any other legal or statutory duty.

(b)    *Profitability of the Fund to the Adviser*

Under *Jones* and *Gartenberg*, a court may consider the profitability of a Fund to its adviser in evaluating whether the adviser's fee was so disproportionately large as to bear no reasonable relationship to the services rendered. However, "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, No. 04-CV-5593, 2009 WL 52157755, at *50 (C.D. Cal. Dec. 28, 2009) (citing S. Rep. No. 91-184, at 5 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4902)*, aff'd sub nom Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011); *see also Gartenberg*, 694 F.2d at 928 (observing that the Senate Report on the bill that became § 36(b) indicates that "a cost-plus type of [advisory] contract is not required").

The Complaint in this case contains no allegations that would permit even a reasonable estimate of the profitability to HCA of its relationship with the Fund, since the Complaint focuses only upon the revenue received by HCA, and summarily dismisses the services it performs as "minimal." Plaintiff's vacant, conclusory allegation that HCA earns "excess profits" (Compl. ¶ 25) does not suffice, and should be disregarded under *Twombly* and *Iqbal*. *See also*

*Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (affirming dismissal of § 36(b) claim; allegations regarding fees "are irrelevant to a showing of profitability without some allegation of the corresponding costs incurred").

As a "manager of managers," HCA has subcontracted with Northern Cross for specified portfolio management services that would otherwise be performed by HCA employees. Portfolio management, however, is not the only function of the investment adviser. (*See* Section III. B. 2. (a), *supra*). But even if it were assumed, contrary to common sense and the documents referenced in plaintiff's Complaint, that every dollar of the 45% of the total management fee that is not paid to HCA's subadviser is *pure profit* to HCA, such a level of profitability at a firm-wide level would not give rise to a permissible inference of excessiveness. Courts have found similar profit margins to be within acceptable ranges when evaluating the profitability of a fund to its adviser. *See, e.g., In re Am. Mut. Funds Fee Litig.*, No. 04-CV-5593, 2009 WL 5215755, at *50 (pre-tax profit margins ranging from 30% to 52% all fall within acceptable range); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 494 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (pre-tax margin of 33% acceptable); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978-79 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987), *cert. denied*, 108 S. Ct. 1594 (1988) (pre-tax margin of 77.3% and post-tax margin of 38.6% acceptable); *Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Supp. 1394, 1401 (S.D.N.Y. 1988), *aff'd*, 895 F.2d 861 (2d Cir. 1990) (pre-tax margin of 89% acceptable); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1236, 1250 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991), *cert. denied*, 112 S. Ct. 75 (1991) (post-tax margin of 37.8% acceptable).

(c)     *Economies of Scale*

Plaintiff alleges that "[e]conomies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets." (Compl., ¶ 22)  This is wrong as a matter of law.  Economies of scale arise only when the *per-unit production costs* of a product decline as a result of increased output.  *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 539, n.32 (S.D.N.Y. 2008).

More importantly, courts have not allowed plaintiffs to simply presume -- as plaintiff would have the Court do here -- that economies of scale *must* be achieved merely because an adviser continues to charge the same management fee rate while a fund grows in assets under management.  *In re Scudder Mut. Funds Fee Litig.*, No. 04-CV-1921, 2007 WL 2325862, at *16 (S.D.N.Y. Aug 14, 2007); *see also In re Salomon*, 528 F. Supp. 2d 332, 339 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds sub nom. The R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 Fed. App'x 25 (2d Cir. 2011) (dismissing § 36(b) claim and holding that economies of scale were not alleged sufficiently where "[a]side from non-Fund-specific, economic analysis regarding theoretical economies of scale, the [complaint] contain[ed] no allegations as to Defendant's costs of managing the Funds").

Rather, in order to allege economies of scale, a plaintiff must "make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew." *Hoffman*, 591 F. Supp. 2d at 540 (affirming dismissal of § 36(b) claim; economies of scale not adequately alleged).  The Complaint in this case is devoid of such allegations.  As a result, the Court is left unable to determine "whether any economy of scale even existed." *Id.*; *see also Amron*, 464 F.3d at 344 (economies of scale not alleged where plaintiff made "no allegations regarding the costs of performing fund transactions  or  the  relationship  between  such  costs  and  the  number  of

transactions performed") (internal citations omitted); *Krinsk v. Fund Asset Mgmt, Inc.*, 875 F.2d 404, 411 (2d Cir. 1989) (same); *In re Evergreen Mut. Funds Fee Litig.*, 240 F.R.D. 115, 121 (S.D.N.Y. 2007) (same); *see also Salomon*, 528 F. Supp. 2d at 336-39 ("[p]laintiffs cannot meet their burden simply by pointing to the size of the funds and their rates of growth"); *Scudder*, 2007 WL 2325862, at *16-17 (dismissing § 36(b) claim and concluding that amendment would be futile where, among other things, plaintiff's allegations merely presumed that economies of scale were achieved but did not explain how, and plaintiff failed to specify how economies of scale were not passed on to investors).

Consequently, even if it were true, plaintiff's allegation that HCA charged the same management fee rates to the Fund "for nearly ***eight years***" (Compl., ¶ 3) (emphasis in original), during a period of significant Fund growth, would be insufficient to plead that HCA had failed to adequately share economies of scale. But it is not true, as plaintiff should have known from a pre-filing review of the Fund's public filings. In addition to the fee schedule breakpoints alleged in the Complaint, which had the effect of reducing HCA's advisory fee ten basis points (from 0.75% to 0.65%) on all assets under management exceeding $12 billion, additional breakpoints, implemented through voluntary fee waivers by HCA, have been in effect for number of years. Beginning in 2011, and continuing in effect throughout the time period relevant to the Complaint, HCA entered into contractual fee waivers establishing *additional* breakpoints at asset levels exceeding $24 billion. (Prospectus effective March 1, 2011, at 1 (filed February 25, 2011), the pertinent portion of which is attached as Walsen Exhibit 6) Thus, for 2013 (eleven months of which are within the one year period preceding the filing of Zehrer's Complaint) the same public filings referenced by plaintiff show that the fee structure for the Fund actually was as follows:

- 0.75 % for the first $12 billion of assets under management (AUM)

- 0.65% for AUM between $12 billion and $24 billion

- 0.63% for AUM between $24 billion and $36 billion

- 0.58% for AUM over $36 billion

(Prospectus effective March 1, 2013, at 1 (filed February 27, 2013), the pertinent portion of which is attached as Walsen Exhibit 7)  The allegations of the Complaint simply omit half of the relevant fee structure in attempting to establish that HCA has failed to share economies of scale.

According to the SAI filed January 29, 2014, HCA's fee was reduced nearly $7 million in 2013 through the contractual waivers that plaintiff ignores, *i.e.*, the breakpoints that reduce the advisory fee rate at the $24 billion and $36 billion levels.  (*See* SAI effective February 1, 2014, at 45 (filed January 29, 2014), the pertinent portion of which is attached as Walsen Exhibit 2)  Another $12 million was shared through the breakpoints acknowledged by plaintiff that reduced the fee rate between $12 billion and $24 billion in AUM.  Thus, HCA's fee was reduced nearly $19 million through breakpoints in 2013 alone, a fact that is inconsistent with plaintiff's conclusory (and factually incorrect) allegation that HCA has failed to share economies of scale.

Finally, plaintiff alleges that HCA ostensibly experiences economies of scale because "[i]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size," such that a "portfolio manager can invest $1 billion nearly as easily as $10 billion, and $10 billion nearly as easily as $50 billion." (Compl., ¶ 22)  However, as plaintiff also has alleged, HCA "subcontracts its investment management duties on behalf of [the Fund] to Northern Cross pursuant to a Sub-Advisory Agreement…."  (Compl., ¶ 16)  The Subadvisory Agreement (Walsen Exhibit 5) provides that HCA will pay Northern Cross "a fee . . . based on a percentage of the average daily net assets . . . of the Fund."  Thus, the expense to HCA of Northern Cross's "[i]nvestment management efforts,

the most important (and most expensive) input into portfolio management" according to plaintiff, in fact *does* increase with portfolio size, because the cost of Northern Cross' services is "based on a percentage of the average daily net assets . . . of the Fund." Consequently, plaintiff's allegation is contradicted by one of the very documents relied upon in his Complaint.

(d)     *Comparative Fee Structures*

Because the Supreme Court has instructed that the § 36(b) analysis should be "sharply focused on . . . whether the fees themselves were excessive," *Jones*, 559 U.S. at 352 (quoting *Migdal*, 248 F.3d at 328), a comparison of the fees charged to the Fund with fees charged to similar funds would provide context for the court's evaluation of the alleged "excessiveness" of the fee. Although the Supreme Court has cautioned that courts should not rely "too heavily" on such comparisons, *Jones*, 559 U.S. at 350, there is no doubt that such comparisons may be relevant, are readily available, and have been relied upon by courts in ruling on motions to dismiss. *See Amron*, 464 F.3d at 342-45 (affirming dismissal of § 36(b) claim where plaintiff failed to allege, among other things, that a fund's performance was appreciably worse than other funds). Yet here, the Complaint alleges no facts relating to comparative fees.

The reason for this omission becomes obvious from a review of readily available public data regarding the expense ratio of the Fund compared with mutual fund industry peers. As indicated in the Morningstar report attached as Walsen Exhibit 8, the Fund (Institutional Share Class) has an exceptionally low total expense ratio (the total expenses charged to shareholders as a percentage of assets under management, or "AUM") of 0.74% for 2013, compared with a Morningstar category average of 1.23% and a Morningstar Fee Level Comparison Group Median of 0.98%.[12] This means that shareholders of the Fund retain a considerably larger percentage of

---

[12]     Morningstar, Inc. is a third-party source of mutual fund industry data that the courts have relied upon in evaluating § 36(b) claims. *See, e.g., In re Scudder Mut. Funds Fee Litig.*, No. 04-CV-1921, 2007

their investment dollars than investors in most other international large cap equity funds -- the category in which the Fund is alleged to belong. (Compl., ¶ 8) In light of this, plaintiff's failure to address this *Gartenberg* factor is understandable -- but that does not make it excusable to simply close one's eyes to facts that should have led plaintiff to conclude that this is a case which should never have been brought.

(e)     *Fallout Benefits*

Fallout benefits are another of the *Gartenberg* factors considered by courts addressing § 36(b) claims. Fallout benefits are "collateral benefits that accrue to the adviser because of its relationship with the mutual fund." *Jones*, 559 U.S. at 345, n.5. Zehrer's Complaint does not allege the existence of any fallout benefits to HCA as a consequence of its service to the Fund, and hence this factor, like all the others discussed above, lends plaintiff no support.

## IV.     CONCLUSION

The Complaint in this case was produced from a template of allegations generic enough for use against any investment manager that employs a subadviser to perform specified investment advisory services -- without regard to the facts of a particular case, the nature, quality, and extent of the services performed by the investment manager, comparative fee structures, or any of the other factors considered by the courts in assessing claims under § 36(b). These origins are reflected in the vacant and conclusory allegations in the Complaint, few of which actually pertain to HCA's fee, and none of which is sufficient to raise plaintiff's claim

---

WL 2325862, at *1 (S.D.N.Y. Aug 14, 2007). Morningstar uses the "total expense ratio" for comparative purposes because that measure includes all expense items, including the advisory fee, and therefore represents the full amount charged to fund shareholders. Comparing total expense ratios is an "apples to apples" comparison because it eliminates the variability that might result from different classifications of expense components. The Institutional Share Class of the Fund holds the vast majority of the AUM in the Fund. (Prospectus effective March 1, 2013, at 36-37 (filed February 27, 2013), pertinent portions of which are attached as Walsen Exhibit 7) The particular share class in which plaintiff holds shares is not alleged in the Complaint, although it obviously is known to plaintiff.

above rank speculation, much less a plausible claim that the advisory fee received by HCA is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones*, 599 U.S. at 346. For the reasons set forth above, HCA respectfully requests pursuant to Fed. R. Civ. P. 12(b)(6) that the Court dismiss plaintiff Terrence Zehrer's Complaint with prejudice for failure to state a claim upon which relief can be granted under § 36(b) of the ICA.

Dated: April 8, 2014                          Respectfully submitted,

                                              DEFENDANT HARBOR CAPITAL
                                              ADVISORS, INC.


                                              By:  _____/s/ John W. Rotunno_____
                                                        One of its Attorneys

John W. Rotunno
Stephen J. O'Neil
Paul J. Walsen
Molly K. McGinley
Nicole C. Mueller
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602-4207
Telephone: 312.372.1121
Facsimile: 312.827.8000
Email: john.rotunno@klgates.com
            stephen.oneil@klgates.com
            paul.walsen@klgates.com
            molly.mcginley@klgates.com
            nicole.mueller@klgates.com

*Attorneys for Harbor Capital Advisors, Inc.*

## CERTIFICATE OF SERVICE

   This is to certify that on April 8, 2014, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to following counsels of record:

Norman Rifkind
Amelia S. Newton
351 West Hubbard Street, Suite 401
Chicago, Illinois 60654

Brian J. Robbins
Stephen J. Oddo
Edward B. Gerard
Justin D. Rieger
600 B Street, Suite 1900
San Diego, California 92101

Joanna L. Barry
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808

Angela M. Liu
Joni S. Jacobsen
Dechert LLP
77 West Wacker
Suite 3200
Chicago, IL 60601

David A. Kotler
Dechert LLP
Suite 500
902 Carnegie Center
Princeton, NJ 08540-6531

Matthew L. Larrabee
Dechert LLP
One Maritime Plaza
Suite 2300
San Francisco, CA 94111

      /s/ John W. Rotunno