**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TERRENCE ZEHRER, | |
| Plaintiff, | |
| v. | Case No. 14-CV-00789 |
| HARBOR CAPITAL ADVISORS, INC., | |
| Defendant. | Consolidated |
| RUTH TUMPOWSKY, | |
| Plaintiff, | |
| v. | Case No. 14-CV-07210 |
| HARBOR CAPITAL ADVISORS, INC., | |
| Defendant. | Honorable Joan Humphrey Lefkow |

**MEMORANDUM IN SUPPORT OF MOTION OF**
**HARBOR CAPITAL ADVISORS, INC. FOR SUMMARY JUDGMENT**

John W. Rotunno
Stephen J. O'Neil
Paul J. Walsen
Clifford C. Histed
Molly K. McGinley
Nicole C. Mueller
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602-4207
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

Email: john.rotunno@klgates.com
        stephen.oneil@klgates.com
        paul.walsen@klgates.com
        clifford.histed@klgates.com
        molly.mcginley@klgates.com
        nicole.mueller@klgates.com

*Attorneys for Defendant Harbor Capital Advisors, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ...................................................................................................... 5

    I.    PLAINTIFFS BEAR AN EXTREMELY HEAVY BURDEN UNDER SECTION 36(b) ......................................................................................... 5

        A.    The Summary Judgment Standard ............................................. 5

        B.    Section 36(b) Of The Investment Company Act Of 1940 ........................ 6

    II.    THE "RETAINED FEE" THEORY ON WHICH PLAINTIFFS' CLAIMS REST IS CONTRARY TO SECTION 36(b), ENTITLING HCA TO SUMMARY JUDGMENT ................................................................. 9

    III.    IN ANY EVENT, THE UNCONTROVERTED FACTS DEMONSTRATE THAT PLAINTIFFS COULD NOT SUCCEED ON THEIR CLAIMS WHEN MEASURED AGAINST THE GARTENBERG FACTORS .......................................................................... 15

        A.    The Investment Advisory Agreements And The Fees At Issue Were Approved By The Eminently Well-Qualified And Well-Informed Harbor Funds Independent Trustees, Pursuant To A Rigorous Process, And Their Decision Is Entitled To Substantial Deference ............................................................................... 16

            1.    The Harbor Funds Board ............................................. 16

            2.    The Board's Process For Considering Approval Of The Investment Advisory Agreements Is Thorough And Rigorous .......................................................................... 18

        B.    The Fees Charged By HCA To The Two Funds At Issue Are Low Compared To Peer Funds .................................................... 22

        C.    To The Extent There Is Any Challenge To The Nature And Quality Of The Services Provided By HCA, The Funds Have Performed Better Than Or In Line With Their Peers ......................... 26

        D.    Plaintiffs' Profitability Analysis Is Both Legally and Factually Deficient ................................................................................. 29

        E.    Plaintiffs Cannot Prove That Economies Of Scale Existed Or Were Not Shared ....................................................................... 32

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ....................................26, 30

*Benak v. Alliance Capital Mgmt. L.P.*,
No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ..........................................................12

*Burks v. Lasker*,
441 U.S. 471 (1979) ...............................................................................................................1, 7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................................................6

*First Indus. Bank v. Baker*,
957 F.2d 506 (7th Cir. 1992) .....................................................................................................6

*Gallus v. Ameriprise Fin., Inc.*,
497 F. Supp. 2d 974 (D. Minn. 2007), *rev'd on other grounds*, 561 F.3d 816
(8th Cir. 2009), *vacated*, 559 U.S. 1046 (2010), *remanded to*, No. 04-4498,
2010 WL 5137419 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir.
2012) .............................................................................................................................26, 28, 32

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ...............................34

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
694 F.2d 923 (2d Cir. 1982) ........................................................................................ *passim*

*Green v. Nuveen Advisory Corp.*,
295 F.3d 738 (7th Cir. 2002) ...................................................................................................11

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................................32, 33

*Jones v. Harris Assocs. L.P.*,
No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007), *aff'd*, 527 F.3d
627 (7th Cir. 2008), *vacated*, 559 U.S. 335 (2010), *remanded to*, 611 F. App'x
359 (7th Cir. 2015) ......................................................................................................22, 26, 34

*Jones v. Harris Assocs. L.P.*,
527 F.3d 627 (7th Cir. 2008), *vacated*,
559 U.S. 335 (2010), *remanded to*, 611 F. App'x 359 (7th Cir. 2015) ....................................8

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010) ................................................................... *passim*

*Jones v. Harris Assocs. L.P.*,
    611 F. App'x 359 (7th Cir. 2015) ............................................. *passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ................... 27, 29, 31

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
    No. 11-1083, 2016 WL 1394347 (D.N.J. Apr. 7, 2016) ................................. *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................... 6

*Meyer v. Oppenheimer Mgmt. Corp.*,
    715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990) ................................ 13

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) .............................................................. 7, 29

*In re Russell Inv. Co. S'holder Litig.*,
    Nos. 1:13-cv-12631-LTS, 1:14-cv-14358-LTS (D. Mass. Aug. 22, 2016), Dkt.
    No. 135 ................................................................................... 3

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987) ......................................................... 30

*Sivolella v. AXA Equitable Life Ins. Co.*,
    Nos. 3:11-cv-4194 (PGS), 3:13-cv-312 (PGS) (D.N.J. Aug. 6, 2015), Dkt. No.
    168 ..................................................................................... 12

*Sivollela v. AXA Equitable Life Ins. Co.*,
    No. 11-cv-4194, 2016 WL 4487857 (D.N.J. Aug. 25, 2016) ........................ *passim*

*Turner v. Davis Selected Advisers, LP*,
    626 F. App'x 713 (9th Cir. Sept. 29, 2015) ................................................ 14

## Statutes

15 U.S.C. § 80a-1, *et seq.* ...................................................................... 6

15 U.S.C. §§ 80a-2(a)(19) ......................................................................... 6

15 U.S.C. § 80a-10(a) ............................................................................. 6

15 U.S.C. § 80a-15(c) ............................................................................ 19

15 U.S.C. § 80a-35(b) ....................................................................... *passim*

17 C.F.R. § 270.0-1, *et seq.* ....................................................................................................6

**Other Authorities**

Fed. R. Civ. P. 56..................................................................................................................5, 6

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 (1970) ...................5, 12, 30, 34

"Mutual Fund Fees and Expenses,"
   Securities and Exchange Commission, *available at*
   http://www.sec.gov/news/studies/feestudy.htm.......................................................23

"Division of Inivestment Management:  Report of Mutual Fund
   Fees and Expenses," Securities and Exchange Commission, December 2000,
   *available at* http://www.sec.gov/answers/mffees.htm ............................................23

Transcript of Hearing on Motions in Limine/Summary Judgment,
   *Sivolella v. AXA Equitable Life Ins. Co.*, Nos 3:11-cv-04194
   (PGS), 3:13-cv-00312 (PGS) (D.N.J. Sept. 9, 2015), Dkt No. 171 ........................12

Karin Jagel Flynn, *So You Want to Be a Manager of Managers*,
   9 The Investment Lawyer 3 (Apr. 2002) ...............................................................10

Defendant Harbor Capital Advisors, Inc. ("HCA"), by its undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Harbor Funds is a Delaware statutory trust and a registered open-end management investment company, commonly referred to as a mutual fund.[1] (Defendant Harbor Capital Advisors, Inc.'s Statement of Material Facts As to Which There Is No Genuine Dispute ("SMF") ¶ 5) Shares issued by Harbor Funds are divided into multiple series, each with its own investment strategy and investment objective. (SMF ¶ 5) One of those share series is the Harbor International Fund ("HIF"); another is the Harbor High Yield Bond Fund ("HHYBF"). (SMF ¶¶ 5-7) Plaintiff Terrence Zehrer is alleged to be a shareholder in HIF, and Plaintiff Ruth Tumpowsky is alleged to be a shareholder in both HIF and HHYBF. (SMF ¶ 2)

HCA serves as the investment adviser to HIF and HHYBF (as well as other share series of Harbor Funds) pursuant to written investment advisory agreements ("IAAs") with the Funds. (SMF ¶ 12) Those agreements obligate HCA to provide the Funds with all services necessary to the operation of the Funds in a highly regulated industry. (SMF ¶ 13) HCA is responsible for, among many other things, establishing the investment policies, strategies and guidelines for each Fund, providing an investment program for each Fund, and overseeing service providers to the Funds. (SMF ¶ 14, 19) HCA also is responsible for administering the affairs of the Trust and each Fund, including providing financial and administrative services, compliance services, legal and regulatory services (such as the preparation of the Funds' public filings) and tax services.

---

[1] A mutual fund "is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010) (alterations in original) (quoting *Burks v. Lasker*, 441 U.S. 471, 480 (1979)). A mutual fund does not have employees of its own, but rather relies upon "[a] separate entity called an investment adviser," which "manages the fund's investments, and provides other services" to the fund. *Id.*

(SMF ¶¶ 15-18)  HCA directly performs most of these and other services with its own personnel, but also selects, monitors and oversees subadvisers to perform, in accordance with the investment objectives and policies of the Funds, the day-to-day portfolio management services that HCA is obligated to provide pursuant to its IAAs.  (SMF ¶ 20, 23)  HCA pays the subadvisers it retains pursuant to agreements HCA has negotiated with the subadvisers; the Funds do not pay the subadvisers and have no obligation to do so.  (SMF ¶¶ 22)

In this case, Plaintiffs claim that management fees paid by HIF and HHYBF for the services HCA provides to the Funds are excessive, in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. §80-a 35(b) ("Section 36(b)").  (SMF ¶ 3)  The challenged management fees were paid to HCA pursuant to its IAAs with the Funds, which were approved by the disinterested trustees of the Harbor Funds Board,[2] as well as by the Board as a whole, following a rigorous contract review process.  (SMF ¶¶ 25, 36-47, 49-51, 55-67)

Section 36(b) permits a mutual fund shareholder to bring suit against an investment adviser to recover "excessive" fees paid to the adviser by the mutual fund.  The standard against which "excessiveness" is measured is an exacting one, as the Supreme Court has confirmed:  to incur liability, "an investment adviser must charge a fee that is *so disproportionately large* that it bears *no reasonable relationship* to the services rendered and *could not have been* the product of arm's-length bargaining."  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (emphasis added).  In determining whether an advisory fee is "so disproportionately large" under this standard, courts

---

[2]  During most of the time period relevant to this action, Harbor Funds was governed by a Board comprised of six Trustees, five of whom (the "Independent Trustees") were not and are not "interested persons," as that term is defined in the Investment Company Act of 1940.  15 U.S.C. § 80a-2(a)(19).  (SMF ¶¶ 5, 31, 34-35)  The Independent Trustees are identified *infra* at 17-18.

(there is no right to a trial by jury in Section 36(b) cases)[3] take into account a series of considerations identified in the Second Circuit's decision in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), known as the "Gartenberg factors."  (*See infra* at 15)  Among the most important of these is the care and conscientiousness of a fund board in approving an advisory fee, since "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions," or "supplant the judgment of disinterested directors apprised of all relevant information . . . ." *Jones*, 559 U.S. at 352.

Plaintiffs' burden under Section 36(b) is so demanding that in the 46 years since Section 36(b) was adopted, no plaintiff has ever succeeded in obtaining a judgment on an "excessive fee" claim.  *Jones* itself was a case in which the district court granted summary judgment for the defendant investment adviser on a claim that the adviser's fees (which were higher than those paid by the Harbor Funds at issue here) were excessive.  The Seventh Circuit affirmed the grant of summary judgment for the adviser—*twice*.  On the second affirmance, following remand from the Supreme Court, the Seventh Circuit defined the standard of liability under Section 36(b) in a manner so antithetical to Plaintiffs' theory in this and other cases brought by their counsel that those same counsel have found it necessary to argue that the Seventh Circuit's affirmance Order in *Jones* "flouts the legal standard" under Section 36(b).  *See* Pl.'s Br. in Resp. to Defs.' Mot. for Summ. J. at 15 n.22, *In re Russell Inv. Co. S'holder Litig.*, Nos. 1:13-cv-12631-LTS, 1:14-cv-14358-LTS (D. Mass. Aug. 22, 2016), Dkt. No. 135.

In this case, it is incontrovertible that the management fees paid to HCA by HIF and HHYBF are at the lower end of the range of fees paid by other comparable mutual funds to their investment advisers, and that the services provided by HCA to the Funds are of high caliber.

---

[3]  Consistent with the case law in this and other Circuits, the Court already has stricken Plaintiffs' jury demand in this case.  (Dkt. 80 at 10)

(SMF ¶¶ 44-48)  The undisputed, material facts preclude any conclusion that the management fees paid by the Funds were "so disproportionately large" as to bear "no reasonable relationship" to the services rendered by HCA.  Fees that compare favorably to fees charged by other actively managed funds with similar investment strategies and similar or inferior long-term performance cannot be "so disproportionately large" as to bear "no reasonable relationship to the services rendered."  *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 360–61 (7th Cir. 2015).

Because there can be no plausible basis for contending that the management fees HCA receives from HIF and HHYBF are "excessive" under Section 36(b), as interpreted by the Supreme Court and the Seventh Circuit, HCA anticipates that Plaintiffs will attempt to oppose summary judgment by focusing their claim on something *other than* the management fees actually paid to HCA for the full panoply of services HCA provides to the Funds.  Specifically, Plaintiffs will construct a hypothetical management fee for each Fund (what Plaintiffs' proffered experts call a "retained fee") by eliminating from HCA's actual management fees (and from HCA's recorded expenses in managing the Funds) an amount equal to the single largest cost incurred by HCA in providing services to the Funds: the expense HCA incurs in fees it pays to independent, third-party subadvisers with which HCA contracts to perform some of the services HCA is obligated to provide to the Funds under its IAAs.  (SMF ¶ 49)  What remains of HCA's management fee after the elimination of subadvisory fees from HCA's revenue and expense, Plaintiffs say, is "excessive" in relation to the services performed directly by HCA's own internal personnel.  By stripping out this major expense, Plaintiffs attempt to make it appear that HCA's profit margin on the range of services it provides to the Funds is much greater than in fact is the case.

The manipulation of fees and expenses underpinning Plaintiffs' claims is not supported by accounting principles, by principles of economics, by logic or by the law. The profit margin of a business can always be made to appear greater than it is by eliminating any expense (much less the *largest* single expense) actually incurred in the operation of the business, but this is a carny trick that serves only to distort economic reality. More to the point here, Plaintiffs' "retained fee" theory misapprehends the inquiry under Section 36(b), which focuses on "*all* services rendered to the fund or its shareholders and *all* compensation and payments received." S. Rep. No. 91-184 (1969), at 13, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 (1970) (emphasis supplied). Thus, the question, as it was formulated by the Supreme Court in *Jones*, is whether an adviser has "charge[d] a fee" so disproportionate to the services rendered that it could not have been produced in arm's length bargaining, not whether some *fraction* of the adviser's fee ostensibly is disproportionate to any particular service, or some combination of fewer than all the services, provided by the adviser.[4]

Plaintiffs cannot adduce evidence giving rise to a genuine issue of material fact under the standard for liability established by the Supreme Court in *Jones* and applied by the Seventh Circuit on remand in that case. Summary judgment should therefore be entered for HCA.

## ARGUMENT

### I.     PLAINTIFFS BEAR AN EXTREMELY HEAVY BURDEN UNDER SECTION 36(b)

#### A.     The Summary Judgment Standard

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[4]   Because the elimination of a principal expense in the calculation of profitability is such an obvious ploy, Plaintiffs prefer to say that their approach treats HCA's subadvisory expense as a "pass-through" or a "contra-revenue" item. The result, however, is precisely the same.

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputed facts are material for purposes of Rule 56 only when they might affect the outcome of a suit. *First Indus. Bank v. Baker*, 957 F.2d 506, 507–08 (7th Cir. 1992). Moreover, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In this case, as in *Jones* itself, there can be no genuine dispute as to any of the facts material to Plaintiffs' claims, and a trial of this action therefore is unnecessary.

### B.     Section 36(b) Of The Investment Company Act Of 1940

Mutual funds are subject to, and regulated by, the Investment Company Act of 1940 (the "ICA"), which establishes extensive operational, recordkeeping and disclosure requirements for mutual funds and governs the relationship between a mutual fund and its investment adviser. *See generally* 15 U.S.C. § 80a-1, *et seq.*; 17 C.F.R. § 270.0-1, *et seq.* One particularly important requirement of the ICA is that mutual funds have a board of directors or trustees, at least 40% of whom must be independent, *i.e.*, not interested persons within the meaning of Sections 2(a)(19) and 10(a) of the ICA. 15 U.S.C. §§ 80a-2(a)(19), 80a-10(a). In addition, the Securities and Exchange Commission (the "SEC") requires that at least 75% of a mutual fund's board must be disinterested in order for the mutual fund to avail itself of certain exemptions from regulations promulgated under the ICA. 17 C.F.R. § 270.0-1(a)(7). At all relevant times, the Harbor Funds Board exceeded these independence requirements. (SMF ¶ 31)

The ICA gives the independent trustees (or directors) of a fund "a host of special responsibilities," among which is that they must "review and approve the contracts of the

investment adviser annually, and a majority of these directors must approve an adviser's compensation." *Jones*, 559 U.S. at 340 (internal citations and quotations omitted). The ICA entrusts the independent trustees with "the primary responsibility for looking after the interests of the funds' shareholders," serving as "an independent check upon the management of investment companies." *Burks v. Lasker*, 441 U.S. 471, 484, 485 (1979) (internal citation and quotation omitted).

Section 36(b) of the ICA, in turn, provides that an investment adviser "shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by . . . [a] . . . registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b). The same section of the ICA permits a shareholder to bring an action for breach of this duty but, in a significant departure from common law principles, places the burden of proving a breach of fiduciary duty squarely on the shareholder-plaintiff. 15 U.S.C. § 80a-35(b)(1); *Jones*, 559 U.S. at 347 ("[t]he Investment Company Act modifies this duty in a significant way: it shifts the burden of proof from the fiduciary to the party claiming the breach"). If the shareholder meets his or her burden to establish a breach of duty, a court may award actual damages not exceeding the amount of compensation received by the adviser in the one year period preceding the filing of the complaint. 15 U.S.C. § 80a-35(b)(3).

The Supreme Court's 2010 decision in *Jones*, 559 U.S. 335, approved both the "so disproportionately large" standard first articulated by the Second Circuit in *Gartenberg* and the use of the Gartenberg factors as a tool in the application of that standard. In doing so, the Supreme Court made clear that "Section 36(b) is sharply focused on the question of whether the fees themselves were excessive," *Jones*, 559 U.S. 352 (quoting *Migdal v. Rowe Price-Fleming*

7

*Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001)), and that this question is *not* one of subjective "reasonableness." To the contrary, Section 36(b) does not "permit a compensation agreement to be reviewed in court for 'reasonableness,'" nor does it charge the courts "with rate-setting responsibilities." *Id.* at 341, 352. As the Seventh Circuit observed in its Order affirming (for a second time) summary judgment for the adviser in *Jones*, the standard announced by the Supreme Court is, in at least this respect, even "less favorable to plaintiffs" than the *Gartenberg* standard in that "the Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees." 611 F. App'x at 360. Moreover, where disinterested fund trustees have considered the relevant factors in deciding to approve a fee agreement, their business judgment "is entitled to considerable weight" in the determination of whether a fee is excessive, "even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351.

The Seventh Circuit's Order on remand of the *Jones* case from the Supreme Court[5] illustrates the severity of the burden the Section 36(b) standard imposes upon a shareholder claiming that an advisory fee is excessive—and the impossibility of Plaintiffs meeting that standard here. The goal, the Seventh Circuit stated, "is to identify the outer bounds of arm's length bargaining and not engage in rate regulation." 611 F. App'x at 360. The Court concluded that the record on summary judgment "show[ed] that . . . [the adviser's] . . . fee was comparable to that produced by bargaining at other mutual fund complexes," thus establishing the "bargaining range." *Id.* at 361. Coupled with undisputed evidence that the funds in question

---

[5] The Seventh Circuit twice affirmed the grant of summary judgment for the adviser in *Jones*. In *Jones v. Harris Assocs. L.P.*, 527 F.3d 627 (7th Cir. 2008), the Seventh Circuit affirmed on the ground that Section 36(b) places no limit on the amount of advisory fees paid to an adviser, as long as the adviser "make[s] full disclosure and play[s] no tricks" on the fund board approving the fees. *Id.* at 632. The Supreme Court vacated, endorsing the *Gartenberg* approach. On remand, the Seventh Circuit again affirmed the grant of summary judgment, applying the standard defined by the Supreme Court. *Jones*, 611 F. App'x at 360.

"did as well as, if not better than, comparable funds," this was enough to warrant summary judgment. *Id.* As explained in Section III, *infra*, the same is true in this case.

## II. THE "RETAINED FEE" THEORY ON WHICH PLAINTIFFS' CLAIMS REST IS CONTRARY TO SECTION 36(b), ENTITLING HCA TO SUMMARY JUDGMENT

For reasons discussed in detail later in this memorandum, the *Jones* standard of Section 36(b) liability, and the Gartenberg factors reaffirmed in *Jones*, pose an insuperable barrier to Plaintiffs' challenge to the management fees paid to HCA by the Funds at issue. Implicitly recognizing that this is the case, Plaintiffs have predicated their claims on a theory of liability focusing upon only a subset of the services provided to the Funds by HCA, and only a portion of HCA's overall management fees and expenses. Specifically, Plaintiffs contend that a portion of HCA's management fees equal to the amount HCA pays to its subadvisers should be recast as "contra-revenue" (meaning not treated as revenue at all), and the expense that HCA incurs for payments to subadvisers (which constitutes more than half of the total amount of HCA's management fee from each Fund) should be ignored and recast as a "pass-through" payment from the *Funds* to the subadvisers.                REDACTED

. Having thus recast the financial relationships (and rewritten the agreements) between HCA and the Funds, and between HCA and its subadvisers, Plaintiffs contend that what they characterize as HCA's "retained fee" is disproportionate in relation to the services HCA performs with its own personnel. No court has ever accepted this distorted approach to Section 36(b), and this Court should not be the first.

HCA has subcontracted with Northern Cross (as to HIF) and Shenkman Capital (as to HHYBF) for specified portfolio management services that would otherwise be performed by HCA employees. (SMF ¶¶ 20-21) Thus, with respect to these specific services, HCA employs what is known as a "manager-of-managers" business model. (SMF ¶ 20) The "manager-of-

managers" structure in the mutual fund industry permits advisers to seek out and engage portfolio management teams that have demonstrated superior performance in a particular investment strategy or asset class, and allows an adviser greater flexibility to replace underperforming portfolio managers (who otherwise would be permanent employees of the adviser) in order to improve overall investment performance for the benefit of fund shareholders. Karin Jagel Flynn, *So You Want to Be a Manager of Managers*, 9 The Investment Lawyer 3, (Apr. 2002) (Mueller Decl., Ex. 138 at 1, 7).

Plaintiffs' "retained fee" theory is an assault on the manager-of-managers business model, in that Plaintiffs seek to impose liability upon an adviser utilizing a manager-of-managers structure for receipt of a management fee that, even in Plaintiffs' view, would be perfectly permissible if paid to an adviser that performed all the services provided to its funds "in house," utilizing its own personnel. Thus, under Plaintiffs' view, the outcome of a claim made under Section 36(b) would turn on the business model employed by the adviser, such that *identical* management fees paid to the advisers of funds with *identical* investment performance would either be lawful (if charged by an adviser utilizing its own personnel to perform all services) or *un*lawful (if charged by an adviser utilizing a manager-of-managers structure), as Plaintiffs' expert concedes is entirely possible using his methodology. (Declaration of Nicole C. Mueller ("Mueller Decl.") Ex. 117 at 165) ("Q. In your view and under your methodology, two funds could have the exact same expense ratio and advisory fee, yet one would be charging excessive fees under your analysis and another would not . . . Isn't that possible? A. That is possible.")[6]

---

[6] In this memorandum, HCA periodically cites to the deposition testimony of the two "experts" proffered by Plaintiffs, but it does so only to illuminate Plaintiffs' theory of the case, which is contrary to the principles governing Section 36(b) claims in numerous respects. Thus, disposition of HCA's motion does not require the Court to weigh the opinions expressed by Plaintiffs' two experts against the contrary opinions expressed by the four economic, accounting, and governance experts tendered by HCA. However, HCA notes that in the recent trial of a Section 36(b) case, one of Plaintiffs' proffered experts in

The manager-of-managers structure is entirely lawful[7] and, as the combination of low fees and good performance of the HIF and HHYBF Funds demonstrates, can serve to benefit investors by providing access to the specialized investment expertise of boutique subadvisory firms at management fees below those charged by advisers who attempt to offer investment products in multiple strategies using their internal resources alone. It would be a perversion of Section 36(b), and a disservice to the goals of that statute, to apply Section 36(b) in a manner that penalizes a business model that offers the unique benefits to shareholders that the outsourcing of specific services can provide. Section 36(b) was never intended to be used in this manner. *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) (the purpose of Section 36(b) is "not to fundamentally revise the system itself").

Plaintiffs' "retained fee" theory fails for multiple, additional reasons. First, Section 36(b) does not provide a right of action to challenge a *portion* of a fee as excessive. To the contrary, in

---

this case, Kent Barrett, was found to have "lacked credibility" and was excoriated for "inconsistent" and "evasive" testimony, such that the district court found it "difficult to assess what is true, half true, or not true" in his testimony. *Sivolella*, 2016 WL 4487857, at *13–14. <span>REDACTED</span>

(Mueller Decl., Ex. 118 at 43, 52-53-58, 61-62, 64, 68, 75-79, 88-91, 106, 121-125, 128) Plaintiffs' other proffered expert, Richard Kopcke, also testified in the *Sivolella* case, where the district court concluded that his testimony "deserve[d] little weight due to his lack of direct experience managing mutual funds and his reliance on broad principles and limited facts, rather than specific methodologies," and found that comparisons Kopcke sought to draw "have little merit. . . ." 2016 WL 4487857, at *15–16. HCA will address these and other issues affecting the qualifications of Plaintiffs' proffered experts in motions *in limine* HCA intends to file promptly following the conclusion of briefing on HCA's motion for summary judgment.

[7] The SEC has found the manager-of-managers structure "in the public interest and consistent with the protection of investors" on numerous occasions. *See Harbor Funds and Harbor Capital Advisors, Inc.*, Investment Company Act of 1940 Release No. 22863 (Oct. 21, 1997) (File No. 812-10650) and amendment thereto (SEC Order authorizing HCA to enter into agreements with subadvisers without seeking fund shareholder approval of those agreements) (Mueller Decl., Ex. 136 and Ex. 137).

enacting Section 36(b), Congress stated that courts must "look at . . . *all* services rendered to the fund or its shareholders and *all* compensation and payments received." S. Rep. No. 91-184 (1969), at 13, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 (1970) (emphasis added). Thus, "under § 36(b) it is the overall nature and quality of the services provided by the investment adviser that is at issue—not merely some small percentage of those services." *Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 WL 1459249, at *8 (D.N.J. Feb. 9, 2004). Recently, in a manager-of-managers case, the court rejected the plaintiffs' argument that the court should narrowly focus on only the services directly provided by an adviser relative to its "retained" fee. *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2016 WL 1394347, at *15 (D.N.J. Apr. 7, 2016). Instead, the court determined that it should "consider both the services performed by . . . [the subadviser] . . . and the services performed by the . . . adviser," and that those "combined services should be measured against the totality of the advisory fee." *Id.* The court gave particular weight to the fact that the advisory agreements "explicitly permitted" the adviser to retain subadvisers. *Id.*[8] That is the case here, as well, where HCA's IAAs with the Funds both permit it to retain subadvisers and obligate it, and it alone, to pay for the services of any

---

[8]   The plaintiff's claims in *Kasilag* ultimately managed to survive summary judgment, as did the plaintiff's claims in *Sivolella*, another manager-of-managers case filed in the same district. *Kasilag*, 2016 WL 1394347, at *17 (ruling "in line with the *Sivolella* court"); Order at 1-2, *Sivolella v. AXA Equitable Life Ins. Co.*, Nos. 3:11-cv-04194 (PGS), 3:13-cv-00312 (PGS) (D.N.J. Aug. 6, 2015), Dkt. No. 168. The denial of summary judgment in *Sivolella* was based upon what the court perceived to be a fact question arising from an expert "disagree[ment] on the proper methodology for calculating [the adviser's] profits, and whether [subadviser] costs . . . should be incorporated into such a calculation . . . ." Transcript of Hearing on Motions in Limine/Summary Judgment at 78:9-79:12, 81:2-81:6, *Sivolella*, Nos. 3:11-cv-04194 (PGS), 3:13-cv-00312 (PGS) (D.N.J. Sept. 9, 2015), Dkt. No. 171. After a *twenty-five day trial*, the *Sivolella* court concluded that "Plaintiffs [f]ailed to establish that it was improper for [the adviser] to treat sub-advisory . . . fees as an expense when reporting profitability to the Board." *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-cv-4194, 2016 WL 4487857, at *56 (D.N.J. Aug. 25, 2016). The court disposed of the *Sivolella* plaintiffs' contra-revenue theory with the observation, noted above, that Kent Barrett, who "served as Plaintiffs' expert in this area" (and also serves as Plaintiffs' expert in *this* case), "lacked credibility." *Id.* In this case, Plaintiffs will rely on the same now-discredited conclusions of its experts that subadvisory expenses should be ignored in the calculation of profitability.

subadvisers it employs. (SMF ¶¶ 14, 21-22)

Second, Plaintiffs' theory would limit investment advisory fees to an amount equal to the costs incurred by an adviser in performing services utilizing its own personnel (and thus, inexplicably, excluding costs incurred to independent third-party service providers), plus what Plaintiffs deem to be a reasonable profit on those internal costs. One of Plaintiffs' two proffered experts admitted as much in deposition, explaining that his "cost-plus" analysis applied what he thought would be a reasonable profit to HCA's costs after excluding subadvisory fees, and defending his approach as "common in utility regulation and similar regulation. . . ." (Mueller Decl., Ex. 117 at 146) But this directly contravenes Section 36(b), which does not impose a "cost plus" limitation on advisory fees. *Gartenberg*, 694 F.2d at 928 (quoting S. Rep. No. 91-184 at 4902-03); *Meyer v. Oppenheimer Mgmt. Corp.*, 715 F. Supp. 574, 577 (S.D.N.Y. 1989)*, aff'd*, 895 F.2d 861 (2d Cir. 1990) ("Nothing in [Section 36(b)] is intended to imply . . . or to suggest that a 'cost-plus' type of contract would be required") (first alteration in original) (quoting S. Rep. No. 91-184 at 4902-03). Nor does Section 36(b) contemplate or permit "rate regulation" by the courts. *Jones*, 559 U.S. at 352 (observing that Congress rejected an approach that had been criticized as "charging the courts with rate-setting responsibilities"); *Jones*, 611 F. App'x at 360 (the goal is "not [to] engage in rate regulation").

Third, as *Jones* repeatedly makes clear, Section 36(b) does not permit Plaintiffs to substitute their judgment (or that of their proffered experts) for the judgment of the well-informed and conscientious Independent Trustees. That would be the case even if the Independent Trustees had not considered a "retained fee" approach to the calculation of HCA's profitability, but in this case (and unlike the circumstance in any other case Plaintiffs are likely to cite), HCA provided and the Independent Trustees in fact *did consider* this alternative approach.

13

(SMF ¶ 56-58; *see also* the discussion of the Modified Profitability Analysis, *infra* at 19-20)

Having done so, however, the Independent Trustees found the approach less than helpful. As

Independent Trustee Professor Raymond Ball (a distinguished professor of accountancy at the

University of Chicago Booth School of Business) testified,                     REDACTED


(SMF ¶ 58)  Similarly, the Lead Independent

Trustee of the Harbor Funds Board, Rodger Smith, testified that                     REDACTED


(*Id.*)  Former Independent Trustee Howard P. Colhoun added his

view                     REDACTED

          (*Id.*)

    Fourth, the manner in which HCA chooses to provide top quality services to the Funds

(whether to provide all services with personnel in its employ or to provide some of those services

through independent service providers that it selects, monitors and supervises) has no bearing on

whether its fee for all those services, collectively, is "excessive."  In either case, Fund

shareholders receive the same advisory services for the same advisory fee.  How HCA chooses to

spend the advisory fees it receives (whether on personnel it directly employs to provide all

required services or whether to engage third-party service providers to perform some of those

services) is irrelevant to the analysis under Section 36(b), since "[a] claim challenging the use, as

opposed to the size, of a fee is not cognizable under § 36(b)." *Turner v. Davis Selected Advisers,*

*LP*, 626 F. App'x 713, 718 (9th Cir. Sept. 29, 2015).

For all of these reasons, Plaintiffs' "retained fee" theory fails as a matter of law—and with it, so do Plaintiffs' claims under Section 36(b), which are rooted in and wholly dependent upon that theory. Consequently, summary judgment for HCA may and should be granted even without the necessity of considering the incontrovertible facts bearing upon each of the Gartenberg factors. Consideration of those factors, however, confirms that summary disposition of Plaintiffs' claims is warranted.

### III. IN ANY EVENT, THE UNCONTROVERTED FACTS DEMONSTRATE THAT PLAINTIFFS COULD NOT SUCCEED ON THEIR CLAIMS WHEN MEASURED AGAINST THE GARTENBERG FACTORS

In *Jones*, the Supreme Court approved of the *Gartenberg* decision's use of "the range of fees that might result from arm's length bargaining as the benchmark for reviewing challenged fees" under Section 36(b). 559 U.S. at 347. The Supreme Court also catalogued the series of factors bearing on the standard for liability which had been identified by the Second Circuit in *Gartenberg*. They are: (1) the independence, expertise, care, and conscientiousness of the independent members of the fund board in evaluating and approving the advisory fee; (2) the nature and quality of the services provided to a fund and its shareholders; (3) the profitability to the adviser of its relationship with the fund; (4) whether economies of scale, if any, are shared with fund investors; (5) comparative fee structures; and (6) "fall-out" benefits resulting to the adviser.[9] *Id.* at 344, n.5; *Gartenberg*, 694 F.2d at 928–29. Here, Plaintiffs' claims fail when measured against any or all of the Gartenberg factors.

---

[9] Plaintiffs have made no allegations, nor attempted to adduce any evidence, regarding fallout benefits.

A. **The Investment Advisory Agreements And The Fees At Issue Were Approved By The Eminently Well-Qualified And Well-Informed Harbor Funds Independent Trustees, Pursuant To A Rigorous Process, And Their Decision Is Entitled To Substantial Deference**

If any one of the Gartenberg factors has primacy over all the others, it is the expertise, care and conscientiousness of the independent members of a fund board in approving the advisory fee at issue. In applying the standard articulated in *Jones*, the decision of a properly functioning fund board must be afforded substantial deference by the courts. *Jones*, 559 U.S. at 351. "[T]he standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Id.* at 352. Thus, "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Id.* at 351; *Kasilag*, 2016 WL 1394347, at *14. In this case, the incontestable facts demonstrate that the decision of the Funds' Independent Trustees and full Board to approve HCA's IAAs is entitled to the full measure of deference contemplated by the Supreme Court in *Jones*. On similar facts, another district court recently granted partial summary judgment that a fund board's determination was entitled to substantial weight. *Kasilag*, 2016 WL 1394347, at *14, *21.

1. **The Harbor Funds Board**

At the time the Harbor Funds Board reviewed, evaluated and approved the continuation of the IAAs for the at-issue funds in 2012 and 2013, the Board was comprised of one interested Trustee (David G. Van Hooser, the Chief Executive Officer of HCA) and five Independent Trustees: Lead Independent Trustee Rodger F. Smith, Raymond J. Ball, Donna J. Dean, John P. Gould and Randall A. Hack. (SMF ¶ 31) Two additional Independent Trustees were elected by the Board effective January 1, 2014: Robert Kasdin and Ann M. Spruill. (*Id.*) An additional

Independent Trustee, Scott Amero, was elected by the Board in 2014.  (*Id.*)[10]

The Independent Trustees who serve on the Harbor Funds Board are highly accomplished, exceptionally well-qualified individuals with deep investment, financial and accounting expertise and a wealth of experience relevant to their Board service:

- Independent Trustee Raymond J. Ball is the Sydney Davidson Distinguished Service Professor of Accounting at the University of Chicago Booth School of Business.  Professor Ball focuses on corporate disclosure, earnings and stock prices, international accounting and finance, market efficiency and investment strategies.  He has served on the Board since 2006;

- Independent Trustee Donna J. Dean is the Chief Investment Officer of the Rockefeller Foundation, a philanthropic organization established by the Rockefeller family in 1913.  Before joining the Rockefeller Foundation, Ms. Dean served as Director of Investments at Yale University.  She has been a Member of the Board since 2010;

- Independent Trustee Randall A. Hack is a Senior Managing Director and Founder of Capstone Capital LLC, which invests in private companies.   Mr. Hack previously served as President of the Princeton University Investment Company, the entity responsible for managing the endowment of Princeton University. Mr. Hack has been a member of the Board since 2010;

- Independent Trustee Robert Kasdin is the Senior Vice President and Chief Operating Officer of Johns Hopkins Medicine, and a former Senior Executive Vice President of Columbia University.  Before joining Columbia, Mr. Kasdin was the Executive Vice President and Chief Financial Officer of the University of Michigan.  Mr. Kasdin is trained as a lawyer.  He began his career as a corporate attorney with the law firm of Davis Polk &Wardwell.  Mr. Kasdin has served on the Board since 2014;

- Lead Independent Trustee Rodger F. Smith is a Managing Director of Greenwich Associates, a research-based consulting firm, where he focuses on issues impacting the investment management industry.  Mr. Smith has been a member of the Board since 1987;

- Independent Trustee Ann M. Spruill recently retired from the private investment management firm GMO & Co. LLC, where she was a partner, portfolio manager and Head of the International Active Equities Division.  Mrs. Spruill joined the Board in 2014.  She also is a Trustee for the Financial Accounting Foundation, a

---

[10]  The Harbor Funds Board, not HCA, has the responsibility for identifying candidates for Board service and ultimately selecting new Trustees.  (SMF ¶ 32)

member of the Investment Committee and Chair of Global Equities for the Museum of Fine Arts in Boston, and a Trustee of the University of Rhode Island; and

- Independent Trustee Scott Amero is the former Vice Chairman and Global Chief Investment Officer, Fixed Income, and Co-Head of Fixed Income Portfolio Management at BlackRock, Inc.

(SMF ¶ 31)  In addition, Professor John P. Gould, who retired from the Board at the end of 2014, is the former Dean and the current Steven G. Rothmeier Professor and Distinguished Service Professor of Economics at the University of Chicago Booth School of Business.  (SMF ¶ 31)

The Independent Trustees are more than merely statutorily defined as "disinterested."  As might be expected of such accomplished individuals, they are, as the Lead Independent Trustee put it, a "very interactive group."  (SMF ¶ 34)  Board records reflect numerous questions posed by the Independent Trustees at Board meetings, as well as requests for specific types of information of interest to the Trustees.  (SMF ¶ 34)  Of particular significance, the Independent Trustees also have demonstrated their independence by directly negotiating adjustments to HCA's fee schedules applicable to certain of the Harbor Funds, including HIF.  (SMF ¶ 68-69)

### 2. The Board's Process For Considering Approval Of The Investment Advisory Agreements Is Thorough And Rigorous

The Harbor Funds Board meets at least eight times per year, a schedule that exceeds industry custom and practice in that most boards meet only four times per year.  (SMF ¶ 33)  The meetings, which are both in person and telephonic, occur in February, May, August and November.  (*Id.*)  The Board's practice is to hold a three hour telephonic meeting, followed a week to ten days later by an in-person meeting typically two days in duration.  (*Id.*)  All Trustees attend all meetings, unless prevented by serious illness.  (*Id.*)  Throughout the relevant period, the Independent Trustees have been represented by experienced investment management

attorneys from Dechert LLP, a law firm with extensive, nationally recognized expertise in the representation of mutual funds and their directors or trustees.  (SMF ¶ 35)

The Independent Trustees' annual review to determine whether to approve continuation of HCA's IAAs and HCA's Subadvisory Agreements with the subadvisers selected by HCA is a year-long exercise that culminates in two days of telephonic meetings and a two to two-and one-half day meeting that typically takes place in February of each year.  (SMF ¶ 36)  Prior to the February meeting, as part of the Board's 15(c) review,[11] the Independent Trustees, through Dechert, submit a detailed written request to HCA for information on a variety of subjects.  (SMF ¶ 38)  Each year, in response to this request, HCA has provided extensive materials concerning these and other topics to the Independent Trustees.  (SMF ¶ 39)  These materials include, but are not limited to, information on the various services provided by HCA; services performed by HCA's subadvisers; the absolute and relative performance of the Harbor Funds over the long term and short term; detailed information to allow the Trustees to analyze fees, including information on fees charged and services provided by HCA to Harbor Funds and to HCA clients other than Harbor Funds; subadvisory fees paid by HCA; HCA's internal costs of providing services to the Funds; and information regarding potential economies of scale.  (SMF ¶ 39-47, 49, 60)

HCA also provides the Board with an analysis showing the profitability to HCA of its relationship with each of the Harbor Funds, including an explanation of the manner in which profitability is calculated and how costs are allocated among the individual Harbor Funds for purposes of determining the profitability to HCA of its relationship with each such Fund.

---

[11]  Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), requires that the trustees or directors of a registered investment company "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms" of any investment advisory agreement.

(SMF ¶ 50-51)  The Board receives a document that clearly shows HCA's profitability and the comparative profitability of ten other firms for the past two years.  (SMF ¶ 55)  *The Board also receives an alternative, "Modified Profitability Analysis," in which profitability is calculated by removing sub-adviser expenses from both revenue and expense and comparing that adjusted profitability to the adjusted profitability of the other firms.*  (SMF ¶¶ 56-57)[12]  In addition, HCA provides aggregate profitability data separately for HCA, and its transfer agent and distributor affiliates, Harbor Services Group and Harbor Funds Distributors, as well as a consolidated total, for the past three years.  (SMF ¶ 9, 10, 53, 59)

In addition to the information provided by HCA, the Independent Trustees also receive detailed information from third parties.  Their counsel provides the Independent Trustees with a memorandum to assist them in their 15(c) review, as well as with counseling throughout the review process.[13]  (SMF ¶ 37, 61-63)  The Independent Trustees also receive extensive information prepared by Lipper, Inc. ("Lipper"), a well-recognized independent source of mutual fund data.  (SMF ¶ 42-43, 46)  Lipper supplies reports ("Lipper Reports") which compare each Harbor Fund's performance, fees, and expenses to benchmarks and/or to peer funds selected by Lipper.  (*Id.*)  Lead Independent Trustee Rodger Smith is involved in the process of selecting the peer groups utilized by Lipper.  (SMF ¶ 42)

In 2012, 2013, 2014 and 2015, as in prior years, the Independent Trustees reviewed and considered the materials provided to them and discussed with representatives of HCA the nature,

---

[12]  The adjustments to the profitability calculation of both HCA and the comparator firms are necessary to make an "apples to apples" comparison, and are fully explained to the Board.  (SMF ¶ 57)

[13]  The Dechert memorandum advises the Independent Trustees of the applicable regulatory framework to consider during their evaluation; of relevant case law under Section 36(b); of their duty to request and consider information necessary to evaluate the IAAs; and additional updates and information regarding a variety of topics relevant to the evaluation process, such as any new SEC rules.  (SMF ¶¶37, 61)

extent and quality of the advisory, subadvisory and other services provided by HCA to Harbor Funds, including the performance of each of the Harbor Funds; the comparative advisory fees and expense ratios of each of the Harbor Funds; the sharing of any economies of scale realized by HCA; HCA's profitability from its relationship with the Harbor Funds; information on any fallout benefits derived by HCA from its relationship with the Funds—in short, information pertinent to each of the Gartenberg factors. (SMF ¶¶ 39-44, 46-47, 49-51, 53, 55-61, 63-66) In each year, the Independent Trustees have voted unanimously to approve the continuation of the IAAs between HCA and the Funds. (SMF ¶ 67)

Against the overwhelming evidence establishing the robust nature of the review process employed by the Harbor Funds Board and the completeness of the information considered by the Board, Plaintiffs cannot point to any evidence warranting less than full deference to the Board's process. In a similar circumstance, the District of New Jersey recently granted summary judgment that a fund board's determination to approve management fees was entitled to "substantial weight" where the board was highly qualified and had received information relevant to each Gartenberg factor (including the amount of the subadvisory fees paid by the adviser and the adviser's own internal operating expenses), had access to comparative data provided by Lipper, and were advised by independent counsel. *Kasilag*, 2016 WL 1394347, at *5–6, *14, *21. The Court therefore should decline what undoubtedly will be an invitation from Plaintiffs to engage in the type of "judicial second-guessing of informed board decisions" that the Supreme Court warned against in *Jones*. 559 U.S. at 352; *see also Kasilag*, 2016 WL 1394347, at *14 ("a plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking," since "[s]uch a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing of a

21

board's process").

### B. The Fees Charged By HCA To The Two Funds At Issue Are Low Compared To Peer Funds

Comparing the fees charged to the Funds with fees charged to similarly styled funds in the mutual fund marketplace provides a critical benchmark in determining whether the fees at issue are so disproportionately large that they could not have been within the range of arm's-length bargaining.[14] In *Jones*, both the United States Supreme Court and the Seventh Circuit on remand noted their reaffirmance of this Gartenberg factor. *Jones*, 559 U.S. at 349–50; *Jones*, 611 F. App'x at 360–61. The Seventh Circuit, in affirming summary judgment for the adviser defendant in a case involving *higher fees* than those at issue here,[15] stated:

> The Justices ask whether a fee is so large that it could not have been the result of arm's length bargaining. This record shows that Harris's fee was comparable to that produced by bargaining at other mutual-fund complexes, which tells us the bargaining range.

*Jones*, 611 F. App'x at 361. Here, the fees paid by the Funds to HCA are not only *within* the bargaining range set by other mutual fund complexes, they are at the very *low end* of that range. (SMF ¶¶ 46-48)

---

[14] Plaintiffs' proffered expert in economics concedes that the mutual fund market is competitive. (Mueller Decl., Ex. 117 at 126) Moreover, most of the investors in the Harbor Funds generally, and in HIF and HHYBF specifically, were institutional investors with the sophistication and bargaining power to choose other mutual fund investments. (*See infra* n.16) Therefore, the Supreme Court's caution in *Jones* that comparative fees may have less value in instances where the fees of comparator funds were not negotiated at arm's-length should not diminish the value of the comparative fee analysis in this case.

[15] The two pure equity funds at issue in *Jones* both had higher fees than HIF. While the fee rates for HIF range from 0.75% to 0.57% depending upon asset levels (SMF ¶ 26), the Oakmark Global Fund charged 1% of the first $2 billion in assets, 0.95% for the next $2 billion and 0.9% for assets in excess of $4 billion; and the Oakmark Fund charged 1% of the first $2 billion of the Fund's assets, 0.9% for the next $1 billion, 0.8% for the next $2 billion, and then 0.75% for assets in excess of $5 billion. *Jones v. Harris Assocs. L.P.*, No. 04 C 8305, 2007 WL 627640, at *1–2 (N.D. Ill. Feb. 27, 2007), *aff'd*, 527 F.3d 627 (7th Cir. 2008), *vacated*, 559 U.S. 335 (2010), *remanded to*, 611 F. App'x 359 (7th Cir. 2015). These fees were found not to be excessive as a matter of law by Judge Kocoras. No high-yield bond fund was at issue in *Jones*.

Pursuant to the IAAs, HCA is compensated for the range of services it provides based upon a fraction of one percent of the average daily net asset values of the Funds. (SMF ¶ 25) The rate at which HCA is compensated for its services to the Funds is set forth below. The schedule for HIF employs "breakpoints" establishing lower fee rates at specified asset levels.

| Fund | Annual Management Fee Rate |
|------|---------------------------|
| HIF | 0.75% for AUM under $12 billion |
| | 0.65% for AUM between $12 billion and $24 billion |
| | 0.63% for AUM between $24 billion and $36 billion based on a contractual waiver |
| | 0.58% for AUM between $36 billion and $48 billion (contractual waiver) |
| | 0.57% for AUM over $48 billion (contractual waiver effective March 1, 2015) |
| HHYBF | 0.56% based on a 0.04% contractual waiver |

(SMF ¶¶ 26, 28)

The Harbor Funds Board has approved these fees after carefully reviewing comparative fee data in the Lipper Reports, as well as comparative fee information from Morningstar, Inc. ("Morningstar"). (SMF ¶¶ 46-48) [16] For HIF, Lipper compares the total expenses (or total expense ratio)[17] and the advisory fees to an "Expense Universe" comprised of "all other institutional and retail no-load international large-cap growth funds and international large-cap core funds" without 12b-1 fees, and to a smaller "Expense Group" using more refined peer

---

[16] There are four classes of shares in the Funds: Institutional, Retirement, Investor, and Administrative. The Lipper and Morningstar comparisons provided to the Board and referenced in this memorandum are for the Institutional class of shares, which holds approximately 87% of the money invested in the Harbor Funds, approximately 90% of the assets invested in HIF, and 93.5% of the assets invested in HHYBF. (SMF ¶ 8) Plaintiffs each hold their investments in the Institutional Class. (SMF ¶ 75, 76)

[17] The total expense ratio is the most common metric used by investors to compare the cost of mutual fund investments. (Mueller Decl., Ex. 117 at 161) Investors look at the total expense ratio when comparing investment options because it captures the total cost of the investment. Another practical reason for the use of the total expense ratio metric is that the division and classification of the costs of advisory, administrative, transfer agency and other services varies from fund to fund, making "apples to apples" comparisons difficult except by using the total expense ratio, which aggregates all of these costs. *See, e.g.*, "Mutual Fund Fees and Expenses," Securities and Exchange Commission, December 2000, *available at* http://www.sec.gov/answers/mffees.htm, accessed on May 20, 2016; "Division of Investment Management: Report on Mutual Fund Fees and Expenses," Securities and Exchange Commission, *available at* http://www.sec.gov/news/studies/feestudy.htm, accessed on May 20, 2016.

selection criteria. (SMF ¶ 46) Both the "total expenses" and the "actual management fees" of HIF have consistently ranked in the 1st Quintile, *or the lowest 20% of fees charged by peer funds.* (*Id.*) The total expense ratio for HIF in 2014 was 0.729%, the 3rd lowest among 16 peer funds in the Expense Group and the 3rd lowest among 56 peer funds in the Expense Universe. (*Id.*) HHYBF also has low fees, with total expenses in either the 1st or 2nd Quintile, and management (advisory) fees squarely in the middle of the pack. (*Id.*) The Lipper comparative expense ratio data for the Funds is summarized below:

| TOTAL EXPENSE RATIOS RELATIVE TO PEER GROUPS | | | |
|---|---|---|---|
| From Lipper 15(c) Expense Analysis Reports to the Board of Trustees | | | |
| | 2014 | 2013 | 2012 |
| **Harbor International Fund** | | | |
| **Expense Ratio** | 0.729% | 0.742% | 0.768% |
| **Expense Universe Comparison** | | | |
| Percentile Rank | 4% | 7% | 18% |
| Quintile | 1st | 1st | 1st |
| Median | 0.999% | 0.998% | 0.951% |
| High | 1.320% | 1.880% | 1.396% |
| Low | 0.635% | 0.414% | 0.446% |
| **Expense Group Comparison** | | | |
| Percentile Rank | 13% | 11% | 14% |
| Quintile | 1st | 1st | 1st |
| Median | 0.960% | 0.962% | 0.947% |
| High | 1.177% | 1.203% | 1.222% |
| Low | 0.635% | 0.639% | 0.642% |

(SMF ¶ 46)

| TOTAL EXPENSE RATIOS RELATIVE TO PEER GROUPS | | | |
|---|---|---|---|
| From Lipper 15(c) Expense Analysis Reports to the Board of Trustees | | | |
| | 2014 | 2013 | 2012 |
| **Harbor High Yield Bond Fund** | | | |
| Expense Ratio | 0.635% | 0.636% | 0.640% |
| Expense Universe Comparison | | | |
| Percentile Rank | 19% | 23% | 19% |
| Quintile | 1st | 2nd | 1st |
| Median | 0.747% | 0.736% | 0.755% |
| High | 1.620% | 1.773% | 1.622% |
| Low | 0.066% | 0.304% | 0.351% |
| Expense Group Comparison | | | |
| Percentile Rank | 25% | 17% | 13% |
| Quintile | 2nd | 1st | 1st |
| Median | 0.691% | 0.696% | 0.736% |
| High | 1.026% | 0.822% | 0.951% |
| Low | 0.299% | 0.383% | 0.568% |

(*Id.*)

The Morningstar comparative fee data reviewed by the Board is consistent with the Lipper Reports. (SMF ¶¶ 46-48) Much of the data and analyses offered by Morningstar is available on its website that is available to the public. (SMF ¶ 48) Consistent with the Lipper data, the expense ratios of HIF and HHYBF are well below both the "Morningstar Category Average" and the Morningstar "Fee Level Comparison Group Median" for each year from 2012 to 2015. (SMF ¶ 48)

For a Court to find that the fees charged to HIF and HHYBF were excessive, it necessarily would also be finding that the vast majority of mutual funds of the same style are charging excessive fees, an absurd result in the competitive mutual fund market. (Mueller Decl. Ex. 117 at 126) (acknowledging that there is competition for investor dollars in the mutual fund market). Nevertheless, Plaintiffs have tendered no expert on comparative fees, no contrary data, and no response to the proposition that the fees charged to the Funds are comparatively low.

Thus, on the Gartenberg factor that carried the most weight in the Seventh Circuit's affirmance of the grant of summary judgment in *Jones*, the evidence of low comparative fees stands unrebutted.[18]

### C. To The Extent There Is Any Challenge To The Nature And Quality Of The Services Provided By HCA, The Funds Have Performed Better Than Or In Line With Their Peers

HCA provides the Funds with all services necessary to the operation of the Funds other than those discrete services for which the Funds separately pay third-party service providers, such as custodial or audit services.  (SMF ¶ 13)  As it relates to investment advisory services, HCA is responsible for establishing, and for recommending changes to, the investment policies, strategies and guidelines for each Fund.  (SMF ¶ 14)  HCA also is responsible for providing, either itself or through a subadviser selected, paid and supervised by HCA, investment research and advice, and for furnishing continuously an investment program for each Fund consistent with the investment objectives and policies of each Fund.  (*Id.*)  In addition, HCA is responsible for overseeing the subadviser to each Fund, including recommending for Board consideration the selection, termination and replacement of subadvisers.  (SMF ¶ 23)  There is no evidence of any deficiency in the "nature and quality" of these investment advisory or any other services provided by HCA—and even Plaintiffs' expert has testified that "I believe that they [the services

---

[18]  Comparative fee analysis was used by the courts in *Jones*, *Gallus* and *Kasilag* in granting full or partial summary judgment for the adviser defendants in those cases. *Jones*, 2007 WL 627640, at *8 (granting full summary judgment where fees fell within the range of prices that investors were willing to pay to invest in comparable mutual funds, "preventing a conclusion that the amount of fees indicates that self-dealing was afoot"); *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982–83 (D. Minn. 2007), *rev'd on other grounds*, 561 F.3d 816 (8th Cir. 2009), *vacated*, 559 U.S. 1046 (2010), *remanded to* No. 04-4498, 2010 WL 5137419, at *1 (D. Minn. Dec. 10, 2010), *aff'd*, 675 F.3d 1173 (8th Cir. 2012) (granting full summary judgment where board considered Lipper comparative fee data); *Kasilag*, 2016 WL 1394347, at *5–6, *21 (granting summary judgment with respect to board process where the board considered Lipper comparative fee data); *see also In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593, 2009 WL 5215755, at *25 (C.D. Cal. Dec. 28, 2009) ("Lipper, Inc. . . . is a recognized industry-leading third-party source for mutual fund industry data," including comparative fee data).

rendered by HCA] were of the nature specified in the contract, and they were reasonably good quality."  (Mueller Decl., Ex. 117 at 132)  Rather than challenge the quality of the services rendered by HCA, Plaintiffs challenge the cost of those services in relation to HCA's "retained fee," an argument that should be seen for what it is—a misguided "profitability," and not a "nature and quality," argument.  (*See infra* Section III.D)

But HCA is responsible for far more than investment advisory services.  (SMF ¶¶ 15-19) It has full responsibility for administering the affairs of the Trust and each Fund, including financial and administrative services, compliance services, legal and regulatory services and tax services.  (SMF ¶ 15)  On an ongoing basis, HCA is responsible for evaluating the pricing of each Fund in light of various developments that may affect each Fund's overall expense ratio internally and relative to peer funds, such as from material changes in net assets or from other industry developments, with the objective that each Fund maintain a competitive overall expense ratio.  (SMF ¶ 16)  These efforts often have resulted in HCA voluntarily implementing and adjusting expense caps and/or contractual advisory fee waivers for the Funds over time.  (*Id.*)  In addition, HCA is responsible for overseeing the services provided to the Funds by all other service providers to the Funds, including the Funds' custodian and transfer agent.  (SMF ¶ 19) There is no dispute regarding the fact that HCA provides these services, nor about the quality of those services.

Some courts have looked to the investment performance of the funds at issue compared to peer funds in considering the nature and quality of the services provided.  *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1229 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ("the fund's performance relative to other funds of the same kind" is an indication of the quality of an investment adviser's services).  The Seventh Circuit in *Jones* also took note of fund

27

performance in finding that "the undisputed evidence shows that Harris delivered value for the money; the funds it was advising did as well as, if not better than, comparable funds." *Jones*, 611 F. App'x at 361; *see also Gallus*, 497 F. Supp. 2d at 977. Neither of Plaintiffs' experts has any opinions regarding the investment performance of the Funds (Mueller Decl., Ex. 117 at 41; Ex. 118 at 273), presumably because the investment performance of HIF over any extended period of time has been outstanding. Because the performance of the Funds is as good as, if not better than, comparable funds (SMF ¶ 44), and the Funds have consistently paid comparatively low fees (SMF ¶ 46), summary judgment is warranted based on these two factors alone. *Jones*, 611 F. App'x at 361 (stating that performance and low fees "jointly suffice under the Supreme Court's standard").

Since the *inception* of HIF in 1987, it has returned 11.38% annually, which exceeds its benchmark by 5.34% on a net of fee basis, meaning *after* adjusting performance for the cost of the investment. (SMF ¶ 44) For the last 25 years ending December 31, 2014, it has been the best performing international equity fund among its peers net of fees. (*Id.*) The portfolio managers for HIF have won the coveted Morningstar International Stock Manager of the Year Award in 1996 and 2007. (SMF ¶ 45)                REDACTED

[19]
.

---

[19]  In recent years, Mr. Zehrer has opted for lower cost index funds and exchange traded funds (SMF ¶ 75)                REDACTED

HHYBF has just slightly underperformed its benchmark over the long term, by either 0.36% or 1.30% over the last ten years depending upon which of two possible benchmarks is used. (SMF ¶ 44) But as reflected in HHYBF's Prospectus disclosure, HHYBF has an intentionally conservative investment strategy designed to avoid investing in "distressed" high yield securities that may provide higher yield (and more risk). (SMF ¶ 7) As a result, the fund provides greater downside protection at the expense of potentially greater appreciation during periods of growth in a full market cycle. (*Id.*) Thus, HHYBF performed well during the financial crisis of 2007 and 2008 in comparison to its peer funds. (SMF ¶ 44)

Plaintiffs may respond by highlighting some recent short-term underperformance. However, underperformance over the short term is hardly remarkable. *Migdal v. Rowe Price-Fleming, Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) ("Even the most knowledgeable advisers do not always perform up to expectations, and investments themselves involve quite different magnitudes of risk"). While variations over the short term will inevitably occur because of market fluctuations, over the long term, HHYBF has been a steady performer and HIF has been an exceptional one. (SMF ¶ 44) Because both fees and performance of the Funds are at least in line with other comparable funds, summary judgment is warranted. *Jones*, 611 F. App'x at 361.

### D. Plaintiffs' Profitability Analysis Is Both Legally and Factually Deficient

It is well settled that a plaintiff cannot establish a violation of Section 36(b) by alleging that the defendant "just plain made too much money." *Kalish*, 742 F. Supp. at 1226–27, 1236–37. As discussed *supra* at page 13, it is equally well-settled that a "cost-plus" type of contract is not required. *Gartenberg*, 694 F.2d at 928 (citing S. Rep. No. 91-184, at 6, *reprinted in* 1970 U.S.C.C.A.N. at 4902 (similar)). Yet, the very premise of Plaintiffs' theory is that HCA's fees should be evaluated on a cost-plus basis:

Q. Now, your opinion as to what would be an advisory fee charged by HCA

29

to the funds, that would not be excessive in your view, would it be fair to say that you've calculated that fee by looking at the internal costs of HCA and then adding to that what you've determined to be a reasonable profit?

> MR. GERARD: Objection to form.

A.  I indeed performed that kind of calculation, yes.

Q.  Okay, and that calculation of expenses plus some reasonable profit margin as you determined it, what's your source of authority in the literature as it relates to that being the appropriate way to determine whether a fee is excessive or not?

A.  Well, that's standard in government contracting, cost plus and cost accounting practice. It is common in utility regulation and similar regulation, and it's common in supervision of banking.

(Mueller Decl., Ex. 117 at 146) Mr. Kopcke's observation that his "cost-plus" analysis is "common in utility regulation" stands in stark defiance of the statement in the legislative history (and cited in *Gartenberg*) that "[Section 36(b)] is not intended to introduce general concepts of rate regulation as applied to public utilities." *See* S. Rep. No. 91-184, at 6.

In any event, HCA's profit margins with respect to the Funds are entirely in line with industry norms. HCA's profitability with respect to the two Funds (excluding distribution expenses, but before taxes) was REDACTED for HIF and REDACTED for HHYBF in 2014, REDACTED (SMF ¶ 53) HCA as a whole, again excluding distribution expenses, had profit margins of REDACTED for the years 2012, 2013 and 2014, respectively. (SMF ¶ 59) These profit margins are below or within the range of margins that courts have found not violative of Section 36(b), many of which were calculated on a post-tax basis and included certain distribution expenses (lowering profitability). *See, e.g.*, *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978, 978 n.49, 979 (S.D.N.Y. 1987) (pre-tax margins up to 77.3% and post-tax margins up to 38.6%, including "sales promotion" costs); *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50 (combined operating profit of adviser and affiliated distributor ranged from 42% to 48% and operating profit

of adviser alone ranged from 36% to 52%); *Kalish*, 742 F. Supp. at 1236, 1250 (post-tax margin

of up to 37.8% "neither requires nor supports a finding [of excessiveness]").

Plaintiffs seek to restate HCA's profit margins, grossly inflating them to more than RED ACT,

by recasting the subadvisory fees paid by HCA as a "contra-revenue" item instead of an expense.

But HCA engages the subadvisers, pays the subadvisers, establishes the investment parameters

that they must follow, manages them on a daily basis, and ultimately is responsible for their

work.  (SMF ¶¶ 20-23)  Given these undisputed facts, treating subadvisory fees as an HCA

expense is entirely proper under generally accepted accounting principles ("GAAP") (SMF ¶

54), as                    REDACTED                    and the *Sivolella* Court has found.  (Mueller Decl.,

Ex. 118 at 232-35); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-cv-4194, 2016 WL

4487857, at *71 (D.N.J. Aug. 25, 2016) (finding that "the credible evidence demonstrated that

sub-advisory and sub-administration fees are properly treated as expenses").  Two independent

auditing firms, Ernst & Young and KPMG, have audited HCA's financial statements and

confirmed that treatment of subadvisory fees as an expense is consistent with GAAP in rendering

unqualified opinions on those financial statements.  (SMF ¶ 52)

Moreover, the Independent Trustees were well aware of the amount of the subadvisory

fees and the obvious effect that removing the single largest expense of operating the Funds

would have on HCA's profit margins.  (Mueller Decl., Ex. 118 at 183-84; SMF ¶¶ 51, 56-58)

The *Kasilag* court, in granting partial summary judgment that the Board's determination

regarding profitability was entitled to substantial weight, rejected an argument identical to

Plaintiffs' argument here that had been advocated by the very same plaintiffs' experts:

> Plaintiffs cannot reconcile the fact that the entirety of their argument that the information
> was misleading is based on re-arranging the documents and information that were
> provided to the Board.  For instance, Plaintiffs do not argue that in 2011 the Board was
> not aware that it paid $113 million in gross advisory fees for the management of the Cap

App Fund. Likewise Plaintiffs do not argue that in 2011, the Board was unaware that $43 million of that amount was paid by the HIFSCO on to Wellington to cover sub-advisory expenses, and that HIFSCO incurred [redacted text] of its own operating expenses. Of course, the reason that this is not argued is because this information was conveyed directly to the Board in preparation for its duties to approve the advisory fee. The fact that the Board was given one accounting treatment of these inputs over another does not in and of itself impugn the Board's approval.

*Kasilag*, 2016 WL 1394347, at *11 (alteration in original); *see also Gallus*, 497 F. Supp. 2d at 981 ("[a]lthough Plaintiffs suggest that the Board should have had different information than what the Board was provided," plaintiffs' experts "do not point to any authority detailing requirements for the presentation of profitability data").

In this case, the Board has been provided the Modified Profitability Analysis each year since 2012, in which subadvisory fees are excluded from the profitability calculus. (SMF ¶¶ 56-58) The Modified Profitability Analysis is both powerful evidence of the independence of the Independent Trustees and conclusive evidence that the Board was well aware of the self-evident proposition that removing subadvisory expenses would result in a large increase in HCA's profit margins, REDACTED . (SMF ¶ 57) Thus, the central tenet of Plaintiffs' theory of Section 36(b) liability—that HCA's profit margins appear much higher when subadvisory expenses are removed from the equation—was well known to the Board.

### E. Plaintiffs Cannot Prove That Economies Of Scale Existed Or Were Not Shared

Courts have consistently held that in order to demonstrate the existence of economies of scale, the plaintiff in a Section 36(b) case must show that the per-unit cost of servicing the funds decreased as the funds' assets grew. *Sivolella*, 2016 WL 4487857, at *56 (finding that plaintiffs failed to prove economies of scale under this definition); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (dismissing complaint that failed to allege "the actual transaction costs

at issue and whether the costs per investor increased or decreased as the assets under management grew") (emphasis added). Here, Plaintiffs have adduced no evidence that the total per-unit cost of servicing the Funds declined as the Funds grew in size. Without such information, "there is no way to determine whether any economy of scale even existed . . . ." *Hoffman*, 591 F. Supp. at 540.

In the manager-of-managers structure, economies of scale can be evaluated only in the context of the full cost of operating a mutual fund, including subadvisory costs. Because subadvisory costs, like advisory fees, are based upon a percentage of AUM, subadvisory fees increase proportionately as AUM increases. The Court in *Sivolella* rejected plaintiffs' economies of scale analysis, presented through Mr. Kopcke, in part because he "only looked at direct costs, whereas he should have used total costs, which include allocated costs from AXA and variable costs such as subadvisory fees." *Sivolella*, 2016 WL 4487857, at *16 (holding that because expert Richard Kopcke "excluded sub-advisory and sub-administrative fees as costs," he "analyzed an under-inclusive set of expenses").[20] If subadvisory expenses are excluded, any economies of scale would be very small in any event. (Mueller Decl., Ex. 118 at 308-10)

HCA has long employed breakpoints and fee waivers to ensure that Fund shareholders receive more than their fair share of any economies of scale that may exist. HCA added a breakpoint reducing its management fee from 75 basis points to 65 basis points on assets between $12 billion and $24 billion. (SMF ¶¶ 26-29, 68-69) Since that time, annual contractual

---

[20] The Court in *Sivolella* relied upon the defendant's expert, Christopher M. James, Ph.D., in rejecting the economies of scale analysis of Mr. Kopcke. *Sivolella*, 2016 WL 4487857, at *59. HCA has proffered Dr. James as one of its experts in this case but is not relying on his findings to support this motion, with one exception. HCA has cited Dr. James's report in this case, but only for his *calculations* of amounts that shareholders saved through breakpoints, which amount to more than $164 million. (*See infra* at 33-34) In *Sivolella*, the Court relied upon Dr. James' similar calculation that shareholders had saved $68.8 million through breakpoints. *Id.* at *57.

fee waivers have added additional breakpoints for each additional $12 billion in assets up to $48 billion. (*Id.*) Due to breakpoints and fee waivers, during 2014, the effective advisory fee charged to HIF was only 64.9 bps, which is 10.1 bps (13.5%) less than the base advisory fee of 75 bps. (SMF ¶ 27) The difference between the fee actually charged and the base advisory fee is the amount of savings associated with the advisory fee breakpoints and waivers. *Sivolella*, 2016 WL 4487857, at *56 ("The most common way in which savings resulting from economies of scale are shared with investors is through breakpoints."); *see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1054 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) (breakpoints are an automatic form of sharing).

From 2012 to 2015, the advisory fee for HIF was reduced by nearly $161 million as a result of the contractual advisory fee breakpoints and waivers. (SMF ¶ 29) During the same period, the advisory fee for HHYBF was reduced through a contractual advisory fee waiver by over $3.1 million. (*Id.*) In 2014 alone, HCA's total internal (allocated) expenses from which it might derive economies of scale for HIF were approximately REDACTED . (*Id.*) In the same year, HCA reduced the HIF advisory fee as a result of breakpoints and waivers by $51.0 million or REDACTED of the total non-subadvisory expenses of HIF. (*Id.*) In view of these undisputed facts, Plaintiffs have not shown, and cannot show, that HCA's sharing of potential economies of scale has been inadequate.[21] *Jones*, 2007 WL 627640, at *9 (granting summary judgment where there was no indication that breakpoints were not set at levels that could have been reached after good-faith negotiations).

---

[21] Section 36(b) does not require an investment adviser to pass on *all* economies of scale benefits to the funds. Rather, it requires only that any such economies be shared *equitably* with the fund. S. Rep. No. 91-184 at 4, *reprinted in* 1970 U.S.C.C.A.N. at 4901 ("[T]his bill recognizes that investors should *share equitably* . . . in the economies") (emphasis added).

## CONCLUSION

The essential premise of Plaintiffs' claims in this case—that the management services provided by an investment adviser and the management fees it receives may be disaggregated and rearranged as Plaintiffs see fit—is contrary to Section 36(b), to the legislative history of that statute, and to the case law construing it. On this basis alone, HCA should be granted summary judgment. Consideration of the undisputed facts bearing upon each of the Gartenberg factors reaffirms this conclusion, and provides an additional and independent basis for an award of summary judgment.

For the reasons set forth in this memorandum, HCA respectfully requests that the Court enter an order granting it summary judgment on the claims of Plaintiffs Terrence Zehrer and Ruth Tumpowsky.


Dated:  September 8, 2016                        Respectfully submitted,

                                                DEFENDANT HARBOR CAPITAL
                                                ADVISORS, INC.


                                                By:  _____/s/ Stephen J. O'Neil_____
                                                        One of its Attorneys

John W. Rotunno
Stephen J. O'Neil
Paul J. Walsen
Clifford C. Histed
Molly K. McGinley
Nicole C. Mueller
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602-4207
Telephone:  (312) 372-1121
Facsimile:    (312) 827-8000

*Attorneys for Defendant Harbor Capital Advisors, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on September 13, 2016, the foregoing **Memorandum In Support Of Motion Of Harbor Capital Advisors, Inc. For Summary Judgment** was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to following counsels of record:

Norman Rifkind
LASKY & RIFKIND, LTD.
100 E. Huron Street #1306
Chicago, Illinois 60654

Stephen J. Oddo
Edward B. Gerard
Jenny L. Dixon
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, California 92101

Andrew W. Robertson
Susan Salvetti
Robin F. Zwerling
Jeffrey C. Zwerling
ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue
New York, New York 10010

Arnold C. Lakind
Robert L. Lakind
Daniel S. Sweetser
Christopher S. Myles
Mark A. Fisher
Robert G. Stevens
SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648

Marvin Alan Miller
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, Illinois 60603

_____
/s/ Stephen J. O'Neil