## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TERRENCE ZEHRER,<br><br>        Plaintiff,<br><br>    v.<br><br>HARBOR CAPITAL ADVISORS, INC.,<br><br>      Defendant. | Case No.: 14-cv-00789<br><br>Hon. Joan Humphrey Lefkow |
| RUTH TUMPOWSKY,<br><br>        Plaintiff,<br><br>    v.<br><br>HARBOR CAPITAL ADVISORS, INC.,<br><br>      Defendant. | Case No.: 14-cv-07210<br><br>CONSOLIDATED<br><br><br><br>ORAL ARGUMENT REQUESTED |

## PLAINTIFFS' RESPONSE TO THE MOTION OF DEFENDANT HARBOR CAPITAL ADVISORS, INC. FOR SUMMARY JUDGMENT

Case: 1:14-cv-00789 Document #: 198-1 Filed: 11/02/16 Page 2 of 49 PageID #:12886

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................... 1

II. LEGAL STANDARDS .................................................................................... 2

    A.  Background to and Legal Standard for Section 36(b) ........................... 2

    B.  Summary Judgment Is Generally Inappropriate in Section 36(b) Cases ................ 5

III. HCA HAS NOT AND CANNOT MEET ITS BURDEN TO SHOW THAT NO TRIABLE ISSUES OF FACT EXIST AS TO WHETHER HCA'S FEES ARE EXCESSIVE ....................... 7

    A.  Summary Judgment Is Not Appropriate Under *Jones II* ....................... 7

    B.  Plaintiffs' Claims Are Not Limited to a "Portion" of the Advisory Fees .............. 10

    C.  There Are Numerous Triable Issues of Fact Regarding the Substantive Fairness of HCA's Compensation ........................... 14

        1.  There Are Disputed Issues of Fact as to the Nature and Quality of Services HCA Provides to the Funds ........................... 14

        2.  Investment Performance Does Not Justify the Funds' Advisory Fees ........................... 17

        3.  There Are Triable Issues Regarding HCA's Profitability ............ 19

        4.  There Are Triable Facts Regarding Comparative Mutual Fund Fee Structures ........................... 24

            a.  HCA's Total Fee Comparison is Improper ............ 25

            b.  HCA Manipulates the Lipper Materials ............ 26

            c.  The Lipper Analysis Contains Inapt Fee Comparisons and Is Patently Misleading ............ 27

            d.  The Fees of the HIF and HHYBF Exceed the Morningstar Averages ............ 29

        5.  There Are Triable Issues of Fact Regarding Economies of Scale ............ 29

        6.  There Are Triable Issues Regarding Fall-Out Benefits ............ 31

    D.  There Are Material Facts in Dispute as to Whether the Board's Approval of the Fees Is Entitled to Any Deference and if so, the Extent of Any Such Deference ........................... 31

1.     Board Process, No Matter How Robust, Is not Sufficient by Itself to Defeat Liability in Section 36(b) cases ...................................................32

2.     Board Approval Is Entitled to Substantial Deference Only if It Followed a Robust Review and Negotiating Process and Had All Material Information at Its Disposal in Approving the Fees ....................33

3.     The Board Is Entitled to Minimal, if Any, Deference in Its Approval of Fees Because of the Failure to Fully Inform Itself, Its Conflicts of Interest in Negotiating Fees, and Its Passive Negotiating History ....................................................................................34

4.     HCA Has Not Presented Evidence Demonstrating that the Board Conducted A Thorough Fee Review Process As a Matter of Law ...........38

IV.    CONCLUSION ...............................................................................................39

# TABLE OF AUTHORITIES

**CASES**             **PAGE(S)**

*Bennett v. Fid. Mgmt. & Research Co.*,
    No. C.A. 04-11651-MLW, 2011 WL 98837 (D. Mass. Jan. 10, 2011) ..............................4

*Blasius v. Angel Auto., Inc.*,
    No. 15-2994, 2016 WL 5929824 (7th Cir. Oct. 12, 2016) .................................5

*Chill v. Calamos Advisors LLC*,
    No. 15 CIV. 1014(ER), 2016 WL 1258984 (SD.N.Y. 2016) ...............................28, 36, 37

*Curran v. Principal Mgmt. Corp, LLC*,
    No. 4:09-CV-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010) ..................................4

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984) ....................................................................................2

*Evangelist v. Fid. Mgmt. & Research Co.*,
    554 F. Supp. 87 (D. Mass. 1982) .................................................................39

*Gallus v. Ameriprise Fin., Inc.*,
    675 F.3d 1173 (8th Cir. 2012) ..........................................................34, 35, 36

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982) .......................................................................4, 8, 37

*Gunville v. Walker*,
    583 F.3d 979 (7th Cir. 2009) .....................................................................30

*In re Am. Mut. Funds Fee Litig.*,
    No. CV 04-5593 GAF, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ...........26, 28, 35, 37

*In re Goldman Sachs Mut. Funds*,
    No. 04 Civ. 2567(NRB), 2006 WL 126772 (S.D.N.Y. Jan.17, 2006)..............................26

*Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011)...............................26

*Jones v. Harris Associates L.P.*,
    611 F. App'x 359 (7th Cir. 2015) ......................................................7, 8, 9, 10

*Jones v. Harris Assocs. L.P.*,
    537 F.3d 728 (7th Cir. 2008) .....................................................................9, 38

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)..................................................................... *passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990)..............................................................8, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ...............................................................................4

*Kasilag v. Hartford Inv. Fin. Servs. LLC*,
    No. CV 11-1083, 2016 WL 1394347 (D.N.J. Apr. 7, 2016) .................................... *passim*

*Krinsk v. Fund Asset Mgmt., Inc.*,
    715 F. Supp. 472 (S.D.N.Y. 1988) .........................................................23

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989) ...............................................................8

*Laborers' Local 265 Pension Fund v. iShares Trust*,
    769 F.3d 399 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1500, 191 L. Ed. 2d
    452 (2015) ...............................................................................25

*Levy v. All. Capital Mgmt. L.P.*,
    189 F.3d 461 (2d Cir. 1999) ...............................................................25

*Meyer v. Oppenheimer Mgmt. Corp.*,
    895 F.2d 861 (2d Cir.1990) ................................................................26

*Midlock v. Apple Vacations W., Inc.*,
    406 F.3d 453 (7th Cir. 2005) ..............................................................24

*Migdal v. Rowe Price-Fleming International, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ..............................................................19

*N. Valley GI Med. Grp. v. Prudential Invs. LLC*,
    No. CV JKB-15-3268, 2016 WL 4447037 (D. Md. Aug. 23, 2016) .................................9

*Pfeiffer v. Integrated Fund Servs. Inc.*,
    371 F. Supp. 2d 502 (S.D.N.Y. 2005) ......................................................26

*Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*,
    No. 11-CV-873-JPS, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ...............................4

*S.E.C. v. Am. Birthright Trust Mgmt. Co.*,
    No. 80-9266, 1980 WL 1479 (D.D.C. Dec. 30, 1980) ........................................13

*Santomenno v. Transamerica Life Ins. Co.*,
    310 F.R.D. 451 (C.D. Cal. 2015) ...........................................................3

*Sivolella v. AXA Equitable Life Ins. Co.*,
    No. 11-cv-4194(PGS)(DEA), 2016 WL 4487857 (D.N.J. Aug. 25, 2016) ...................23, 24

*Thomas v. Sheahan*,
    499 F. Supp. 2d 1062 (N.D. Ill. 2007) .....................................................5

## STATUTES, RULES & OTHER AUTHORITIES

1970 U.S.C.C.A.N. 4897 ..................................................................................................2

15 U.S.C. §80a-35(b) .................................................................................................24

Fed. R. Civ. P. 56(a) ....................................................................................................5

H. Norman Knickle, *The Mutual Fund's Section 15(c) Process: Jones v. Harris, the SEC, and Fiduciary Duties of Directors*, 31 Boston L.J. 265, 336 (2011-2012)..........................................................................................................12

H.R. Rep. No. 2337 (1966) .............................................................................................3

ICI Independent Directors Council Task Force Report, *Board Oversight of Subadvisers*, Jan. 2010 ...................................................................................12

*In re Smith Barney Fund Mgmt LLC*, Exchange Act Release No. 05-51761 (May 31, 2005) ..........................................................................................13, 23

Kate Stalter, *The Investment Fees You Don't Realize You're Paying*, Dec. 15, 2014 ........................3

Morgan Housel, *Stop Deluding Yourself About Investing Expenses*, Apr. 10, 2015 ...........................3

S. Rep. No. 91-184 (1969) ....................................................................................2, 3, 33

Thoreau Bartmann, et al., SEC, IM Guidance Update, *Mutual Fund Distribution and Sub-Accounting Fees* (Jan. 2016) ...............................................................12

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| "Action" | *Zehrer, et al. v. Harbor Capital Advisors, Inc.*, Case No. 14-cv-00789 (N.D. Ill.) |
| "AUM" | Assets under management |
| "Barrett Rebuttal" | Rebuttal Expert Report of Kent E. Barrett prepared on June 10, 2016 |
| "Barrett Rpt" | Expert Report of Kent E. Barrett prepared on March 28, 2016 |
| "Barrett" | Kent E. Barrett |
| "Board" | Funds' Board of Trustees |
| "Dixon Decl. Ex." | Exhibits attached to the Declaration of Jenny L. Dixon in Support of Plaintiffs' Response to the Motion of Defendant Harbor Capital Advisors, Inc. for Summary Judgment |
| "DSMF" | Defendant Harbor Capital Advisors, Inc.'s Statement of Material Facts as to Which There Is No Genuine Dispute filed September 8, 2016 (redacted version filed September 8, 2016) (Document 165) |
| "Funds" | The mutual funds named in this action refer to Harbor International Fund and the Harbor High-Yield Bond Fund |
| "GAAP" | Generally Accepted Accounting Principles |
| "Harbor Funds" | Thirty share series composing the Trust (includes HIF and HHYBF) |
| "HCA" or "Defendant" | Defendant Harbor Capital Advisors, Inc. |
| "HHYBF" | Harbor High-Yield Bond Fund |
| "HIF" | Harbor International Fund |
| "Kopcke Rebuttal" | Rebuttal Expert Report of Richard W. Kopcke, Ph.D., CFA prepared on June 10, 2016 |
| "Kopcke Rpt" | Expert Report of Richard W. Kopcke, Ph.D., CFA prepared on March 28, 2016 |
| "Kopcke" | Richard W. Kopcke, Ph.D., CFA |
| "Mot." | Memorandum in Support of Motion of Harbor Capital Advisors, Inc. for Summary Judgment filed September 8, 2016 (redacted version filed September 13, 2016) (Document 173) |

| "Mueller Decl." | Declaration of Nicole C. Mueller filed September 8, 2016 |
| "Mueller Decl. Ex." | Exhibits attached to the Declaration of Nicole C. Mueller filed September 8, 2016 |
| "Northern Cross" | Northern Cross, LLC |
| "Plaintiffs" | Plaintiffs Terrence Zehrer and Ruth Tumpowsky |
| "RESP" | Plaintiffs' Response to Defendant Harbor Capital Advisors, Inc. Statement of Material Facts as to Which There Is No Genuine Dispute |
| "SAMF" | Plaintiffs' Statement of Additional Material Facts |
| "Section 36(b)" | Section 36(b) of the Investment Company Act of 1940, as amended 15 U.S.C. §80a-35(b) |
| "Shenkman" | Shenkman Capital Management, Inc. |
| "Subadvisers" | Northern Cross and Shenkman, unaffiliated investment advisers who provide investment advisory services to the Harbor Funds |
| "Wermers Rpt" | Expert Report of Russell R. Wermers, Ph.D. prepared March 28, 2016 |
| "Wermers" | Russell R. Wermers, Ph.D. |

## I.    PRELIMINARY STATEMENT

Plaintiffs bring this action to hold HCA accountable for the excessive fees it charges HIF and HHYBF in breach of Section 36(b) of the Investment Company Act of 1940.  Put simply, for ███████ in compensation HCA collects from the Funds, it incurs only █████ in costs for the services it purportedly provides.  As a result, the fees HCA collects are "'so disproportionately large" 'that they "'bear[] no reasonable relationship to the services rendered'" and that the fees "'could not have been the product of arm's length [negotiations].'"  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 335-37 (2010) ("*Jones*").[1]

Section 36(b), which imposes a fiduciary duty on mutual fund advisors, is the only legal mechanism that exists for shareholders to challenge the excess fees charged to mutual funds by advisers like HCA.  Not surprisingly, mutual fund advisers have fiercely litigated challenges to the fees they collect, retaining large defense firms and throwing unlimited resources toward defeating shareholders who dare to question the fees they collect from the mutual funds.  And HCA's insinuation that because no shareholder has "succeeded in obtaining a judgment" (Mot. at 3) in a Section 36(b) action summary judgment must be entered here is non-sensical.  In fact, not a single Section 36(b) action pursuing claims based on the "manager-of-managers" theory as Plaintiffs are here has been dismissed at the summary judgment stage.

HCA's request for summary judgment hinges on its unsupported claims that "it is incontrovertible that the management fees paid to HCA by HIF and HHYBF are at the lower end of the range of fees paid by other comparable mutual funds … and that the services provided by HCA to the Funds are of high caliber."  Mot. at 3.  The evidence tells a different story.  ████

████████████████████████████████████████████████████

---

[1] Here, as throughout, all emphasis is deemed added and citations and footnotes are deemed omitted unless otherwise noted.

 At a minimum, this evidence establishes that there are genuine disputes over material facts that preclude summary judgment and that a trial is required to scrutinize the substantive fairness of the challenged fees.

## II.  LEGAL STANDARDS

### A.  Background to and Legal Standard for Section 36(b)

"Unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser," which selects the fund's directors, manages the fund's investments, and provides other services.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).  For almost fifty years, legislators and regulators have lamented that the "forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors" since "a mutual fund cannot, as a practical matter, sever its relationship with the adviser," which is still true today.  S. Rep. No. 91-184, at 5 (1969), reprinted in 1970 U.S.C.C.A.N. 4897, 4901.  In fact, the U.S. Securities and Exchange

Commission (the "SEC") concluded in its 1966 Report, regardless of how informed shareholders were, they have almost no power to effect a change in the fees of a fund.[2]  This is still true today. Further, there is widespread evidence that, despite the disclosure requirements, mutual fund shareholders generally have a low understanding and awareness of the fees they pay.[3]  As a result, mutual fund shareholders are not able to effectively monitor and analyze whether each particular fee they are paying is reasonable relative to the services provided.[4]

Concern that this structure had led to excessive fees in the mutual fund industry prompted Congress to enact Section 36(b) in order to provide fund shareholders with a stronger legal remedy to challenge excessive fees.  S. Rep. No. 91-184, at 5.  The new "fiduciary duty" imposed by Section 36(b) on mutual fund investment advisers with respect to fees was intended to be a significant departure from the prior "'corporate waste'" standard—which was highly deferential to board approval.  *Id.* at 5.  Because Congress found mutual fund board directors could not be relied upon to protect investors against excessive fees, less deference to board

---

[2] *See* H.R. Rep. No. 2337, at 127-28, 147-49 (1966) (noting the lack of practical alternatives available to dissenting shareholders, limited shareholder rights, the lack of incentives to collectively organize, and the difficulty for lay shareholders to analyze the fairness of fees).

[3] *See* Kate Stalter, *The Investment Fees You Don't Realize You're Paying*, Dec. 15, 2014, http://money.usnews.com/money/personal-finance/mutual-funds/articles/2014/12/15/the-investment-fees-you-dont-realize-youre-paying (referencing survey which revealed lack of understanding of mutual fund investors about the amount of fees they paid); *see also* Morgan Housel, *Stop Deluding Yourself About Investing Expenses*, Apr. 10, 2015, http://wsj.com/articles/stop-deluding-yourself-about-investing-expenses-1428669774 (citing to study making similar conclusions).

[4] H.R. Rep. No. 2337, at 128 (noting the difficulty for shareholders to appreciate and analyze the fairness of mutual fund fees because of the complexity of the determination); *Santomenno v. Transamerica Life Ins. Co.*, 310 F.R.D. 451, 465 (C.D. Cal. 2015) (noting the inability of shareholders to monitor the appropriateness of their total fees).

approval was appropriate.[5]

In *Jones*, the Supreme Court adopted a standard of liability for Section 36(b) cases that focuses on the relationship between the adviser's compensation and the services it provides. Specifically, an adviser is liable if its compensation is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. *Jones*, 559 U.S. at 346. The court emphasized that all "relevant circumstances" must be considered. *Id.* at 344-45, 349. While the court mentioned certain factors considered by prior courts, including the so-called "*Gartenberg* factors," it did not require consideration of those factors or limit consideration of other facts and circumstances. *Jones*, 559 U.S. at 344-45. Rather, the court left to the discretion of trial courts which facts and circumstances are relevant in a particular case and the weight to be afforded each such factor as part of the analysis.

Accordingly, to prevail on a Section 36(b) claim, Plaintiffs must show, based on the totality of the "relevant circumstances," that HCA's compensation bears no reasonable relationship to the services it provides. As set forth herein, Plaintiffs have adduced evidence that, at a minimum, demonstrates that the material facts at the core of this inquiry are in dispute.[6]

---

[5] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) ("Congress added § 36(b) to the ICA in 1970 because it concluded that the shareholders should not have to 'rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board.'").

[6] *Jones*, 559 U.S. at 347; *Curran v. Principal Mgmt. Corp, LLC*, No. 4:09-CV-00433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010); *Bennett v. Fid. Mgmt. & Research Co.*, No. C.A. 04-11651-MLW, 2011 WL 98837, at *1 (D. Mass. Jan. 10, 2011) (considering several factors other than the *Gartenberg* factors); *Kasilag v. Hartford Inv. Fin. Servs. LLC*, No. CV 11-1083 (RMB/KMW), 2016 WL 1394347, at *21 (D.N.J. Apr. 7, 2016) (denying motion for summary judgment where the plaintiff had not presented evidence creating triable issues on each factor); *Reso ex rel. Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, No. 11-CV-873-JPS, 2011 WL 5826034, at *5 (E.D. Wis. Nov. 18, 2011) (plaintiff not required to address all of the *Gartenberg* factors "so long as the totality of the alleged facts gave rise to an inference that a particular fee was disproportionately large").

**B.      Summary Judgment Is Generally Inappropriate in Section 36(b) Cases**

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Blasius v. Angel Auto., Inc.*, No. 15-2994, 2016 WL 5929824, at *3 (7th Cir. Oct. 12, 2016) (courts must interpret the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party).   At summary judgment, the focus for the Court is to determine whether there is evidence sufficient to go to the trier of fact—not as HCA seeks by this motion—to determine the facts or weigh the evidence. *Blasius*, 2016 WL 5929824, at *6 (reversing order granting defendant summary judgment) ("Appellee asks us to raise this standard and require that a plaintiff, at the summary judgment stage, show *actual* persuasion of a *particular* person to a *particular* degree of certainty. Obviously, we decline that invitation here.") (emphasis in original); *Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1089 (N.D. Ill. 2007) ("'Summary judgment cannot be used to resolve swearing contests between litigants,' and a 'court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts.'").

Section 36(b) cases are fact-intensive and rarely resolved on summary judgment.  To date, not one Section 36(b) action involving a manager-of-managers structure has been dismissed on summary judgment.  In fact, of the three such cases to reach this stage, one settled during the pendency of the summary judgment ruling, and the motions in the other two were denied.  *See* Dixon Decl. Ex. GGGG (Order, *Sivolella, et al. v. AXA Equitable Funds Mgmt. Grp., LLC, et al.*, No. 3:11-cv-04194 (PGS)(DEA) (D.N.J. Aug. 6, 2015) (denying motion for summary judgment)); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. CV 11-1083 (RMB/KWM), 2016 WL 1394347, at *19 (D.N.J. Apr. 7, 2016); Dixon Decl. Ex. AAAA (*Curran v. Principal Mgmt. Corp., LLC*, No. 4:09-CV-00433 (S.D. Iowa May 17, 2013)) (court docket #164 advising case settled while motion for summary judgment pending).

Section 36(b) actions involving the "manager-of-managers" structure are particularly ill-suited for summary judgment because the core set of facts—specifically, an investment adviser's delegation of its primary responsibilities while retaining for itself a substantial portion of the fees charged—create "overwhelming" factual disputes that "[c]ertainly ... [are] not subject to summary judgment." Dixon Decl. Ex. FFFF (Transcript of Hearing on Motions in Limine/Summary Judgment, *Sivolella v. AXA Equitable Funds Mgmt. Grp., LLC*, No. 3:11-cv-04194 (GPS)(DEA) (D.N.J. Aug. 5, 2015) ("*AXA* Transcript") at 49 ("[T]he number of facts that are in dispute is overwhelming.... I mean how do you resolve those without some kind of trial?"). As the *AXA* and *Hartford* courts concluded, the manager-of-managers structure creates, at a minimum, triable issues of fact regarding (i) the importance and scope of the oversight services performed by the adviser versus the day-to-day services performed by the sub-adviser (Dixon Decl. Ex. FFFF, *AXA* Transcript at 78-79; *Hartford*, 2016 WL 1394347, at *15-16); (ii) the appropriate method of recording subadvisory fees and reporting profitability information (Dixon Decl. Ex. FFFF, *AXA* Transcript at 79-81; *Hartford*, 2016 WL 1394347, at *16-17); (iii) the salience of comparative fee structures (and fee data) in the mutual fund industry (Dixon Decl. Ex. FFFF, *AXA* Transcript at 81-82; *Hartford*, 2016 WL 1394347, at *18); and (iv) whether economies of scale exist and the extent to which they are shared with investors (Dixon Decl. Ex. FFFF, *AXA* Transcript at 82-83; *Hartford*, 2016 WL 1394347, at *18). Tellingly, Defendant does not attempt to distinguish the factual issues raised in this case from those that rendered summary judgment inappropriate in *AXA* and *Hartford*.

## III. HCA HAS NOT AND CANNOT MEET ITS BURDEN TO SHOW THAT NO TRIABLE ISSUES OF FACT EXIST AS TO WHETHER HCA'S FEES ARE EXCESSIVE

### A. Summary Judgment Is Not Appropriate Under *Jones II*

HCA contends that, under *Jones v. Harris Associates L.P.*, 611 F. App'x 359 (7th Cir. 2015) ("*Jones II*"), summary judgment is proper whenever (i) defendant's advisory fees are similar to fees charged at other mutual fund complexes; and (ii) the funds in question have done "as well as, if not better than, comparable funds." Mot. at 8-9 (citing *Jones II*, 611 F. App'x at 360-61). HCA misreads *Jones II* and attempts unsuccessfully to expand the limited scope of its entirely fact-based holding. As discussed *infra*, the factual record in *Jones II* differs significantly from this case (and *AXA* and *Hartford*). *Jones II*, 611 F. App'x at 361, and thus has little applicability here.

The Seventh Circuit affirmed summary judgment in *Jones II*, and held that there was no material dispute as to the evidence submitted on "four propositions," not just the two mentioned by HCA: (i) the challenged fees were in line with those charged by advisers for other comparable funds; (ii) accurate information was provided to the funds and approved by disinterested members; (iii) there were breakpoints in the fee schedule; and (iv) "the fees could not be called disproportionate in relation to the value of Harris's work, as the funds' returns (net of fees) exceeded the norm for comparable investment vehicles." *Id.* at 360-61. The Seventh Circuit further noted that plaintiffs "lack[ed] the sort of evidence that might justify a further inquiry under the Supreme Court's approach." *Id.*

Critically, however, the Seventh Circuit did not hold that only those "four propositions" (much less the two selected by HCA) need be considered, or that establishing each of the four would entitle defendant to summary judgment in every case. Rather, the Seventh Circuit merely determined that those four propositions were dispositive based on the particular facts and

circumstances of that case, which did not involve a "manager-of-managers" scenario and involved other facts vastly different than the evidence adduced here.[7]  The Seventh Circuit could not, consistent with the Supreme Court's holding in *Jones* that "all relevant circumstances" must be considered, *see Jones*, 559 U.S. at 344-45, 349, establish a rule that only those four propositions be considered in evaluating any and every Section 36(b) claim.  Consideration of "all relevant circumstances" necessarily must be tailored to the specific facts and theories of each case.

HCA's argument that peer fee comparisons carry the "most weight" in the Seventh Circuit for any evaluation of a Section 36(b) claim (Mot. at 26) is particularly misguided.  The Supreme Court held in *Jones* that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length."[8]  *Jones*, 559 U.S. at 350-51.  *Jones II* cannot be read to hold that peer fee comparisons carry the "most weight" because that holding is squarely at odds with the Supreme Court's direction not to rely "too heavily" on such comparisons.  This is particularly true in view of the fact that the Supreme

---

[7] Most significantly, the adviser-defendant in *Jones II* managed its mutual funds directly and did not use a manager-of-managers structure such as HCA employs.  That case did not involve evidence similar to that adduced by Plaintiffs here showing that HCA ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

[8] Even before *Jones*, many courts determined to give little weight to peer fee comparisons for this reason.  *See Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1249 (S.D.N.Y. 1990) ("This factor, the last and least probative of those bearing upon the fairness of an adviser-manager's fee...."); *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 412 (2d Cir. 1989) (cautioning against providing much weight to comparative fee structures); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982) ("*Gartenberg I*") ("[T]he existence in most cases of an unseverable relationship between the adviser-manager and the fund it services tends to weaken the weight to be given to rates charged by advisers of other similar funds.").

Court's decision in *Jones* reversed an earlier decision by the Seventh Circuit that did put great weight on peer fee comparisons.[9]  *See Jones*, 559 U.S. at 342.

Another district court recently rejected a similar argument, based on *Jones II*, that "the most important of the relevant circumstances to be considered on the excessive-fee issue [is] 'whether the adviser's fee' was comparable to that produced by bargaining at other mutual fund complexes.'"  *N. Valley GI Med. Grp. v. Prudential Invs. LLC*, No. CV JKB-15-3268, 2016 WL 4447037, at *8 (D. Md. Aug. 23, 2016).  The court found this interpretation of *Jones II* to be untenable because it requires a departure from *Jones*, stating "The Supreme Court's opinion, which is what governs this Court, clearly did not place great store in what other mutual funds paid in fees to their investment advisors.  559 U.S. at 350-51.  *Jones* does not require pleading of comparable fund fees in order to state a viable claim.  Nor is the *Jones* all-relevant-circumstances standard circumscribed by a particular method of proof, much less pleading."  *Prudential*, 2016 WL 4447037, at *8.

---

[9] In support of its holding that courts should not rely too heavily on peer fee comparisons, the Supreme Court cited Judge Posner's dissent from the Seventh Circuit's prior decision.  *Jones*, 559 U.S. at 350-51 (citing *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 730-32 (7th Cir. 2008) (denying petition for rehearing; Posner, J., dissenting).  In that dissent, Judge Posner explained why "[c]ompetition in product and capital markets" can't "solve the problem" of excessive fees due to inherent conflicts in the mutual fund industry:

> The panel's "so unusual" standard is to be applied solely by comparing the adviser's fee with the fees charged by other mutual fund advisers.  *Gartenberg's* "so disproportionately large" standard is rightly not so limited.  The governance structure that enables mutual fund advisers to charge exorbitant fees is industry-wide, so the panel's comparability approach would if widely followed allow those fees to become the industry's floor.

537 F.3d at 732.  In reversing the Seventh Circuit panel, the Supreme Court noted that panel's views about competition and peer fee comparisons are "a matter for Congress, not the courts."  *Jones*, 559 U.S. at 353.

Even if *Jones II* could be read to hold that only the "four propositions" are relevant or that peer fee comparisons carry the most weight, there are numerous issues of material fact that preclude summary judgment. Indeed, Plaintiffs have adduced evidence that places each of the "four propositions" in dispute:

- HCA has not established that the Funds' fees are in line with those charged by peer funds, *see* §III.C.4., *infra*;

- Plaintiffs dispute that accurate and appropriate information was provided to the Board, *see* §III.D.3; III.D.4., *infra*;

- Plaintiffs dispute that any breakpoints or waivers appropriately shared economies of scale with the Funds, *see* §III.C.5., *infra*;

- Plaintiffs have adduced substantial evidence that HCA's compensation is disproportionate to the services provided by HCA, *see* § III.B, III.C.1, *infra*; and

- unlike in *Jones II*, where the adviser-defendant directly managed the funds, HCA's compensation cannot be justified by the Funds' performance because performance is attributable to the Subadvisers' services, and not HCA's services, and performance of the Funds has been poor in any event, *see* §III.C.2., *infra*.

In view of these factual disputes, HCA would not be entitled to summary judgment even if its interpretation of *Jones II* were correct.

**B.      Plaintiffs' Claims Are Not Limited to a "Portion" of the Advisory Fees**

HCA contends that Plaintiffs' claims necessarily fail because ███████████████

████████████████████████████████████████████████████████

█████████████████████.      *See* Mot. at 9-15.   HCA is wrong, and its argument mischaracterizes Plaintiffs' claims.  Plaintiffs never have limited, and do not intend to limit, their claims to a "portion" of the advisory fees.

Indeed, the purported "limitation" HCA seeks to impose on Plaintiffs' claims makes no sense because it relies on a false distinction between ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████  ████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

Accordingly, even if the Court ultimately must evaluate the total advisory fee charged to each Fund, it must—as part of that evaluation—evaluate the amount ████████████████

████████████████████████████████ As explained by Dr.

Richard W. Kopcke, ██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

- 11 -



The SEC's Division of Investment Management recently cautioned that a fund's board should receive "information about the specific services provided" under each of the fund's service agreements and that consideration of "the *overall payment* for a bundled set of services or activities" is "inconsistent" with the regulatory requirements governing mutual funds.[12] The SEC

---

[10] HCA lauds Dechert as "a law firm with extensive, nationally recognized expertise in the representation of mutual funds and their directors or trustees." Mot. at 19.

[11] Similarly, the Investment Company Institute ("ICI")—the leading trade association for the mutual fund industry—instructs mutual fund boards to "understand the degree to which the principal adviser will delegate its investment management and related responsibilities and the fee to be paid to the subadviser under the agreement" and to "consider the fee paid to the principal adviser in light of the specific services performed by the principal adviser versus those that are delegated to the subadviser." ICI Independent Directors Council Task Force Report, *Board Oversight of Subadvisers*, Jan. 2010, https://www.idc.org/pdf.idc_10_subadvisers.pdf.

[12] *See* Thoreau Bartmann, et al., SEC, IM Guidance Update, *Mutual Fund Distribution and Sub-Accounting Fees*, at 4, 8 (Jan. 2016), https://www.sec.gov/investment/im-guidance-2016-01.pdf; *see also* H. Norman Knickle, *The Mutual Fund's Section 15(c) Process: Jones v. Harris, the SEC, and Fiduciary Duties of Directors*, 31 Boston L.J. 265, 336 (2011-2012) (recognizing that

also has brought enforcement actions under Section 36(b) and other statutes where the fees retained by a fund's primary adviser (or its affiliates) within a manager-of-managers structure were excessive in light of the services actually provided by the adviser. *See S.E.C. v. Am. Birthright Trust Mgmt. Co.*, No. 80-9266, 1980 WL 1479, at *1 (D.D.C. Dec. 30, 1980) (Section 36(b) action where "the compensation paid to ABTM by the funds has been excessive in light of the services actually performed by ABTM.... [M]ost of the advisory services provided to the funds have been provided by a 'sub-adviser' retained by ABTM, rather than by ABTM itself.").[13] Consistent with this well-established guidance from the SEC, ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████.[14]

---

SEC guidance and industry practices demonstrate the importance of boards considering the division of services and fees between adviser and sub-adviser in manager-of-manager structure).

[13] *See also In re Smith Barney Fund Mgmt LLC*, Exchange Act Release No. 05-51761 at 2 (May 31, 2005) (enforcement action where adviser's affiliate "contract[ed] directly with the Funds as named [transfer agent], perform[ed] limited functions and sub-contract[ed] with First Data for the bulk of the transfer agent services," and the affiliated transfer agent "received more than $100 million in net fees for ... limited [services] at a total cost of approximately $11 million").

[14] HCA cites *Hartford* in support of its "total advisory fee" approach (*see* Mot. at 12), but such reliance is misplaced. *Hartford* is ambiguous as to the court's acceptance of the "total advisory fee" approach, and in any event, the court denied summary judgment due to factual disputes regarding the services provided similar to those here. *See Hartford*, 2016 WL 1394347, at *16. Further, even if *Hartford* could be read to adopt the "total advisory fee" approach, the court failed to consider—much less distinguish—the legal, regulatory, and industry guidance discussed herein, which demonstrates that HCA's advisory compensation must be evaluated in relation to HCA's services as part of any evaluation of the total advisory fee.

**C.     There Are Numerous Triable Issues of Fact Regarding the Substantive Fairness of HCA's Compensation**

> **1.     There Are Disputed Issues of Fact as to the Nature and Quality of Services HCA Provides to the Funds**

HCA's claim that it provides "all services necessary to the operation of the Funds" (Mot. at 26) simply does not comport with documents and testimony showing that HCA's services are limited in both nature and quality.  These conflicting contentions regarding HCA's services preclude summary judgment.  *See Hartford*, 2016 WL 1394347, at *16 (denying motion for summary judgment where "the true nature of the services performed remain[ed] relatively nebulous" and the "dispute concerning the actual services performed by the Hartford Defendants [as the investment adviser] and the quality of those services remain[ed] genuine"); Dixon Decl. Ex. FFFF, *AXA* Transcript at 78-79 (denying summary judgment where there was a factual dispute whether the services provided were *de minimis* in relation to the fee charged).

With respect to investment advisory services, HCA generally claims to be responsible for "overseeing" the Subadviser for each Fund (*see* Mot. at 26), but it fails to specify what it actually does in connection with such oversight.  HCA claims that it is responsible for "establishing, and for recommending changes to, the investment policies, strategies and guidelines for each Fund" (*see id.*), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dixon Decl. Ex. X at HCA0011286 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dixon Decl. Ex. VV at HCA0141362, which was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at HCA0141345,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮, *id.* at HCA0141371-72 ▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████  *See also*

SAMF 11, 12; RESP 5(b), 13.

Further, in view of the talent, skills, and services provided by the Subadvisers, HCA has little, if any role, in implementing the Funds' investment program. For example, former Trustee Howard P. Colhoun described ████████████████████████████████████

███████████████████████████████████████████████

Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 73:1-12, and explained ████

███████████████████████████████████████████████

████████ *Id.* at 113:19-23. *See also* SAMF 11, 12; RESP 5(b), 13.

HCA does select the Subadvisers for each Fund, but that service was completed many years ago at the inception of each Fund – neither fund has changed subadvisers since inception – and does not justify significant ongoing charges to the Funds. In the case of the HIF, ████

███████████████████████████████████████████████

████████████████████████  *See* Dixon Decl. Ex. VV at HCA0141374. *See also* SAMF 11, 12; RESP 5(b), 13. HCA claims to have ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████.[15]

---

[15] In contrast, ██████████████████████████████████████████

████ *See* Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 249:12-250:21. Similarly, Kiplinger's Personal Finance, an investment publication ██████████ removed the HIF from the "Kiplinger 25" list of recommended mutual funds in 2014, noting that the Fund "had lagged its benchmark ... by an average of nearly a percentage point per year"

- 15 -

In addition to investment advisory services, HCA claims to have "full responsibility for administering" the Funds.  Mot. at 27.  However, the Funds pay significant additional fees to HCA's affiliates and unaffiliated service providers for administrative services.  For example, in its fiscal year ended October 31, 2015, the HIF paid Harbor Services Group, Inc. ("HSG") ████████████████████████████████████████ provided by HSG and by unaffiliated sub-transfer agents, which include significant compliance, legal, regulatory, and tax requirements.  *See* Dixon Decl. Exs. HHHH, IIII (2015 Annual Report) at 33; Dixon Decl. Ex. S ████████████████████████████████████ Dixon Decl. Ex. WW at HCA0142224 ████████████████████████████ Dixon Decl. Ex. HH at HCA0022204 ████████ ████████████████████ In addition, in the same fiscal year, the HIF paid ████████ ████████ in other fees to other entities for a range of services, including 12b-1/distribution fees to Harbor Funds Distributors, Inc. ("HFD"), custodian fees to State Street Bank & Trust Co., shareholder communications fees, registration fees, Trustees' fees and expenses, and professional fees to outside counsel, auditors, and other advisors.  *See* Dixon Decl. Exs. HHHH and IIII (2015 Annual Reports) at 33.  In view of these additional charges to the Funds, there are questions of fact regarding what administrative services HCA actually provides in exchange for the investment advisory fees at issue in this litigation.

In any event, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████.  Dixon Decl. Ex. NNN at HTR_00001326; Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 300:15-301:18; 304:21-308:2.

██████████████████████████████████████████████████████ *See*

Dixon Decl. Ex. J, Barrett Rpt at 53.  In other words, ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

### 2. Investment Performance Does Not Justify the Funds' Advisory Fees

HCA relies heavily on the Funds' investment performance—and particularly performance

of the HIF—as justification for the Funds' investment advisory fees.  *See* Mot. at 26-29.  Even

assuming the Funds had good performance for certain periods that would still not justify the

advisory compensation retained by HCA.

Investment performance here results from █████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████[16]  █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Dixon Decl. Ex. H (Deposition Transcript of Rodger Smith) at 27:14-19.[17]  For the HIF in

particular, the Fund's strong performance track record over the long term results from the talent

████████████████████████████████████████  ██████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████  *See* Mueller Decl. Ex. 99.

---

[16]  Alpha measures a fund's performance relative to a benchmark index and often is used to
evaluate the skill of a fund manager.  *See* www.investopedia.com/terms/a/alpha.asp.

[17]  ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████  Dixon Decl. Ex. M, Kopcke Rebuttal at 22.

████████████████████████████████

████████████████████████████████

██████████  ████████████████████████

████████████████████████████████

████████████████████████

In any event, even if HCA were permitted to take credit for the Funds' investment performance to justify its compensation, the Funds' performance has been poor during the period at issue in this lawsuit (February 2013 to the present). *See* Dixon Decl. Ex. FFFF, *AXA Transcript* at 60, 79-80 (evidence showing that certain funds underperformed their benchmark raised "an issue of material fact that cannot be decided on a motion for summary judgment"). The HIF in particular ████████████████████████████████ ████████████████. Analyses by HCA's own expert Russell Wermers show ████████ ██████████████████████████████ *see* Dixon Decl. Ex. N, ████████████████████████████ *see id.*, Exs. 5- 6. Dr. Wermers also found that ████████████████████████ ████████████████████████████████ ████████████████ *See id.*, Exs. 8-9. Thus, for the period at issue here, the Funds' performance was *not* "as good as, if not better than, comparable funds," as HCA contends (Mot. at 28).

HCA ignores this recent poor performance and instead focuses on the HIF's performance since the Fund's inception in 1987 and over the 10- and 25-year periods ending December 31, 2014. However, these long-term performance figures have no bearing on the advisory fees charged to the HIF from February 2013 to the present, ████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ ██ .[18]

Further, the figures relied upon by HCA inexplicably exclude ████████████

████████████████████████████████████████████████████████

████ *See* Dixon Decl. Ex. N, Wermers Rpt, Ex. 4. ██████████████

█████████████████████████████████████ *See* DSMF 44. ████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Dixon

Decl. Ex. N, Wermers Rpt., Exs. 5, 8.

### 3. There Are Triable Issues Regarding HCA's Profitability

HCA realizes extremely large profits from the advisory fees charged to the Funds. In

2014, for example, HCA realized more than ███████████ in profits from the Funds, with more

than ███████████ in profits from the HIF alone. *See* Dixon Decl. Ex. J, Barrett Rpt at 22. ████

████████████████████████████████████████████████████████

███████████████████████████████ *See id.*

HCA expends little of its own money to generate these large profits. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[18] These facts distinguish this case from *Migdal v. Rowe Price-Fleming International, Inc.*, 248 F.3d 321 (4th Cir. 2001), where the court discounted allegations of poor performance as merely a short-term aberration. Here, there is a clear causal connection between the recent period of underperformance and ███████████████████████████, and the underperformance has been both prolonged and consistent. SAMF 12 (Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 301:2-18; *see also id.* at 249:12-250:21 ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████

██████████████████████████████.[19] *See id.*

█████████████████████████████████████████████

██████████████████████████████████ *See id.*

HCA realizes these large profits because the advisory compensation it receives from the Funds far exceeds its internal costs of providing advisory services, ███████████

████████████████████  ███████████████████████

████████████████████████████████ *See id.* ██████

█████████████████████████████████████████████

████████████████████ *See id.*

████████████████████████████

██████████████████████ (*see* Mot. at 30) ████████████

█████████████████████████████████████████████

████████.[20] As held in *AXA* and *Hartford*, HCA's contention that different metrics should be used to evaluate its profitability confirms that there are triable issues that cannot be resolved



---

[19] ██████████████████████████████████████

███████████████████████████████  ███████

█████████████████████████████████████████████

██████████████ *See* Dixon Decl. Ex. J, Barrett Rpt at 48-57.

███████████████████████████████ *See id.* at 53.

[20] █████████████████████████████████████████

██████████████████████████ *See* Dixon Decl. Ex. J, Barrett Rpt at 40-44; *see also* Dixon Decl. Ex. HH ██████████ at HCA0022145-46 ████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████  ██████████████████████████

██████████████████ *See* Dixon Decl. Ex. J, Barrett Rpt at 23-24.

at this stage. *See* Dixon Decl. Ex. FFFF, *AXA* Transcript at 81:2-10; *Hartford*, 2016 WL 1394347, at *17.

HCA claims that its method is consistent with GAAP, but GAAP does ***not*** govern profitability reporting to a mutual fund board or this Court's evaluation of profitability in connection with Plaintiffs' Section 36(b) claims, ███████████████████ *See* Dixon Decl. Ex. G (Deposition Transcript of Russell Peppet) at 41:11-14 ("Q: ████████████ ███████████████████████████ A: ███████████████ ███████████ ; *see also* Dixon Decl. Ex. ZZZ (PwC Whitepaper) at 11 ████████████████ ███ ███ █ ███ █ ███ ███ ████ ███ ███ ████████ In contrast to financial accounting governed by GAAP, mutual fund profitability reporting is █████████████████████████ ██████████████ ████████████████████████ █████████████████████████████ ██████████████████████████ *See* Dixon Decl. Ex. J, Barrett Rpt at 17-18; Dixon Decl. Ex. G (Deposition Transcript of Russell Peppet) at 41:15-43:20; *see also* SAMF 19. █████████████████████████████ █████████████████████ *See id*. at 45:13-46:3 ("Q: ███████████████████████████ A: ████████████ ███████████ █████████████ █████████████████

As discussed above, the critical question that must be resolved in evaluating the advisory fees charged to the Funds is whether the advisory compensation retained by HCA is reasonable

in relation to the oversight and related services provided by HCA. The profit margins that best inform that question are 

*See* Dixon Decl. Ex. J, Barrett Rpt at 18-22, 29. In contrast,

*See id.* at 22-30.

SAMF 20, 23; RESP 22, 51(b); 54(b).

Both the SEC and prior courts have recognized that net margins should be utilized, and that gross margins are inappropriate and misleading, where a fund's adviser (or its affiliates) makes pass-through payments to a sub-contractor involved in providing services to the fund. For example, in an administrative procedures order involving payments made by a fund's transfer agent (CTB) to an unaffiliated sub-transfer agent (First Data), the SEC found the following with respect to transfer agent's profitability reporting:

> Because virtually all of the work was to be done by First Data, the 33% margin figure was itself *misleading*. The margin was based on an analysis that *treated sub-TA payments to First Data as expenses of CTB*. The *economic reality* would have been *more accurately portrayed* by deducting payments to First Data from revenue—not treating them as expenses of CTB. *CTB is essentially a pass-through for those payments*. In fact, internally, CAM described the fee

> arrangement with First Data as a revenue sharing arrangement. Had payments to First Data not been treated as an expense of CTB, the projected pre-tax profit margin would have been approximately 70%.

*In re Smith Barney Fund Mgmt. LLC*, Exchange Act Release No. No. 05-51761, at 14 (May 31, 2005).

Similarly, in a Section 36(b) case involving pass-through payments from a fund's adviser to financial consultants providing services to fund shareholders, the court held that such payments were "neither a revenue nor an expense" to the adviser even though the payments were made through the adviser and the adviser retained a portion of the fee. *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 490 (S.D.N.Y. 1988). Notably, in reaching this conclusion, the *Krinsk* court expressly relied upon the opinion of Russell Peppet—who was an expert for defendant in *Krinsk* and is an expert for HCA here—that such **payments have no place in a study of profitability**" of the adviser. *Id.* ███████████████████ Mr. Peppet explained in *Krinsk* that it would be "improper [] to put 12B 1 payments in as both a revenue and an expense even though that would equate to a zero net profit" because such treatment would "distort the ratios" and be "misleading from a managerial point of view and ... absolutely misleading from a legal, financial accounting point of view." *See* Dixon Decl. Ex. XXX, *Krinsk* Trial Transcript at 1074:8-1075:25.[21]

---

[21] Notably, the *AXA* court did not address, much less distinguish, these authorities and, instead, focused its discussion on how the subadvisory and sub-administration fees at issue in that case were treated in defendant's GAAP financial statements and under "ordinary accounting principles." *See Sivolella v. AXA Equitable Life Ins. Co.*, No. 11-cv-4194(PGS)(DEA), 2016 WL 4487857, at *51 (D.N.J. Aug. 25, 2016). Further, the court relied on its evaluation of the credibility of the *AXA* defendants' expert in that case—who is not an expert here—whereas this Court must make its own credibility determinations, particularly in view of the inconsistencies between Mr. Peppet's testimony in this action and his prior testimony in *Krinsk*. Additionally, the *AXA* court misconstrued the relevant legal inquiry under Section 36(b) as being "whether the Board breached its fiduciary duty in approving contracts that awarded excessive fees to [defendants] for investment services that were then delegated to sub-advisers for a much lesser

HCA also contends that 

See Mot. at 19-20, 32. However,

See SAMF 21, 22, 23, 24, 34. In any event, this Court must conduct its own analysis of the substantive fairness of HCA's fees, and it is free to evaluate profitability as it sees fit, irrespective of how the Board chose to evaluate profitability for purposes of its review.

### 4. There Are Triable Facts Regarding Comparative Mutual Fund Fee Structures

HCA contends evidence of "low comparative fees" here "stands unrebutted." Mot. at 26. Not true. There are several critical disputes of material facts regarding HCA's peer fee comparisons that bar summary judgment for HCA, including the fact that HCA has manipulated the way in which the comparative fee analysis is presented, both in this motion and to the Board. In any event, as discussed above, peer fee comparisons should be given little weight under *Jones*. *See Jones*, 559 U.S. 350–51 (cautioning that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers" and that such comparisons are "problematic").

---

fee." *Sivolella*, 2016 WL 4487857, at *8. As discussed *infra* II.A., however, Section 36(b) imposes a fiduciary duty on a mutual fund's investment adviser and the adviser's affiliates with respect to fees charged to the fund, not on the fund's board of trustees with respect to approval of such fees. *See* 15 U.S.C. §80a-35(b). It is well-established that district court opinions are not binding precedent; rather they are "no different from a persuasive article or treatise. The fact of such a decision is not a reason for following it." *See Midlock v. Apple Vacations W., Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005) ("a district court decision does not have stare decisis effect; it is not precedent").

### a. HCA's Total Fee Comparison is Improper

As a threshold matter, HCA's comparable fee analysis is flawed in that it improperly compares the ***total expense ratios*** of the HIF and HHYBF to the total expense ratios ("TER") of other mutual funds.  A mutual fund's TER is the aggregate amount of all of the fees charged to the mutual fund for all of the services that are provided.  DSMF 46.[22]  In a case where the underlying claims are that the advisor breached its fiduciary duty by charging an *advisory* fee that was disproportionate to the *advisory* services provided, it is illogical to evaluate the total fee in order to determine if the *advisory* fee is reasonable.  In other words, by comparing the total fee of the HIF and HHYBF Funds to the total fee of other Funds, HCA's analysis ignores the central issue in this case – whether or not the *advisory fee is excessive*.  HCA's total fee analysis is contrary to the instructions the Board received from its independent counsel:



HCA's analysis also runs counter to the applicable legal standards.  *See Jones*, 559 U.S. at 350 (inquiry on 36(b) claim requires an examination whether the fee bears reasonable relationship to the services rendered); *Levy v. All. Capital Mgmt. L.P.*, 189 F.3d 461, *2 (2d Cir. 1999) (fees "of each type must be examined for reasonableness separately, not aggregated and then considered as a whole"); *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399,

---

[22] Citing to Wikipedia, Defendant claims that the "TER is a standard of method of measuring the cost of a mutual fund in a way that facilitates comparison among different funds."  DSMF 46, n.1.  Wikipedia cannot reverse the Supreme Court's pronouncement that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers…."  *Jones*, 559 U.S. at 350.

404 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1500, 191 L. Ed. 2d 452 (2015) ("The Second

Circuit has rejected a similar argument regarding the aggregation of separate fees.").  As one

court explained:

> Section 36(b) does not require Plaintiffs to establish that the fees charged by Defendants were excessive in the aggregate.  Plaintiffs may challenge a particular fee and may prevail on their Section 36(b) claim if they show that such a fee was disproportionate to the services rendered in exchange for that fee.  *See Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir.1990); *Pfeiffer v. Integrated Fund Servs. Inc.*, 371 F. Supp. 2d 502, 508 (S.D.N.Y. 2005); *In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567(NRB), 2006 WL 126772, at *9 & n.22 (S.D.N.Y. Jan.17, 2006).

*In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593 GAF (RNBX), 2009 WL 5215755, at *44

(C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x

716 (9th Cir. 2011).

### b. HCA Manipulates the Lipper Materials

HCA exerts considerable control over the preparation of the Lipper Materials and

manipulates the Funds' expense and performance rankings.  SAMF 28; *see, e.g.*, HCA0163849-

60 ██████████████████████████████████████████████████████████████

*id*. at HCA0163857 ████████████████████████████████████████████████

██████████████████████████████████████████████████  In

particular, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████  SAMF 28;

Dixon Decl. Ex. SS (2013 Lipper Performance Report) at HCA0089197 ████████

████████████████████████████████████████████████████████████████

█████████████████  *id*. at HCA0089321 █████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

SAMF 28.

Further, ████████████████████████████████████████████

████████████████████████████████████████████ Dixon Decl.

Ex. QQ (2015 Lipper Expense Report) at HCA0088597 ██████████████

However, ███████████████████████████████████████████

████████████████████████████████████████████████████████

Dixon Decl. Ex. QQ ████████████████████ at HCA0088255 ████████

████████████████████████████████████████████████████████

██████████; *id.* at HCA0088485 ███████████████████████

████████████████████████████████████████████████████████

██████

   In short, HCA ████████████████████████████████████████

██████ and now seeks to use that manipulated peer group as evidence that its fees are in line with

that group.

       ### c.   The Lipper Analysis Contains Inapt Fee Comparisons and Is
                 Patently Misleading

   Even if the Court accepts HCA's comparable fee analysis, factual disputes abound as to

the propriety of the comparatives.  HCA relies upon Lipper[23] for its fee comparison arguments.

DSMF 46. The Lipper data is misleading for several reasons.  First, ████████████████████

████████████████████████████████████████████████████████

---

[23] According to HCA, ███████████████████████████████████████

██████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Mueller Decl. Ex. 101 at 4.

████████████████████████ Mueller Decl. Ex. 101 at HCA0022867. ████████████

████████████████████████ RESP 46. ████████████████████

████████████████████████████████████ *See*

Mueller Decl. Ex. 101 at HCA0022749.  Without this critical information, it is impossible to

determine whether or not the "peer funds" provide an apt comparison to the Funds.  Thus, any

conclusions HCA attempts to draw from the comparisons to the fees of the funds in the expense

universe is *ipse dixit*.

*Jones* instructs that courts "must be wary of inapt [fee] comparisons." *Jones*, 559 U.S. at

350.  Accordingly, courts have been sensitive to the need to compare the fees of funds of similar

size.  *See  Am. Mut.*, 2009 WL 5215755, at *25 (Lipper peer group "included the 30 largest funds

in [each] investment category"); *Kalish*, 742 F. Supp. at 1230 (comparing funds of "similar

objective and size"); *Chill v. Calamos Advisors LLC*, No. 15 CIV. 1014(ER), 2016 WL 1258984,

at *8 (SD.N.Y. 2016) (comparing the large subject fund to the funds in the peer group universe

that had assets in excess of $1 billion like the subject fund).  ████████████████

████████████████████  As the SEC has repeatedly recognized, larger funds have lower

expense ratios (*i.e.*, fees).  Dixon Decl. Ex. YYY (SEC 2000 publication) at 5, 26, 31.  Thus, ██

████████████████████████████████████

██████ ████████████████████████████████

████████████████████████████████████

████████████████████████████ Mueller Decl. at 122.

Additionally, ████████████████████████████

Mueller Decl. Ex. 101 at 128.  By ████████████████████████

███████████████████████████████████    ████████████████████████

████

#### d. The Fees of the HIF and HHYBF Exceed the Morningstar Averages

A mutual fund offers different share classes, and each share class has a different fee structure. DSMF 8; s*ee also*, Dixon Decl. Ex. YYY (SEC 2000 publication) at 17 ("each class has its own fee structure…and shareholders investing in different classes pay different," fees for their investment). The largest share class for both the HIF and HHYBF is the "[i]nstitutional" share class (DSMF 8). ███████████████████████████████████

██████████████████████ (DSMF 46). By comparison, ████████████████████████

████████████████████████████████████████████

████████████████████████████ Dixon Decl. Ex. D (Deposition Transcript of Christopher M. James) at 31:15-21; Dixon Decl. Ex. DDDD (Morningstar) at 4. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Dixon Decl. Ex. DDDD (Morningstar) at 4. The other share classes of the HIF and HHYBF are similarly expensive. For example, ██████████████

████████████████████████████████████████████

████████ Dixon Decl. Ex. DDDD (Morningstar) at 4. ████████████████

████████████████████████████████████ *See* Mueller Decl. Ex. 1 at 1; *see also* Mueller Decl. Ex. 8 at 5.

#### 5. There Are Triable Issues of Fact Regarding Economies of Scale

HCA has not shown and cannot show the absence of triable issues of fact concerning the existence or sharing of economies of scale ("EOS") with investors. ████████████████

(i) ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

Even if the Court accepts HCA's method for calculating EOS, factual disputes still exist

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ ████████ █████████

███████████████████████████████ Experts cannot create facts and HCA's

contention amounts to inadmissible hearsay. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir.

2009).

Moreover, there are disputed issues of fact surrounding any alleged reduction. ██████

████████████████████████████████████████████████████████

██████████████████████████████ ████████ ██████ ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ DSMF 26, 27. █████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ RESP 26,

27. ██████████████████████████████████████████████████████

███████████████████████████████████ RESP 26. ████████████████

█████████████████████████████████████████ (*see* RESP

26, 27) ██████████████████████████████████████████

███████████████████

HCA's claim that it shared EOS with the HHYBF because ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

### 6.     There Are Triable Issues Regarding Fall-Out Benefits

HCA erroneously contends that there is no evidence in this action as to the existence of

fallout benefits accruing to HCA.  Mot. at 15 n.9.  Not true.  █████████████████████

█████████████████████████████████████████████████████████████.

SAMF 37; Dixon Decl. Ex. H ██████████████████████ at 41:16-45:18; Dixon

Decl. Exs. EEEE, JJJJ, KKKK (Harbor Funds, Certified Shareholder Report of Registered

Management Investment Companies (Form N-CSR)) (all public).  ███████████████████

█████████████████████████████.  SAMF 7 (Dixon Decl. Exs. HHHH, IIII

(2015 Annual Report) at 33); *see also* Dixon Decl. Ex. H (Deposition Transcript of Rodger

Smith) at 213:14-219:21.

### D.     There Are Material Facts in Dispute as to Whether the Board's Approval of the Fees Is Entitled to Any Deference and if so, the Extent of Any Such Deference

HCA argues that: (i) the Board's qualifications and supposedly thorough process for

reviewing and negotiating investment advisory fees are sufficient to merit substantial deference

of its approval of HCA's fees as a matter of law; and (ii) that such deference automatically entitles it to prevail in this case without any scrutiny of the fees themselves. Both contentions lack merit. First, consistent with the governing Supreme Court decision of *Jones* and the legislative history of Section 36(b), board process, even if flawless, is not dispositive as to liability under Section 36(b). Second, the Board is entitled to substantial deference only if it carried out a highly robust process for reviewing fees, was informed of all material information, and aggressively negotiated fees, none of which were the case here. Third, related to this point, HCA's argument disregards evidence adduced in discovery that reflects ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████ Fourth, Defendant has not presented conclusive evidence demonstrating that the Board conducted a robust fee review and negotiating process. Rather, it relies solely on the 15(c) materials submitted to the Board with minimal, if any, evidence of whether and to what extent the trustees reviewed, considered, or deliberated on such information or whether (and if so, how) they conducted any negotiations in response to it.

      1.      **Board Process, No Matter How Robust, Is not Sufficient by Itself to Defeat Liability in Section 36(b) cases**

As an initial matter, Defendant misstates the governing standard in arguing that the Court should merely defer to the Board's approval of Defendant's fees where the Board conducts a thorough process in reviewing and negotiating them. *See* Mot. at 21 (contending the Court should not engage in "judicial second-guessing" of the Board's approval of fees and asserted that Board care and conscientiousness is the primary *Gartenberg* factor under Section 36(b)). In *Jones*, the Supreme Court expressly held that board process, no matter how strong or thorough, is

not a controlling factor in Section 36(b) cases: "a fee may be excessive [under Section 36(b) even if it was negotiated by a board in possession of all relevant information." *Jones*, 559 U.S. at 351.

As discussed in *supra* section II.A., the legislative history and purpose of Section 36(b) also reflect that Board approval was not to be a dispositive factor in the determination. Indeed, Congress expressly stated that Board "consideration would not be controlling in determining whether or not the fee encompassed a breach of fiduciary duty." S. Rep. No. 91-184, at 4910. In addition, the SEC proposed the creation of Section 36(b) and Congress adopted the new right of action based on their conclusion that directors were not in a position to protect shareholders from excessive fees because of the general lack of arm's-length bargaining between the Board and investment adviser. S. Rep. No. 91-184, at 4898 (adopting a new legal remedy for mutual fund shareholders under Section 36(b) because of the conflicted nature of the relationship between trustees and the investment advisers in negotiating fees). That Congress intended to limit the weight of Board approval in Section 36(b) cases is further reflected by the fact that in passing this provision, Congress expressly rejected the prior corporate waste standard as being too deferential to Board approval. S. Rep. No. 91-184, at 4901 (deciding that the standard of corporate waste is unduly restrictive and recommending that it be changed); *id*. at 4910 (rejecting the corporate waste test).

> **2. Board Approval Is Entitled to Substantial Deference Only if It Followed a Robust Review and Negotiating Process and Had All Material Information at Its Disposal in Approving the Fees**

Although the Supreme Court confirmed that Board process was not be the controlling factor in the Section 36(b) analysis, it did state that board approval could be entitled to some level of deference based on the strength of the process and the degree to which the board was fully informed. *Jones*, 559 U.S. at 351. But the Supreme Court made it clear that board

approval is entitled to substantial deference only if the board employed a robust process for reviewing and negotiating fees and received **all** material information in reviewing the fees. *Id.* at 351-52 (stating that "where the board's process was deficient or the adviser withheld important information," the court must scrutinize the fees more closely). Conversely, the Supreme Court noted that lesser deference would be afforded where, as here, either the Board's process for reviewing or negotiating fees was deficient or adviser withheld **any** material information. *Id.*; *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1180 (8th Cir. 2012). As shown below, even if the Court finds that the Board is entitled to some degree of deference, it should be minimal in light of facts showing ████████████████████████████████████

████████████████████████████████████████████████████

### 3. The Board Is Entitled to Minimal, if Any, Deference in Its Approval of Fees Because of the Failure to Fully Inform Itself, Its Conflicts of Interest in Negotiating Fees, and Its Passive Negotiating History

In arguing broadly that the Board employed a thorough process and negotiated aggressively, and is therefore entitled to substantial deference,[24] Defendant ignores significant

---

[24] The lone case Defendant cites in support of its argument that deference is due here is the *Hartford* decision, which actually supports Plaintiffs' argument that, regardless of the deference to be afforded, summary judgment is not appropriate here. In that case, even while holding that the board was entitled to substantial deference, the District Court still denied the motion for summary judgment due to the multiple triable issues that existed with respect to the facts and circumstances of the fees. As for the *Hartford* court's holding that the board was entitled to substantial deference as a matter of law, it was wrongly decided. While the plaintiffs in *Hartford* had presented evidence of material information that had been withheld from the board in the 15(c) process, the District Court held, without citation to any legal authority for the proposition, that such a showing was not sufficient to create a triable issue absent specific evidence that the withheld information impacted the fee negotiation process. *Hartford*, 2016 WL 1394347, at *10. In effect, the court required plaintiffs to present evidence that, had the board been aware of the withheld information, they would have negotiated a different fee rate structure, which imposed on the plaintiff a nearly impossible evidentiary burden with no basis in case law. *Id.* at *13. In fact, to the contrary, the Supreme Court in *Jones* affirmed that the withholding of **any** material information is sufficient, by itself, to warrant affording less deference to board approval. *Jones*, 559 U.S. at 351-52; *see also Gallus*, 675 F.3d at 1180 (no showing that the withheld information had an effect on the negotiated fee rate). The *Hartford* decision also wrongly took a binary

deficiencies in the Board's review and negotiating process and conflicts of interest possessed by the trustees that demonstrate the Board is not entitled to any deference here.

*First*, as Defendant concedes, ██████████████████████████████████████

██████████████████████████████████ DSMF 68, 69. ███████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████ DSMF 68, 69; Dixon Decl. Ex. I (Deposition Transcript of David Van Hooser) at 295:15-21. ███████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████ *See* Dixon Decl. Ex. H (Deposition Transcript of Rodger Smith) at 23-25; *Am. Mut.*, 2009 WL 5215755, at *3 (criticizing the Board for its passive negotiating approach in which it did not seek to obtain the "best possible deal" for shareholders); *Gallus*, 675 F.3d at 1180 (declining to grant deference to board approval where the board focused on tying fees to the peer group median). ██████████████████████████

██████████████████████████████████████████████████████████████████

██████████████ ███████████████████████████████████████. On these facts, regardless of the thoroughness of Defendant's review process, ████████████████

██████████████████████████████████████████████████████████████████

approach to analyzing deference—finding that deference was either due or not as opposed to determining the degree of deference—which ran contrary to the Supreme Court's statement that the amount of deference may vary based on the circumstances. *See* Section 36(b) (stating that board approval shall be given such consideration as is deemed appropriate under all circumstances); *Jones*, 559 U.S. at 349 ("the appropriate deference varies depending on the circumstances"). Thus, it is not just a matter of whether deference is to be afforded, but even if due, the Court is to weigh the extent of it as part of its entire Section 36(b) analysis.

[25] ████████████████████████████████████████████████████████████████

████████████████████████████████████████

- 35 -

█████████    *See Chill*, 2016 WL 1258984, at *15 (noting that the lack of "any actual bargaining or negotiating by the Trustees with respect to the fees ... strip[s] the Board's decision of deference even *if* the Trustees engaged in a thorough review of all the information [the adviser] provided them"); *see Jones*, 559 U.S. at 351 (holding that deference may be afforded only where a board's process "for ***negotiating*** and reviewing" fees is robust).

Other evidence further calls into question the robustness of Defendant's negotiating process. ████████████████████████████████████████

████████████████████████████████████████

███████████████████████. *See Chill*, 2016 WL 1258984, at *15 (holding that the board was not entitled to deference where, among other things, the board never shopped the advisory services contract to other providers); SAMF 7, 12 ████████████████

█████████████████████ 33.

***Second***, the Board failed to adequately inform itself about key issues bearing on the appropriateness of Defendant's fees. *Jones*, 559 U.S. at 351-52; *Gallus*, 675 F.3d at 1180. For example, as discussed herein, ███████████████████████████████████

████████████████████████████████████████

█████[26] SAMF 34. █████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████ Dixon Decl. Ex. E (Deposition Transcript of Anmarie Kolinski) at

---

[26] The Board also did not ████████████████████████████████
████████████████████████████████████████
███████ Dixon Decl. Ex. E (Deposition Transcript of Anmarie Kolinski) at 279:8-18; 280:13-19.

356:11-16; 358:10-16. ██████████████████████████████████████████████

██████████ "merely as a passive receptor of information" and was not fully informed, and therefore does not warrant any deference here. *Chill*, 2016 WL 1258984, at *15 (stating that the board should not be afforded deference where it failed to give careful analysis to important issues in the fee review process); *Am. Mut.*, 2009 WL 5215755, at *3 (finding fault with the board process where the directors passively accepted a claim by defendant adviser about a particular issue without further inquiry).

*American Mutual* illustrates that, regardless of the thoroughness of the review process, the failure of the board to fully inform itself about even a single key issue related to fees is fatal to a claim of deference. In that case, the district court found that the independent directors were well-qualified with significant experience and received "voluminous materials" related to the *Gartenberg* factors in the fee review process, as Defendant similarly argue here. Nevertheless, the district court refused to defer to board approval based on its finding that the board, like the Board here, failed to diligently inquire into and carefully analyze a key issue related to fees. *Am. Mut.*, 2009 WL 5215755, at *54-56.[27]

***Third***, the Board was plagued with conflicts of interest that compromised its ability to serve as an effective check in fee negotiations. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████     ██████████████████████

████████████████████████████████████████████████████████

---

[27] As Defendant is likely to note, the *American Mutual* court ultimately found defendant adviser was not liable on the Section 36(b) claim, but its decision was made in spite of the deficient board process and relied on evidence. *See Am. Mut.*, 2009 WL 5215755, *48-53.



*See* Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 103, 108, 111 ████████████████████████████

███████████████ Dixon Decl. Ex. H (Deposition Transcript of Rodger Smith) at 17:7-14, 20-21 ███████████████████████████████████████

████; Dixon Decl. Ex. BBBB, *In re MFW S'holders Litig.*, Transcript on MSJ Hearing at 139-40 (suggesting that a long serving board may be less likely to negotiate aggressively with management in a management buyout of the company); Dixon Decl. Ex. EEE at HCA0177697; Dixon Decl. Ex. B (Deposition Transcript of Howard P. Colhoun) at 118, 126, 150 ████████████████████████████████████ In addition, many of the trustees ████ ██████ ███████ ██████ ████ ██████ ██████ ██ ████ ██ ████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ SAMF 35, 36; *Jones*, 537 F.3d at 730 (noting that boards lack the incentives to negotiate aggressively with senior managers over compensation because many directors have served in similar positions and "naturally think that ... they should be well paid").

### 4. HCA Has Not Presented Evidence Demonstrating that the Board Conducted A Thorough Fee Review Process As a Matter of Law

Defendant argues that it has conducted a thorough 15(c) process which included reviewing and considering detailed information regarding the fees, but has not presented persuasive evidence to support such an assertion. The evidence it has submitted consists mostly of the materials the Board received as part of the 15(c) process, but Defendant has provided minimal (if any) evidence showing ██████████████████████████████ ████████████████████████████████████████████



■ *See Evangelist v. Fid. Mgmt. & Research Co.*, 554 F. Supp. 87 (D. Mass. 1982).

## IV. CONCLUSION

Defendant's motion for summary judgment should be denied.

Dated: October 24, 2016                    Respectfully submitted,


                                           By: /s/ Jenny L. Dixon

                                           ROBBINS ARROYO LLP
                                           Brian J. Robbins
                                           Stephen J. Oddo
                                           Jenny L. Dixon
                                           600 B Street, Suite 1900
                                           San Diego, CA 92101
                                           Tel: (619) 525-3990
                                           Fax: (619) 525-3991

                                           LAW OFFICE OF NORMAN RIFKIND
                                           NORMAN RIFKIND
                                           100 E Huron Street #1306
                                           Chicago, IL 60611
                                           Telephone: (847) 372-4747
                                           Facsimile: (312) 634-0059

                                           MILLER LAW LLC
                                           Marvin A. Miller
                                           115 South LaSalle Street, Suite 2910
                                           Chicago, IL 60603
                                           Tel: (312) 332-3400
                                           Fax: (312) 676-2676

ZWERLING, SCHACHTER
& ZWERLING, LLP
Robin F. Zwerling
Jeffrey C. Zwerling
Robert S. Schachter
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, NY 10010
Tel:  (212) 223-3900
Fax:  (212) 371-5969

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.
Robert L. Lakind
Arnold C. Lakind
Daniel S. Sweetser
Mark A. Fisher
Christopher S. Myles
Robert G. Stevens
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
Tel:  (609) 275-0400
Fax:  (609) 275-4511

*Attorneys for Plaintiffs*

1126293

Case: 1:14-cv-00789 Document #: 198 Filed: 11/02/16 Page 49 of 49 PageID #:12682

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: October 24, 2016

/s/ Jenny L. Dixon

JENNY L. DIXON