**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TERRENCE ZEHRER,<br><br>        Plaintiff,<br><br>   v.<br><br>HARBOR CAPITAL ADVISORS, INC.,<br><br>        Defendant. | Case No. 14-CV-00789<br><br>Consolidated |
| RUTH TUMPOWSKY,<br><br>        Plaintiff,<br><br>   v.<br><br>HARBOR CAPITAL ADVISORS, INC.,<br><br>        Defendant. | Case No. 14-CV-07210<br><br>Honorable Joan Humphrey Lefkow |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF
HARBOR CAPITAL ADVISORS, INC. FOR SUMMARY JUDGMENT**

John W. Rotunno
Stephen J. O'Neil
Paul J. Walsen
Clifford C. Histed
Molly K. McGinley
Nicole C. Mueller

**K&L GATES LLP**
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Telephone:  (312) 807-4213
Facsimile:   (312) 827-8000

Emails: john.rotunno@klgates.com
        stephen.oneil@klgates.com
        paul.walsen@klgates.com
        clifford.histed@klgates.com
        molly.mcginley@klgates.com
        nicole.mueller@klgates.com

*Attorneys for Defendant Harbor Capital Advisors, Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................1

I.     PLAINTIFFS' "RETAINED FEE" THEORY FAILS AS A MATTER OF LAW ...........5

     A.     Plaintiffs Have Not Challenged HCA's Advisory Fee As A Whole ......................5

     B.     An Excessive Fee Claim Under Section 36(b) Cannot Be Based On A Cost-Plus Analysis Of The Reasonableness Of Individual Cost Items ..................7

     C.     There Is No Legal Support For Plaintiffs' "Retained Fee" Theory ........................9

     D.     The Modified Profitability Analysis Provided To The Board Contains The Information Plaintiffs Contend Was Missing From the 15(c) Process .................12

II.     SUMMARY JUDGMENT SHOULD BE GRANTED FOR HCA UNDER JONES II ...........................................................................................................................14

     A.     Comparative Fees....................................................................................................15

     B.     Performance .............................................................................................................19

CONCLUSION................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Austin Police Retirement System v. Kinross Gold Corp*.,
 957 F. Supp. 2d 277 (S.D.N.Y. 2013) .......................................................................................19

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
 528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ................................9

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
 694 F.2d 923 (2d Cir. 1982) ............................................................................................8, 20

*Jones v. Harris*,
 559 U.S. 335 (2010) ...................................................................................... *passim*

*Jones v. Harris Associates L.P.*,
 527 F.3d 627 (7th Cir. 2008) ...............................................................................15

*Jones v. Harris Associates L. P.*,
 611 Fed. App'x 359 (7th Cir. 2015) ..................................................................4, 14, 18, 20

*Jones v. Harris Associates L.P.*,
 No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007) .............................................15, 16

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
 No. CV 11-1083, 2016 WL 1394347 (D.N.J. Apr. 7, 2016) ....................................2, 4, 13, 14

*Krinsk v. Fund Asset Mgmt., Inc.*,
 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd* 875 F.2d 404 (2d Cir. 1989) .............................9, 10

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
 248 F.3d 321 (4th Cir. 2001) .........................................................................................7, 19

*Sivolella v. AXA Equitable Life Ins. Co.*,
 No. 11CV4194PGSDEA, 2016 WL 4487857 (D.N.J. Aug. 25, 2016) ...............................3, 16

*Turner v. Davis Selected Advisors, LP*,
 626 F. App'x 713 (9th Cir. 2015) ...........................................................................7

*Upton v. SEC*,
 75 F. 3d 92 (2d Cir. 1996) ...................................................................................10

**Statutes**

15 U.S.C. § 80a-12(b) ...................................................................................................9

15 U.S.C. § 80a-35(b) .............................................................................................. *passim*

**Other Authorities**

17 CFR § 270.12b-1 ...............................................................................................9, 10

Fed. R. Civ. P. 56 .......................................................................................................20

ICI Independent Directors Council Task Force Report, Board Oversight of
    Subadvisers, Jan. 2010, https://www.idc.org/pdf.idc_10_subadvisers.pdf................................9

IM Guidance Update, Mutual Fund Distribution and Sub-Accounting Fees, Jan.
    2016, https://www.sec.gov/investment/im-guidance-2016-01.pdf ...........................................9

*In re Shipley*,
    Exchange Act Release No. 34, 10870, 1974 WL 161761 (June 21, 1974) ...........................10

*In re Smith Barney Fund Mgmt. LLC*,
    Exchange Act Release No. 05-51761 (May 31, 2005) ...........................................10

S. Rep. No. 91-184...................................................................................................8

*SEC v. American Birthright Trust Mgmt. Co.*,
    Litigation Release No. 80-9266, 1980 WL 1479 (D.D.C. Dec. 30, 1980) .............................10

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "Barrett Dep." | Deposition of Kent E. Barrett |
| "Board" | Harbor Funds Board of Trustees |
| "Dechert" | Dechert LLP, counsel for the Independent Trustees |
| "Dixon Decl. Ex." | Exhibits attached to the Declaration of Jenny L. Dixon (Dkt. 191) |
| "Funds" | Harbor International Fund and Harbor High-Yield Bond Fund |
| "Guidance Update" | IM Guidance Update, Mutual Fund Distribution and Sub-Accounting Fees, Jan. 2016, https://www.sec.gov/investment/im-guidance-2016-01.pdf |
| "HCA" | Defendant Harbor Capital Advisors, Inc. |
| "HFD" | Harbor Funds Distributors, Inc. |
| "HHYBF" | Harbor High-Yield Bond Fund |
| "HIF" | Harbor International Fund |
| "HSG" | Harbor Services Group, Inc. |
| "ILCC" | International Large-Cap Core |
| "ILCG" | International Large-Cap Growth |
| "Kolinski Dep." | Deposition Transcript of Anmarie M. Kolinski |
| "Kopcke Dep." | Deposition Transcript of Richard W. Kopcke |
| "Kopcke Rpt" | Expert Report of Richard W. Kopcke |
| "Mem." | Memorandum in Support of Motion of Harbor Capital Advisors, Inc. for Summary Judgment |
| "Mueller Decl. Ex." | Exhibits attached to the Declaration of Nicole C. Mueller (Dkt. 166) |
| "Northern Cross" | Northern Cross, LLC |
| "Plaintiffs" | Plaintiffs Terrence Zehrer and Ruth Tumpowsky |
| "Resp." | Plaintiffs' Response to Defendant Harbor Capital Advisors, Inc.'s Statement of Material Facts as to Which There Is No Genuine Dispute |
| "SAMF" | Plaintiffs' Statement of Additional Material Facts |

"SAMF Resp."          Defendant's Response to Plaintiffs' Statement of Additional Material Facts

"SEC"          United States Securities and Exchange Commission

"Section 36(b) or          Section 36(b) of the Investment Company Act of 1940, as amended 15 U.S.C.
§ 36(b)"          §80a-35(b)

"SMF"          Defendant Harbor Capital Advisors, Inc.'s Statement of Material Facts As To
          Which There Is No Genuine Dispute

"Subadvisers"          Northern Cross, LLC and Shenkman Capital Management, Inc.

"Task Force Report"          ICI Independent Directors Council Task Force Report, Board Oversight of
          Subadvisers, Jan. 2010, https://www.idc.org/pdf.idc_10_subadvisers.pdf

## PRELIMINARY STATEMENT

Plaintiffs hope to defeat HCA's motion for summary judgment by convincing the Court that somewhere in the stack of "evidence" that they have mischaracterized, taken out of context, or outright falsified from the discovery record, there must surely be a triable issue of fact.[1] But Plaintiffs' opposition strategy should not be allowed to obscure the simple dispositive issue of law that can and should be resolved on this motion, and that Plaintiffs do not dispute is central to their claims. That issue is whether § 36(b) of the ICA allows a plaintiff to recover based on the theory that only a *portion* of the advisory fee charged by the adviser for a *portion* of the services provided to the funds at issue is purportedly "excessive," even though the fee as a whole is well within the range of fees that might have been produced in arm's-length bargaining. Nothing in § 36(b), its legislative history, or the case law setting the standard for § 36(b) liability supports the proposition that any fee, other than the advisory fee as a whole, can be challenged in a § 36(b) action.

The material facts surrounding this question are not in dispute: HCA engages subadvisers rather than internal portfolio managers to make the day-to-day investment decisions for the Funds; it pays those subadvisers just like it pays any other expense it incurs in operating the Funds, *i.e.*, from the overall advisory fee paid to HCA by the Funds; and its profitability percentage from operating the Funds changes drastically depending upon whether those subadvisory fees are treated as an expense or not. Plaintiffs concede that "there is no material dispute regarding the dollar amount of HCA's profits . . ." (Resp. at 20) nor, for that matter, is

---

[1] Most of the purported "facts" injected into this record by Plaintiffs are immaterial because they assume that the advisory fee charged to the Funds, and the costs and services encompassed by that advisory fee, should not be evaluated as a whole under § 36(b). To the extent that Plaintiffs raise additional "facts" regarding material issues, such as comparative fees or performance, those "facts" are either misrepresented or insufficient in any event to raise a genuine issue of material fact regarding those *Gartenberg* factors as to which they pertain.

there any dispute as to the dollar amounts of HCA's revenues and costs. It is only the profit *margin* that changes when subadvisory expenses are removed, from an unremarkable ████ or ████ as determined by HCA and reported to the Board, to almost ████ as recalculated by the Plaintiffs. (*Id.*) Consistent with the practice among "managers-of-managers," HCA treats its subadvisory fees as an expense, and when that single largest expense of operating the Funds is removed from the profitability equation, HCA's margins necessarily more than double. This same trick can be applied to any manager-of-mangers in the mutual fund industry with the same effect -- ordinary profit margins will appear to become extraordinary ones, and every manager-of-managers could be found to charge "excessive" fees. At HCA's actual ████ or ████ profit margins, Plaintiffs' claim evaporates.

Substantive rulings in the first two manager-of-manger cases provide strong indication that the courts will not allow otherwise normal advisory fees to be transformed into "excessive" fees by virtue of the simple fact that an adviser chooses to provide portfolio management services through subadvisers rather than its own employees. While Plaintiffs note that "not one Section 36(b) action involving a manager-of-managers structure has been *dismissed* on summary judgment" (Resp. at 5) (emphasis supplied), *partial summary judgment was granted* in one of those two cases.[2] In addition to granting partial summary judgment regarding board process, the *Kasilag* court expressed a view that likely will sound the death knell for Plaintiffs' "retained fee" theory in that case -- *i.e.*, that the Court is inclined to consider the "combined services [of the adviser and subadvisers] measured against the totality of the advisory fee," not just the services rendered by the adviser's own employees. *Id.* at *15 (setting the case for a "few days of trial" in

---

[2]    *See Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. CV 11-1083, 2016 WL 1394347, at **14, 21 (D.N.J. Apr. 7, 2016) (ruling that the Board's approval of the fees was entitled to "substantial weight" where the plaintiffs' challenge to the adequacy of the information provided to the Board amounted to nothing more than "nit-picking").

view of the remaining issues). In *Sivolella v. AXA Equitable Life Ins. Co.*, the other manager-of-managers case in which summary judgment was denied, the case proceeded through a full 25-day trial, and the plaintiffs suffered a resounding defeat on every aspect of their claims, including their "retained fee" theory of § 36(b) liability presented through the same experts they rely upon in this case. No. 11CV4194PGSDEA, 2016 WL 4487857, at *72 (D.N.J. Aug. 25, 2016).

Plaintiffs seek to create a new sub-category of § 36(b) case law for managers-of-managers, applying a restated version of the *Gartenberg* factors used by courts over the last 35 years to evaluate excessive fee claims and a modified version of the standard for § 36(b) liability reaffirmed by the Supreme Court in *Jones v. Harris*, 559 U.S. 335 (2010).[3] But a manager-of-managers is just like every other mutual fund adviser except for the decision to contract with subadvisers to make day-to-day investment decisions rather than hire portfolio management employees to do exactly the same thing. Based on nothing more than whether that portfolio management expense is external versus internal, Plaintiffs argue that *Gartenberg's* "nature and quality" factor should be limited to non-portfolio management services performed by a manager-of-managers because those services, when *segregated* from the services performed by the subadviser, are purportedly "limited in both nature and quality" (Resp. at 14-17); that the Fund's "award-winning performance" and its "star" portfolio managers should be removed from consideration because that performance was generated (at least in part) by subadvisers selected by HCA rather than by HCA employees themselves (*Id.* at 2, 17-18); and that any economies of

---

[3]     Plaintiffs also use the fact that HCA is a manager-of-managers to "distinguish" relevant case law, contending that the cases granting summary judgment for a § 36(b) defendant supposedly are inapposite because no summary judgment has yet been entered in a manager-of-managers case (Resp. at 1), and that the *Jones II* decision of the Seventh Circuit, is distinguishable because "it did not involve a 'manager-of-managers' scenario . . . ." (Resp. at 7-8)  In that same passage, Plaintiffs claim that *Jones II* "involved other facts vastly different than the evidence adduced here" with a footnote that presumably identifies these other "vastly different facts"; however, there are no "facts" disclosed in footnote 7, just another statement that the adviser-defendant in *Jones II* "managed its mutual funds directly and did not use a manager-of-managers structure." (*Id.* at 8 n.7)

scale experienced by HCA should be evaluated based on HCA's internal operating expenses, exclusive of the largest expense of operating the Funds. (*Id.* at 29-30) And, of course, Plaintiffs would have the profitability factor under *Gartenberg* turn on an adviser's profit margin *after* removing the Funds' single largest expense. (*Id.* at 20-24) Not surprisingly, Plaintiffs cite no authority in which a court has countenanced the rewriting of the *Gartenberg* factors in this manner.

Plaintiffs' attempt to rewrite the basic standard of liability reaffirmed by the Supreme Court in *Jones* is best reflected in their contention that "the critical question that must be resolved in evaluating the advisory fee charged to the Funds is whether the advisory compensation *retained by* HCA is *reasonable* in relation the *oversight and related services* provided by HCA." (*Id.* at 21-22) (emphasis supplied) This is not the "critical question" at all, and it completely misstates the standard in several respects. It is not the "advisory compensation retained" that is at issue but rather the advisory fee *charged to the Funds* under *Jones*. *Jones*, 559 U.S. at 346 (to be liable "an investment adviser must *charge a fee* that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the result of arm's-length bargaining") (emphasis supplied). The standard is not what is "reasonable" but what is within the range of what could be negotiated at arm's-length under the "so disproportionately large" standard in *Jones*. (*Id.*) It is not just the "oversight and related services" that are at issue but the "combined services . . . measured against the totality of the advisory fee." *Kasilag*, 2016 WL 1394347, at *15. Nor must the Court "conduct its own analysis of the substantive fairness of HCA's fees," as Plaintiffs contend. (Resp. at 24) To the contrary, the Seventh Circuit expressly held in *Jones II* that "the Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees" (*Jones v. Harris*

*Associates L. P.*, 611 Fed. App'x 359, 360 (7th Cir. 2015) ("*Jones II*")) and requires that the business judgment of the disinterested trustees be given deference where they have considered the relevant factors "even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351.

The complete lack of any logic or authority for fashioning a different standard of § 36(b) liability for managers-of-managers in the mutual fund industry, coupled with the rejection of the "retained fee" theory reflected in the *Sivolella* and *Kasilag* decisions, warrants summary disposition of the same failed theory in this case. Moreover, the *Sivolella* and *Kasilag* cases were not filed in a district court within the appellate jurisdiction of the Seventh Circuit, where the decision in *Jones II* has interpreted the Supreme Court's decision in *Jones* to mean that funds that have delivered reasonable performance (net of fees) at comparatively low cost cannot, as a matter of law, be charging excessive fees. The facts of record here compare quite favorably with *Jones*, and summary judgment therefore should be granted for HCA.

## I.      PLAINTIFFS' "RETAINED FEE" THEORY FAILS AS A MATTER OF LAW

### A.      Plaintiffs Have Not Challenged HCA's Advisory Fee As A Whole

That Plaintiffs challenge only the "retained" portion of the fee in this case was never in doubt until Plaintiffs filed their response to HCA's motion for summary judgment. Their experts used the term throughout their reports to describe their opinion that the retained portion of the fee was somehow excessive (Dixon Decl. Ex. L at 2-3, 7-14, 16, 18-19; Ex. M at 2, 4-6, 15, 17, 18, 32-35; Ex. J at 10, 15, 19, 21, 24-26, 29, 31, 55) and their "excessive fee" expert stubbornly resisted expressing any opinions in deposition regarding the advisory fee as a whole. (Dixon Decl. Ex. F at 102-04) However, now that HCA has moved for summary judgment on the ground that § 36(b) does not provide a right to challenge a *portion* of the advisory fee, Plaintiffs argue that they actually are challenging the fee as a whole after all. (Resp. at 10-11) In so doing, they carefully avoid using their own "retained fee" terminology in favor of the term

"compensation" that they use throughout their Response, but the meaning is exactly the same. (*Id.* at 11)  In Plaintiffs' lexicon, "compensation" is the portion of the advisory fee that HCA does *not* use to pay the subadvisers that it hires, supervises, pays and for whom it has ultimate responsibility.  (*Id.*) [4]

Plaintiffs argue that "a claim that the advisory compensation retained by HCA is excessive in relation to HCA's own services *is* a claim that the total advisory fee is excessive." (*Id.*) (emphasis in original) but this is a play on words for which Plaintiffs offer no authority or explanation other than the equally conclusory statement that "[t]he excessive portion retained by HCA renders the overall fee excessive."  (*Id.*)  When Plaintiffs present any financial "analysis" to support their theory, it is always predicated on the relationship between HCA's "retained fee" and its internal (non-subadvisory) costs.  (*Id.* at 1-2, 16-17; SAMF at 13-15)  When the relationship is properly viewed as between the total advisory fee charged by HCA and the total costs incurred in providing the services encompassed by that fee, Plaintiffs concede that HCA's profit margin from its relationship with the two Funds falls in the ████ to ████ range. (SAMF 13)  Margins of ███ or ███ are no evidence whatsoever of an excessive fee.  Plaintiffs' own "excessive fee" expert used what he described as a "competitive" profit margin of ███ derived from profit margins of public investment advisory firms as a benchmark against which to measure the artificially inflated "net margins" created by Plaintiffs through removal of the

---

[4]    Another surprise in Plaintiffs' Response is its argument that so-called "fallout benefits" are at issue in this case.  Plaintiffs' two experts, including their purported "excessive fee" expert, each testified that he had no opinions whatsoever regarding any fallout benefits to HCA.  (Dixon Decl. Ex. F (Kopcke Dep.) at 133; Mueller Decl. Ex. 118 (Barrett Dep.) at 273-274)  It is not enough to raise a genuine issue of material fact for Plaintiffs to simply state that the receipt of *revenues* by HCA's affiliates (HSG and HFD) constitute a fallout benefit. First, they are not fallout benefits because fees paid to HSG and HFD are paid directly by the Funds and approved by the Board of Trustees.  But even if they *could* be considered fallout benefits, there has been no challenge to the reasonableness of the fees paid to HSG and HFD, which is not surprising, because in 2014 HSG's profit margin was only 2.9% and HFD's was just 0.4%.  (SMF 59)  In fact, Plaintiffs actually complain that the profitability of HSG and HFD should not be included in HCA's reported profit margin because it *dilutes* HCA's profitability.  (Resp. at 20 n.20)

subadvisory expense. (Dixon Decl. Ex. L (Kopcke Rpt.) at 10 ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ When HCA's

advisory fee and costs are evaluated as a whole, as they should be, its margins fall squarely in the

range that Plaintiffs concede is the normal result of competitive forces. (*Id.*)

> **B.    An Excessive Fee Claim Under Section 36(b) Cannot Be Based On A Cost-Plus Analysis Of The Reasonableness Of Individual Cost Items**

Rather than keeping the § 36(b) analysis "sharply focused on the question of whether the

fees themselves were excessive," as *Jones* requires (559 U.S. at 352 (quoting *Migdal v. Rowe

Price-Fleming Int'l, Inc*., 248 F.3d 321, 328 (4th Cir. 2001)), Plaintiffs propose an unworkable

"unbundling" analysis of an adviser's fee that would require scrutiny of each line item of cost

incurred by the adviser in generating the fee.  Thus, Plaintiffs argue that "the only way to

evaluate the bundled fee is to price each set of services separately . . . ." (Resp. at 11) (citing

their expert report for the proposition that "[i]t is essential that fees align with costs at every

stage for every component of services.")  The obvious impact of such an "unbundling" is that

courts could be asked by § 36(b) plaintiffs to engage in a line-item-by-line-item assessment of an

adviser's cost, from employee compensation, to legal and accounting services, to rent and office

supplies.  Aside from the staggering burden such an approach would impose on defendants and

the courts, it is simply improper under § 36(b), which does not authorize claims "challenging the

use, as opposed to the size, of a fee . . . ." *Turner v. Davis Selected Advisors, LP*, 626 F. App'x

713, 718 (9th Cir. 2015).

If an investment adviser can reduce costs in one area by, for example, moving its

facilities to a lower cost location, it should not be penalized for that efficiency.  Similarly, if an

investment adviser decides to use subadvisers rather than employees to make day-to-day

investment decisions, it is not required to adjust its fee just because its largest expense is moved from one category to another, *i.e.*, from an employee compensation cost to a contractual subadvisory fee. Yet, because Plaintiffs believe it is essential for fees to align with costs at every stage, a reduction (or a recharacterization if an internal cost item becomes an external one) of any given cost must, in Plaintiffs' view, result in a reduction of the fee. (Resp. at 11; Dixon Decl. Ex. F (Kopcke Dep.) at 163-165) As a result, two advisers charging exactly the same fee for managing the same kind of mutual fund with the same performance could have completely different results under § 36(b) (Dixon Decl. Ex. F (Kopcke Dep.) at 165), and are certain to have different results under Plaintiffs' theory if one uses subadvisers to provide portfolio management services and the other does not. Nowhere in their Response do Plaintiffs explain why the law under § 36(b) should operate in such an arbitrary and irrational fashion.

A separate but equally critical flaw in Plaintiffs' proposed attack on each part of an adviser's cost structure, rather than on the fee as a whole, is that Plaintiffs indisputably are using a "cost-plus" measure as the standard for determining § 36(b) liability. (Mem. at 13; Dixon Decl. Ex. F (Kopcke Dep.) at 146) Once costs are "unbundled," Plaintiffs add what they determine to be a reasonable profit of ▇ to assess the supposed "excessiveness" of the fee. (*Id.*; Dixon Decl. Ex. L (Kopcke Rpt.) at 12) However, it has been settled law since *Gartenberg* that § 36(b) does not impose a "cost-plus" limitation on advisory fees. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (quoting S. Rep. No. 91-184 at 4902-03). Faced with their own expert's concession that he applied a "cost-plus" approach to determine whether HCA's advisory fees are "excessive" (Mem. at 13, 29-30; Dixon Decl. Ex. F (Kopcke Dep.) at 146-147), Plaintiffs offer no rebuttal whatsoever, failing even to mention the "cost-plus" concept in their Response or to describe their analytical framework as anything other

than "cost-plus."  Plaintiffs' "retained fee" theory, based on a "cost-plus" approach to pricing, is simply not actionable under § 36(b).

### C.    There Is No Legal Support For Plaintiffs' "Retained Fee" Theory

As supposed support for their "retained fee" theory of liability, Plaintiffs rely upon language taken out of context from an assortment of older administrative proceedings and industry publications, as well as a more recent SEC "Guidance Update" (Resp. at 12-13) on the separate and very different topic of Rule 12b-1 fees.[5]  Neither the Guidance Update nor the Task Force Report (Resp. at 12) cited by Plaintiffs address advisory fees at all, much less stand for the proposition that § 36(b) authorizes a claim based on the Plaintiffs' theory.  (Resp. at 12)  The Guidance Update addresses the SEC's concerns regarding payments by mutual funds to financial intermediaries for shareholder and recordkeeping services provided to investors whose shares are held in the intermediaries' omnibus and networked accounts.  The very different issue in that setting is the SEC's concern that intermediary fees not be used to improperly finance *distribution costs* in violation of Rule 12b-1 of the Investment Company Act.  *See* Guidance Update at 1, 6.

---

[5]     12b-1 fees are those which finance "any activity which is primarily intended to result in the sale of shares issued" by an investment company.  17 CFR § 270.12b-1(a)(2) (1981).  Under § 12(b) of the ICA, it is unlawful "for any registered open-end company . . . to act as a distributor of securities of which it is the issuer . . ." (*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1052 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) (quoting 15 U.S.C. § 80a-12(b) (1976))), except through a plan approved by the board of directors.  17 C.F.R. § 270.12b-1(b)(2).  As a result, distribution expenses may not be considered in determining whether an investment company's advisory fee is excessive, "lest the Fund subsidize the costs of [the investment adviser]'s commission-generating activities."  *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 490 (S.D.N.Y. 1988), *aff'd* 875 F.2d 404 (2d Cir. 1989); *see also Gartenberg*, 528 F. Supp. at 1052 (finding that plaintiffs failed to prove that certain processing costs were "of the character of forbidden 'distribution' expenses.").  In *Krinsk*, a § 36(b) case, HCA's expert Russell Peppet was engaged to perform a study of the costs incurred by an investment adviser to a fund that was made available to Merrill Lynch clients who participated in a cash management account program.  715 F. Supp. at 489.  To calculate the profitability of the adviser in that case, plaintiffs sought to include 12b-1 revenues in the analysis but preclude them from the adviser's expenses.  *Id.* at 490 n.37.  The Court accepted Mr. Peppet's position that 12b-1 payments have no place in Merrill Lynch's profitability analysis, finding that "the Fund pays these monies to the financial consultants for services to shareholders and for selling Fund shares."  *Id.* at 490.  The *Krinsk* court did not have any occasion to consider whether the standard "gross" method of determining fund profitability would apply, much less "reject" the "gross"

The text pointed to by Plaintiffs is specifically tailored advice provided by the SEC relating to information "a board might generally consider" in order to identify and prevent the improper use of sub-accounting fees for distribution expenses. *See id.* at 4, 8. There is no indication in the Guidance Update that any of the SEC's recommendations should be applied beyond the context of Rule 12b-1 fees, and the comparison drawn by Plaintiffs between Rule 12b-1 and § 36(b) is inapt because there is no analogous concern regarding the categorization of subadvisory fees as something other than an investment advisory cost.[6]

The non-precedential SEC settlement orders[7] cited by Plaintiffs similarly afford no support for their position here. (Resp. at 13) In *SEC v. American Birthright Trust Mgmt. Co.*, Litigation Release No. 80-9266, 1980 WL 1479, at *1 (D.D.C. Dec. 30, 1980), the adviser had failed to disclose both the advisory services provided by the subadviser and the compensation paid to the subadviser (only about 6% of the adviser's fee). The fund board also was not provided with information reasonably necessary to evaluate the advisory agreements. And in *In re Smith Barney Fund Mgmt. LLC*, Exchange Act Release No. 05-51761 (May 31, 2005), the adviser first negotiated a "rebate" arrangement with the funds' transfer agent, in which the transfer agent was to kick back a portion of its fee to the adviser. When the adviser was informed by its consultant that "this arrangement would in no way be acceptable to the fund boards and may not be legally viable," the structure of the deal (but not its substance) was

---

method as Plaintiffs have claimed. *See id.* HCA, like the defendant in *Krinsk*, does not include 12b-1 fees in its profitability analysis, and such fees are not at issue here.

[6] The Task Force Report is similarly a red herring. It "explore[s] practices relating to board oversight of subadvisers," including the approval of *subadvisory* fees. Task Force Report at 1, 10-13. Plaintiffs concede that the subadvisory fees paid by HCA are established at arm's length (Resp. at 18). The Task Force Report does not in any way address approval of advisory fees.

[7] *Upton v. SEC*, 75 F. 3d 92, 98 (2d Cir. 1996) (SEC consent orders carry "little, if any, precedential weight" (quoting *In re Shipley*, Exchange Act Release No. 34, 10870, 1974 WL 161761 (June 21, 1974)).

changed so that an affiliate of the adviser was interposed as the transfer agent, and the former independent transfer agent was engaged to serve as a sub-transfer agent -- with the unlawful rebate recast as a heavy "discount" to its former fee. The adviser's affiliate retained the "discount," rather than passing it along to the funds. The adviser also failed to disclose to the funds' board the existence of a side agreement in which the former transfer agent (now the sub-transfer agent) made a series of business concessions to the adviser, including a revenue guarantee, and misled the board concerning the transaction, the benefits to the adviser, and the profit earned by the adviser as a consequence of the "discount." In short, the transfer agent was not paying its sub-transfer agent anything like what the fund board was being told. Nothing remotely resembling these facts is present here.

Lacking case law or even administrative authority to support their novel "retained fee" theory of § 36(b) liability, Plaintiffs rely on a single passage contained in an approximately 37-page legal memorandum from counsel to the Independent Trustees (Dechert) that provides overall guidance on their § 15(c) responsibilities. The actual statement, as distinct from the one misquoted at page 25 of their brief (by combining passages from different sections of the memorandum and inserting new material in brackets) or paraphrased beyond recognition in SAMF 5, reads as follows:



(Resp. at 12, 25; SAMF 5 (citing Dixon Decl. Ex. HH at HCA0022146))  First, Dechert notes the undisputed fact that it is HCA and not the Funds that pays the Subsadviser's fee. (Dixon Decl. Ex. HH at HCA0022146; *see also* SMF 22)  Second, █████████████████

11

██████████████████████████████████████████████████ (SAMF 5

(citing Dixon Decl. Ex. HH at HCA0022146)) ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (*Id.*)  Dechert says

nothing about any "retained fee" (because no such "fee" exists), much less comparing such a

hypothetical "retained fee" to the *costs* associated with such a fee. (*Id.*) ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ (SMF 49; SMF Resp. 49)  Contrary to Plaintiffs' assertion (apparently copied from

briefing in another case) that HCA's fee, net of subadvisory expense, "exceeds the fees the star

subadvisers . . . receive" (Resp. at 2), HCA pays the majority of the total advisory fee to its

subadvisers, a fact that compares favorably to the "spreads" in other manager-of-managers cases.

(SMF 49; *see also* Dixon Decl. Ex. F (Kopcke Dep.) at 181-182; 192-194)

### D. The Modified Profitability Analysis Provided To The Board Contains The Information Plaintiffs Contend Was Missing From the 15(c) Process

Even if Dechert's statement in a legal memorandum to its clients could be interpreted to

support the utility of some kind of comparison of HCA's costs (excluding its subadvisory costs)

to the "retained" portion of the advisory fee, HCA provided an alternative form of profitability

analysis to the Board that includes such information.  (SMF 56-57; Dixon Decl. Ex. HH at

HCA0022133).  While the effect on profitability of removing the subadvisory expense could

easily be ascertained with an ordinary calculator (SMF 54), the Modified Profitability Analysis

prepared by HCA and provided to the Independent Trustees at Dechert's request did the math for

the Board and showed them the resulting margins for HCA of ██████.  (SMF 55)  Plaintiffs'

only response to this indisputable evidence that the Board knew exactly what would happen to

profit margins if subadvsiory costs were removed is to claim that HCA's calculation understated HCA's net profitability by some small amount.[8]  (Resp. at 24 (citing SAMF 21-24, 34))  But a modest change in the margins under this alternative presentation would not have made any difference because the Board found the recalculated "net margin" approach to be only marginally useful in any event.  (SMF 58)  In a last-ditch effort to minimize the value of the Modified Profitability Analysis, Plaintiffs argue that "[i]n any event, this Court must conduct its own analysis of the substantive fairness of HCA's fees, and it is free to evaluate profitability as it sees fit, irrespective of how the board chose to evaluate profitability for purposes of its review." (Resp. at 24)  This could not be more wrong.  *Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process").  The Board's request for, and HCA's willingness to provide, the alternative Modified Profitability Analysis sets this case apart from the facts in *Kasilag* and *Sivolella,* where no similar information was provided to the Board.  Thus, this is an even stronger case for summary judgment than in *Kasilag* where the Board's approval of the fees was entitled to "substantial weight" as a matter of law.[9]

---

[8]      Plaintiffs argue that HCA should not



[9]      Many of the supposed complaints that Plaintiffs raise about the Board's process are the very same "quibbles" that the court in *Kasilag* dismissed as "no more than nit-picking" in concluding that such criticisms "do not create triable issues of fact with regard to the Board's independent approval of the fees."  2016 WL 1394347, at *10.  Like the plaintiffs in *Kasilag*, Plaintiffs complain that the Board did not solicit proposals to replace HCA as adviser to the Funds (Resp. at 36); *Kasilag*, 2016 WL 1394347, at *12 (rejecting argument that board did not consider retaining a replacement adviser as an attempt to "manufacture a flaw in the Board's review"); that the Lipper reports supposedly were manipulated (Resp. at 26-27); *Kasilag*, 2016 WL 139437, at *13 ("the Court does not construe from the evidence Plaintiffs point to that HIFSCO exerted control over Lipper to the detriment of the Board"); and that the accounting

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED FOR HCA UNDER *JONES II*

Nothing in the Seventh Circuit's *Jones II* decision suggests that its reasoning should not apply to a manager-of-managers.  In *Jones II*, the Seventh Circuit affirmed a grant of summary judgment for the investment adviser defendant based on facts strikingly similar to those before the Court on this motion.  In affirming summary judgment, the Court acknowledged the "so disproportionately large" standard articulated in *Gartenberg* and reaffirmed in *Jones*, and recognized that "the goal is to identify the outer bounds of arm's-length bargaining and not engage in rate regulation."  *Jones II*, 611 Fed. App'x at 360.  In doing so, the Court found that there was no material dispute regarding four propositions, but it focused on the "first and fourth" (fees in line with those of comparable funds and returns (net of fees) that exceeded the norm) which the Court found "jointly suffice under the Supreme Court's standard" to warrant summary judgment.  *Id*. at 360-361.  The Seventh Circuit's reasoning was that a fund that has low comparative fees, and performance at least as good as comparable funds, must by definition fall within the broad "bargaining range" of what might have been reached at arms-length.  *Id*.  The same rationale supports summary judgment here.  While performance and comparative fee statistics over different time periods or measured against different benchmarks necessarily will vary, there can be no genuine factual dispute that HCA has delivered strong long-term performance to the shareholders of the Funds at comparatively low fees.  (SMF 46-48)  Fees that compare favorably to fees charged by other actively managed funds with similar investment strategies cannot be objectively unreasonable, and low competitive fees that produce good

---

methodology used by HCA in reporting profitability was misleading. (Resp. at 36); *Kasilag*, 2016 WL 1394347, at *11 (holding that argument that accounting methodology was misleading failed because it was "based on re-arranging the documents and information that were provided to the Board" and concluding that the "fact that the Board was given one accounting treatment of these inputs over another does not in and of itself impugn the Board's approval").

investment performance (net of fees) cannot be "so disproportionately large" that they bear "no reasonable relationship to the services rendered" under *Jones*.

### A.     Comparative Fees

Plaintiffs attempt to minimize the Seventh Circuit's reliance on comparative fees by noting that the Supreme Court directed courts not to rely "too heavily" on such comparisons. (Resp. at 8, 24)  But the concern about excessive reliance on fee comparisons arises from the generalized concern that some mutual funds used for comparisons may not be setting fees within the range of what would be negotiated at arm's length.   (*Id*. at 8-9)  Here, Plaintiffs' own "excessive fee" expert concedes that the mutual fund market is competitive (Dixon Decl. Ex. F (Kopcke Dep.) at 126), and Plaintiffs offer no evidence to the contrary.   In fact, evidence submitted by Plaintiffs reflects steadily declining mutual fund fees because of competition from low cost, passively managed investment vehicles.  (Dixon Decl. DDDD at 1)  In a competitive market, the fees charged by other comparable funds provide at least a benchmark for the Court in its evaluation of the bargaining range, and the Funds' fees clearly fall at the low end of that range.  (SMF 46-48)

The district court in *Jones* rejected the plaintiffs' similar argument that comparisons with other mutual funds' fees should be disregarded, noting that, "making all inferences in favor of Plaintiffs does not mean we must ignore the undisputed fact that shareholders in at least nine other mutual funds were paying fees at the same level the Funds were."  *Jones v. Harris Associates L.P.*, No. 04 C 8305, 2007 WL 627640, at *8 (N.D. Ill. Feb. 27, 2007).   Judge Kocoras found that the fees of other mutual funds established a "range of prices that investors were willing to pay," *Id.*, exactly as the Seventh Circuit later approved in its affirmances.  *Jones v. Harris Associates L.P.*, 527 F.3d 627, 635 (7th Cir. 2008); *Jones*, 611 F. App'x at 362.  With respect to the two Funds at issue in this case, Plaintiffs cannot dispute the fact that HIF's total

15

expense ratio *and* its advisory fee rank among the lowest of its peers. (SMF 46-48) In 2014, HIF had an expense ratio among the lowest 4% of its expense universe peers, and among the lowest 13% of its expense group peers. (*Id.* at 46) HHYBF was in the lowest 25% in both categories. (*Id.*) In response to these facts, Plaintiffs offer no comparative fee analysis of their own. Instead, they quibble about the methodology, arguing that HCA improperly compares total expense ratios rather than advisory fees (Resp. at 25), but they are simply wrong about this. HCA has supplied the Court with *both* total expense ratio and advisory fee comparisons showing that the Funds' fees are comparatively low using either metric. (SMF 46-48)

Plaintiffs complain about the reliability of Lipper data, but courts have often relied upon Lipper comparative fee data in § 36(b) cases. *See, e.g., Sivolella*, 2016 WL 4487857, at *65 (finding Lipper comparative fee data reliable). Plaintiffs also contend that HCA somehow "manipulated" the Lipper data that demonstrate the comparatively low fees of the Funds, though the very documents upon which Plaintiffs rely for the proposition that HCA "manipulated" the Lipper data demonstrate precisely the opposite. The supposed evidence of "manipulation" comes from emails that, when read in their entirety, show that HCA made *formatting edits*, corrected *numerical errors*, and posed *questions* to Lipper about the analysis to ensure the accuracy of the reports. (SAMF Resp. 28).[10] The assertion that HCA "instructs Lipper (outside the presence of the Board) to suspend its Peer Ranking Methodology" is a complete fiction. (*Id.*; Resp. at 26) While there is no dispute that HCA requested modifications to Lipper's initial peer groups (SAMF Resp. 28), the record does not support the contention that such modifications were unusual, or a "deviation from" or "suspension of" Lipper's normal practices. (*Id.*) Nor is there

---

[10]     Plaintiffs' statement that HCA "controls preparation of the Lipper materials" because it requested that a comment "intentionally omitted" be removed from a report is a disturbing example of how Plaintiffs' have mischaracterized the record. In fact, HCA thought the "intentionally omitted" note in the

any question about the Board's active involvement in the process, as the Board's lead independent trustee participated at every important step. (*Id.*)

Moreover, Plaintiffs clearly misapprehend the effect of the modifications to the Lipper peer comparisons that they criticize. In suggesting that HCA altered the Lipper peer groups in order to make it appear that its fees were comparatively lower, Plaintiffs claim that HCA requested the inclusion of retail shares (which have higher fees) in the peer groupings so as to make HCA's fees look *lower* in comparison. (Resp. at 27) In reality, it was *Lipper* that classified the Funds' institutional share classes as retail (as opposed to institutional), and it was *HCA* that requested that the Funds be compared to *both* institutional and retail share classes, which had the overall effect of making HCA's fees look *higher* in comparison to its peers. (SAMF Resp. 28) Similarly, Plaintiffs' contention that HCA manipulates HIF's peer groups by combining two classifications (international large-cap growth ("ILCG") and international large-cap core ("ILCC")), rather than comparing only to Lipper's default classification of ILCG, is misinformed. (*Id.*)[11]

Plaintiffs' next argument, that the fees of HIF and HHYBF exceed the Morningstar averages (Resp. at 29), shows Plaintiffs' duplicity at its most troubling. HCA provided the Court with comparative fee data directly from the Morningstar website showing that the fees of HIF and HHYBF are well below the median in the two Morningstar categories *in which Morningstar*

---

Lipper report was an error and inquired about it as part of its proofread of the report. (See SAMF Resp. 28)

[11]    First, while Lipper classifies HIF as an ILCG fund based on an analysis of the fund's holdings relative to an index (Mueller Decl. Exhibit 70 at HCA0023121-HCA0023122, HCA0023132; Dixon Decl. Ex. E (Kolinski Dep.) at 447-448), HIF holds itself out to the public as an ILCC fund. (Dixon Decl. Ex. E (Kolinski Dep.) at 450) HCA has a separate Harbor International Growth Fund. Second, because there were only 12 funds in the ILCC classification (Dixon Decl. E (Kolinski Dep.) at 8-19), HCA requested a comparison combining ILCG and ILCC classifications. (SAMF Resp. 28) Lipper routinely combines groups where there is an insufficient number of comparable funds to create a statistically

*itself places the Funds*. (SMF 48) Ignoring Morningstar's own categorization of the Funds, Plaintiffs cite a Morningstar 2015 Fee Study supposedly showing that "the average fee for all institutional share classes was .54% in 2014." (Resp. at 30; Dixon Decl. Ex. DDDD (Fee Study) at 5) As Plaintiffs' counsel knows (because it is explained in the Fee Study and was further explained in the deposition in which this document was marked as an exhibit), this .54% figure includes *all types of funds*, including passively and actively managed funds (passive funds include low cost exchange traded funds, or ETFs, and index funds), equity and fixed income, domestic and international, growth and value. (Dixon Decl. Ex. DDDD (Fee Study) at 1-2) Indeed, the point of the Fee Study was to show that investors are paying less for fund management because of the competitive pressure of lower cost products. (*Id.* at 1) ("Fund investors are increasingly buying passive funds and investing in lower-cost actively managed funds.") Having complained about Lipper comparing HIF to both ILCG and ILCC funds, as well as about the use of the total expense ratio to compare funds, it is astonishing that Plaintiffs would then argue that HIF's fees exceed a .54% *total expense ratio* figure for *all types of funds*, making no effort whatsoever to determine whether such funds are comparable. *See Jones,* 611 Fed. App'x at 361 (holding that the relevant consideration was whether the evidence shows that the funds at issue "did as well as, if not better than, *comparable* funds") (emphasis supplied). In fact, the same Fee Study reports an asset-weighted average expense ratio for international equity funds (including low-cost passively managed funds) of .77% which is *higher* than the .729% expense ratio of the *actively-managed* HIF. In other words, the expense ratio for HIF is low among international equity funds even when low cost passively managed funds are included.

---

significant peer group. (*Id.*) This combination also caused the peer group to include funds closer in size to HIF than would otherwise have been the case under Lipper's standard methodology. (*Id.*)

### B.    Performance

Plaintiffs do not dispute the excellent long-term performance of HIF.  They argue, however, that "these long-term performance figures have no bearing on the advisory fees charged to HIF *from February 2013 to the present* . . . ."  (Resp. at 18)  (emphasis supplied)  Without explanation, Plaintiffs appear to be arguing that the § 36(b) *damage* period, which reaches back just one year from the filing of the complaint, should be used to limit a court's evaluation of mutual fund *performance*.  *See* 15 U.S.C.A. § 80a-35(b)(3).  There is, however, no support in the ICA or the case law for such a limitation.

Courts have found, and it should be self-evident, that short-term investment returns cannot be relied upon as evidence of the "nature and quality" of services rendered because of the significant likelihood of an aberration due to market volatility.  *See Migdal,* 248 F. 3d at 327.  Indeed, this Court can take judicial notice of the volatility of short-term market performance.  *See City of Austin Police Retirement System v. Kinross Gold Corp*., 957 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2013) (noting that courts may take judicial notice of "widely-known . . . market-wide events").  Implicitly recognizing this, Plaintiffs suggest that recent short-term performance of HIF cannot be discounted because "there is a clear causal connection" between the purported short-term underperformance of HIF and the death of Haken Castegren, one member of the team from Northern Cross that made the day-to-day portfolio decisions for HIF prior to his death in 2010.  (Resp. at 19 n.18)  This is nonsense.  Plaintiffs cite no evidence whatsoever of this supposed "causal connection." [12]

---

[12]    HIF is a low turnover fund (Dixon Decl. Ex. VV at HCA0141345), meaning that investment decisions made prior to Mr. Castegren's death still affect the performance over the last several years. Further, Mr. Castegren was not the only Northern Cross portfolio manager.  He was part of a team of portfolio managers for HIF for years before his death.  (*See id.* at HCA0141362).

The performance numbers from Lipper cannot be disputed. While Plaintiffs feign surprise that those figures "inexplicably exclude the impact of the Fund's performance in calendar year 2015" (Resp. at 19), Plaintiffs know that the last Board meeting covered by the discovery period and for which materials were produced in this litigation was the February 2015 meeting, and the Lipper performance reports from that meeting ran through calendar year 2014. Plaintiffs looked outside the discovery period to support their argument that HIF may have slightly underperformed its benchmark for the most recent 5-year period ended December 31, 2015. (SAMF 11) But even if HIF's performance for the most recent 5-year period is close to the benchmark, or slightly under, it is certainly close enough that it still performed "as well as" comparable funds. *Jones II*, 611 Fed. App'x at 361. Section 36(b) requires that the relationship between an advisory fee and the services rendered not be so disproportionate that it could not have been the product of arm's-length bargaining. It does not require superior performance every year. When a full view of the Funds' investment performance is considered, there is no basis for an argument that HCA's services have been so deficient that the fee charged to HIF could not have been the product of arm's-length bargaining. (*Id.*; SMF 42-45)

## CONCLUSION

Summary judgment should be entered in favor of HCA and against Plaintiffs under Fed. R. Civ. P. 56 in that there are no genuine issues of material fact and HCA is entitled to judgment as a matter of law that the fees charged to the Funds do not violate § 36(b) of the ICA under the standards established by the courts in *Jones*, *Jones II* and *Gartenberg*.

Dated: November 14, 2016                           DEFENDANT HARBOR CAPITAL
                                                   ADVISORS, INC.


                                                   By:    /s/ Stephen J. O'Neil
                                                          One of its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on November 21, 2016, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to following counsels of record:

Norman Rifkind
LASKY & RIFKIND, LTD.
100 E. Huron Street #1306
Chicago, Illinois 60654

Stephen J. Oddo
Jenny L. Dixon
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, California 92101

Andrew W. Robertson
Susan Salvetti
Robin F. Zwerling
Jeffrey C. Zwerling
ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue
New York, New York 10010

Arnold C. Lakind
Robert L. Lakind
Daniel S. Sweetser
Christopher S. Myles
Mark A. Fisher
Robert G. Stevens
SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648

Marvin Alan Miller
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, Illinois 60603

    /s/ Stephen J. O'Neil